J48TALL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CARLETO ALLEN,

                    Plaintiff,

          v.                              16 CV 3403 (PGG)

JEREMIAH S. WILLIAMS, et al.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          April 8, 2019
                                          9:45 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                          District Judge

                         APPEARANCES

LAW OFFICES OF JOHN KNUDSEN
     Attorneys for Plaintiff
BY:   JOHN KNUDSEN

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants
BY:   ERIN RYAN
      NICHOLAS MANNINGHAM
      ELISSA JACOBS

```
1          (Case called, jury not present)
2          THE COURT:  At the final pretrial conference on
3   April 5th, the defendants objected to plaintiff presenting a
4   failure to intervene claim to the jury.  Plaintiff, for his
5   part, objected to defendants eliciting from Detective Williams
6   that certain unidentified "sources of information" had told him
7   that plaintiff carried a gun.
8          I directed the parties to brief the issues, and I will
9   address them now.
10          Beginning with the failure to intervene claim,
11   defendants argue that the complaint does not plead a failure to
12   intervene claim, and that it is too late for plaintiff to raise
13   this claim now.  Defendants assert that they proceeded through
14   discovery on the understanding that plaintiff was raising only
15   an excessive force claim, and that permitting plaintiff to
16   proceed on a failure to intervene claim would cause them to
17   suffer unfair prejudice.  (Docket No. 94)
18          I have reviewed the pro se complaint, and even
19   liberally construed, I find that it does not raise a failure to
20   intervene claim.  To the contrary, plaintiff identifies each
21   defendant by name and explicitly asserts that each defendant
22   was involved in assaulting him.  (Complaint, Docket No. 1, page
23   3)  Accordingly, the complaint asserts that each defendant used
24   excessive force in arresting plaintiff, and the complaint
25   cannot be read to assert a failure to intervene claim against
```

1    any defendant.

2         It also bears mention that while plaintiff filed the

3    complaint pro se, he has been represented by counsel for nearly

4    two years, and counsel never sought to amend the complaint to

5    add a failure to intervene claim.  To the contrary, when

6    defendants, in a premotion letter seeking permission to file a

7    summary judgment motion, asserted that "plaintiff only alleges

8    a claim for excessive force against all the individual

9    defendants," (*See* Defendant's October 15, 2018 letter (Docket

10   No. 70), page 2), plaintiff did not dispute that

11   representation, nor did he assert in any fashion that plaintiff

12   was raising a failure to intervene claim.  (*See* plaintiff's

13   Oct. 19, 2018 letter (Docket No. 72), pages 3 to 4).  Indeed,

14   in response to defendants' argument that Officer Sanchez was

15   not personally involved in the alleged assault, plaintiff did

16   not say that he was proceeding on a failure to intervene

17   theory.  Instead, he said that it was a jury question whether

18   Officer Sanchez was personally involved.  (*Id*. at page 4)

19        In the March 8, 2019 joint pretrial order, in the

20   section entitled Statement of Claims and Defenses, plaintiff

21   described his claims as follows:  "On January 9, 2015,

22   Mr. Allen's Fourth Amendment rights were violated when

23   defendants used excessive force on Mr. Allen."  (Docket No. 80

24   at page 2)  This statement does not so much as hint that

25   plaintiff intends to raise a failure to intervene claim.  And

J48TALL1

1    when I asked plaintiff's counsel at the April 5th conference

2    why he didn't list the failure to intervene claim in response

3    to that question, there was no cogent response.

4            Despite this multitude of failures, however, it was

5    obvious to defendants, at least as of March 8, 2019, that

6    plaintiff intended to assert a failure to intervene claim,

7    because plaintiff's requests to charge and proposed verdict

8    sheet include such a claim.  (Proposed jury instructions

9    (Docket No. 78), page 20; the proposed verdict sheet (Docket

10    Number 81) page 2)  And defendants did not miss the reference.

11    In each document, defendants objected in a footnote stating

12    that the failure to intervene claim was not pled in the

13    complaint and had never been asserted as a cause of action at

14    any point during the litigation.  (*Id.*, page 20, note 10,

15    proposed verdict sheet (Docket No. 81) at 2, n.2)

16            Although plaintiff did not raise his failure to

17    intervene claim until a month before trial, Federal Rule of

18    Civil Procedure 15 allows amendments before, during, and even

19    after trial.  For amendments before trial, Federal Rule of

20    Civil Procedure 15(a)(2) provides:  "The court should freely

21    give leave when justice so requires."  As to amendments during

22    and after trial, Federal Rule of Civil Procedure 15(b)(1)

23    states, and I quote, "If, at trial, a party objects that

24    evidence is not within the issues raised in the pleadings, the

25    court may permit the pleadings to be amended.  The court should

J48TALL1

1    freely permit an amendment when doing so will aid in presenting
2    the merits and the objecting party fails to satisfy the court
3    that the evidence would prejudice that party's action or
4    defense on the merits."

5        Accordingly, the principal inquiry at this point is
6    whether defendants have been prejudiced by plaintiff's late
7    raising of a failure to intervene claim and whether the
8    evidence would support a failure to intervene claim.  As to the
9    former point, the defendants complain that, one, they would
10   have moved for summary judgment on the failure to intervene
11   claim, and two, they would have asked additional questions of
12   plaintiff at his deposition if they had understood him to be
13   raising a failure to intervene claim.

14       To prevail on a failure to intervene claim, "a
15   plaintiff must show (i) the officer's failure 'permitted fellow
16   officers to violate [plaintiff's] clearly established statutory
17   or constitutional rights,' and (ii) it was objectively
18   unreasonable for him to believe that his fellow officers'
19   conduct did not violate those rights."  *Buchy v. City of White
20   Plains*, 2015 WL 8207492, at *3 (S.D.N.Y. December 7, 2015).

21       Defendants did not file a summary judgment motion
22   after this Court pointed out the stark factual disputes between
23   the two sides as to what happened at the time of plaintiff's
24   arrest.  (Dec. 7, 2018 Conf. Tr.; Def. Dec. 14, 2018 Ltr.
25   (Docket No. 76))  The factual disputes apparent with respect to

plaintiff's excessive force claim apply to the same extent with

respect to a failure to intervene claim. *See, e.g.*, *Stephanski*

*v. Arnone*, 2008 WL 413301, at *9 (W.D.N.Y. Feb. 13, 2008)

("The existence of a material issue of genuine fact as to

whether the plaintiff was subjected to excessive force in being

removed from his cell on February 28, 2004, however, also

precludes summary judgment in defendant's favor on the failure

to intervene claim because Defendant Arnone was present and

thus aware of any need to intervene.")

As for defendants' arguments that they would have

asked plaintiff more questions at his deposition if they had

understood him to be making a failure to intervene claim, they

do not explain what additional questions they would have asked.

Nor have defendants submitted the deposition transcript for

this Court's review.  Given the failure to explain in any

fashion what additional questions defendants would have asked

if they had known that plaintiff was raising a failure to

intervene claim, I find that defendants have not demonstrated

unfair prejudice related to either discovery or motion

practice.  *See, e.g., Hernandez v. Goord*, 2014 U.S. Dist. LEXIS

113720 at *6 (S.D.N.Y Aug. 14, 2014) ("'In opposing a Rule

15(b) amendment, a party cannot normally show that it suffered

prejudice simply because of a change in its opponent's legal

theory.  Instead, a party's failure to plead an issue it later

presented must have disadvantaged its opponent in presenting

J48TALL1

its case.'" (*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d

Cir. 2000))); also *Reese v. NBC*, 1982 U.S. Dist. LEXIS 13383,

at *14 (S.D.N.Y., May 18, 1982) ("'Rule 15(b) requires the

party opposing the amendment be seriously prejudiced in the

presentation of his action or defense on the merits. Absent a

showing of his character, the court should grant leave to amend

and allow evidence on the newly raised issue to be

introduced.'" *See also*, *Eriksson v. Galvin*, 484 F.Supp. 1108,

1120 (S.D.N.Y. 1980) ("The important question in a motion under

Rule 15(b) is whether the defendant would be prejudiced by the

implied amendment."

As for whether permitting the claim will aid in

presenting the merits, it is unclear at this stage whether the

evidence at trial will support a failure to intervene claim.

As I have noted, to prevail on a failure to intervene

claim "a plaintiff must show (i) the officer's failure

'permitted fellow officers to violate [plaintiff's] clearly

established statutory or constitutional rights,' and (ii) it

was 'objectively unreasonable for him to believe that his

fellow officers' conduct did not violate those rights.'"

*Buchy*, 2015 WL 8207492, at *3. Plaintiff would have to prove

that the defendant was "present during the assault, and failed

to intercede on behalf of the victim even though he had the

reasonable opportunity to do so." *Medina v. Donaldson*, 2014

U.S. Dist. LEXIS 33723, at *19 (E.D.N.Y. Mar. 14, 2014).

1          While a defendant "may not be held liable both for

2     using excessive force and for failing to prevent the use of

3     excessive force," "excessive force and failure to intervene

4     claims [may] proceed in the alternative [at trial]." *Buchy*,

5     2015 Westlaw 8207492, at *3, (citing *Cumberbatch v. Port Auth.*

6     *of N.Y. & N.J.*, 2006 WL 3453670, at *11 (S.D.N.Y. December 5,

7     2006 ("The Court will thus construe the claims as pleading in

8     the alternative, that is, the officers either used excessive

9     force or one or both of them failed to intervene while another

10    officer used excessive force.").

11         Here, as I said, it is not clear whether the evidence

12    will support a failure to intervene claim.  The account

13    plaintiff set forth in the complaint does not provide a basis

14    for such a claim because, as I have said, the plaintiff claimed

15    at that time that each defendant had personally assaulted him.

16    Whether, based on plaintiff's trial testimony, a reasonable

17    juror could find that one or more of the defendants observed

18    the alleged beating and did not intervene is unknown.  I will,

19    of course, only charge the jury as to claims that are supported

20    by the evidence and that conform to plaintiff's theory at

21    trial.  *McCardle v. Haddad*, 131 F.3d 43, 52 (2d Cir. 1997) ("A

22    party is not entitled to have the court give the jury an

23    instruction for which there is no factual predicate in the

24    trial record."); also, *Kelber v. Joint Indus. Bd. of Elec.*

25    *Indus.*, 27 F.3d 42, 47 (2d Cir. 1994) ("A plaintiff's claims

J48TALL1

and theories of law, if supported by the evidence and brought

to the attention of the trial court, should be given to the

jury"); *also, Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.

1994) ("A litigant is entitled to an instruction on a claim

where that claim is supported by evidence of probative

value."); finally, *Santos v. Fedcap Rehab Services*, 2003 U.S.

Dist. LEXIS 989, at *11 (S.D.N.Y. Jan. 23, 2003 ("When there is

no factual predicate for a proposed instruction, a party is not

entitled to it.").

Accordingly, I will reserve decision as to whether a

failure to intervene claim will be presented to the jury.

Turning to the question of the admissibility of

Detective Williams' proposed testimony about "sources of

information," earlier in this litigation there was a dispute

about whether defendants would be able to rely on information

Detective Williams received from a confidential informant

concerning plaintiff.  Defendants asserted that a confidential

informant had informed Detective Williams of plaintiff's

location on January 9, 2015, and had stated that plaintiff had

a gun.  Defendants ultimately "agreed not to rely on the

informant's tip in their case going forward." (Def. Dec. 14,

2018 Ltr. (Docket No. 76)  At the final pretrial conference,

however, defendants disclosed that they planned to elicit from

Detective Williams that other "sources of information,"

separate and apart from the confidential informant, had told

J48TALL1

him the that plaintiff had a gun.  Plaintiff objected to such

testimony at the final pretrial conference, stating that during

discovery defendants had never disclosed these other sources of

information.  I directed the parties to brief the issue and

submit Detective Williams' deposition testimony concerning this

point.

During his deposition, Detective Williams testified

that he had reason to believe, prior to plaintiff's arrest,

that he would be armed.  Detective Williams testified at

several points that the source for his information on this

point was (1) Mount Vernon police, who had obtained a warrant

for plaintiff's arrest for armed robbery; and (2) a

confidential informant who had been arrested by officers of the

47 Precinct.

Detective Williams' testimony on this point included

the following:

"Q.  Who had prior knowledge that [Mr. Allen] had a firearm?

"A.  A prisoner that was arrested had knowledge of Carleto

Allen.

"Q.  So another individual who was arrested in the 47th

[precinct] indicated that Mr. Allen had a firearm?

"A.  An illegal firearm, yes.

"Q.  Okay.  Who was that arrestee that indicated that Mr. Allen

had a firearm?

"A.  CI."

J48TALL1

1          (Williams dep. (Def. Ex. A)(Docket No. 94-1) at 38-39)

2          At a later point in the deposition Detective Williams

3   addressed this matter again:

4   "Q.  Well, you've indicated that you had information that

5   Mr. Allen had a firearm or -- yes, had a firearm, and that was,

6   you had that knowledge at the time you arrested Mr. Allen.  And

7   I'm asking:  Who told you that information?

8   "A.  That would be, we didn't use the word CI back then, we can

9   use SOI, which is a source of information, as well as Mount

10  Vernon indicated that he was, when we saw the video of Carleto

11  Allen, it appeared to be Carleto Allen doing the robbery with a

12  firearm.

13  "Q.  Okay, so I'm clear:  So the information that you had --

14  strike that.

15          What was the basis of the information you had that

16  Mr. Allen may have had a firearm at the time on January 9,

17  2014?"

18          Let me break from the deposition for a moment to say

19  that's an obvious error, it's January 9, 2015.

20          In any event, in answer to the question, "What was

21  basis of the information that you had that Mr. Allen may have

22  had a firearm at the time," the answer was, "A CI."

23          (*Id*. at pages 40 to 41)

24          And still later in the deposition Detective Williams

25  repeated that his basis for believing that plaintiff would be

armed was the warrant from Mount Vernon police and information

obtained from a confidential informant.

"Q.  So there were at least two bases to believe Mr. Allen had

a firearm; one would be the Mount Vernon claim, and then

another individual who had been arrested had indicated the same

thing?

"A.  Right."

          (*Id*. at page 41)

          After testifying three times about these two bases for

believing that plaintiff would have a gun, however, Detective

Williams suggested that there might be another source of

information.

"Q.  The CI had given information to someone at the 47th prior

to January 9, 2015 that Mr. Allen had a gun?

"A.  That particular day it was a CI.  Prior to us arresting

Carleto Allen on that day, we had a Mount Vernon and also an

SOI, which is a source of information, not a confidential

informant.  A source of information is someone just giving you

information that is not signed up."

          (*Id*. at page 42)

          Apparently plaintiff's counsel did not ask additional

questions about the alleged source of information that

Detective Williams mentioned the fourth time that he addressed

this issue at his deposition.

          Now defendants claim that Detective Williams should be

J48TALL1

permitted to testify about multiple unidentified "sources of

information" who allegedly told him that plaintiff had a gun.

Detective Williams, of course, never suggested at his

deposition, at least in the excerpts that have been shared with

me, that there were multiple "sources of information" separate

and apart from the Mount Vernon police and the confidential

informant who had told him that plaintiff might have a gun.

        Separate and apart from the issue of whether

defendants should be allowed to introduce the notion of such

multiple sources of information at trial, sources not discussed

or disclosed in any fashion at Detective Williams' deposition,

is that even now on the eve of trial defendants have not

provided any information as to these alleged "sources of

information."  In their April 6, 2019 letter asking the Court

to admit such testimony from Detective Williams, defendants do

not disclose who these people are who provided the information

to Detective Williams, when they provided this information, the

circumstances under which the information was provided, or

whether or not there was reason to believe that the information

that these alleged multiple sources of information provided was

reliable.  Indeed, the only additional information defendants

provide in their April 6, 2019 letter concerning the alleged

multiple sources of information is that Detective Williams did

not document the information he received from these alleged

sources of information in any fashion. (Def. Apr. 6, 2019 Ltr.

J48TALL1

1    (Docket No. 94) at 5)

2              I am excluding any references to these alleged

3    multiple sources of information under Federal Rule of Evidence

4    403.  The absence of any detail concerning these alleged

5    statements made to Detective Williams, his failure to mention

6    these sources the first three times he was questioned about the

7    issue at his deposition, and the fact that the one alleged

8    source of information mentioned in passing by Detective

9    Williams at his deposition has now grown to multiple sources of

10   information persuade me that there is not an adequate

11   foundation to admit evidence of these statements from

12   unidentified people made at an unknown time under unknown

13   circumstances.  I conclude that the probative value of these

14   statements under the circumstances is far outweighed by the

15   risk of unfair prejudice to plaintiff.  Because of the absence

16   of any detail concerning these alleged statements made to

17   Detective Williams, cross-examination on this point would be

18   impossible.  Accordingly, statements from alleged "sources of

19   information" is excluded under Rule 403.

20             All right.  Are we prepared to proceed?

21             MR. KNUDSEN:  I had a couple supplemental issues or

22   two clarifications of your rulings on Friday.  One pertains to

23   Mount Vernon where you said they were allowed to discuss the

24   fact that they had information from Mount Vernon about

25   Mr. Allen potentially having a gun.

J48TALL1

1          THE COURT:  Well, that he was wanted for armed

2     robbery, right?

3          MR. KNUDSEN:  Okay, right.  And I think that should be

4     the end of it.  They shouldn't be able to come in and say the

5     bit about the video, for example, that they saw a video.  The

6     purpose is state of mind, not anything else.  That's their

7     presentation.  They could say we thought he had a gun,

8     potentially, because of what we learned from Mount Vernon, not

9     anything else, which you would be just prejudicial, I think.

10          THE COURT:  Were the defendants planning on showing a

11     video of some sort?

12          MS. RYAN:  No, your Honor.  I believe Mr. Knudsen is

13     referring to if the officers say that at the time they had seen

14     a video, if I'm understanding counsel's argument correctly.

15          MR. KNUDSEN:  That's correct, yes.  I think it should

16     be -- they're allowed to talk about background, that goes to

17     their state of mind, but it shouldn't be compiled with how they

18     learned it, like whether there's a wanted poster or a video or

19     whatever, which is unnecessary, and it would be hearsay in any

20     event.

21          MS. RYAN:  Your Honor, if I may, to the extent this

22     goes to their state of mind, it's not that they just got a

23     phone call from some officer in Mount Vernon.  If they saw

24     wanted fliers, if they saw a video of the crime --

25          THE COURT:  What's the evidence going to be?  We don't

J48TALL1

```
 1    need to speak in the hypothetical, you know what the evidence
 2    will be, so tell me what you want to elicit.
 3            MS. RYAN:  That Detective Williams did receive -- was
 4    in contact with Mount Vernon, and many of the officers saw
 5    wanted posters of plaintiff that were posted in the precinct at
 6    the time of plaintiff's arrest.
 7            THE COURT:  Well, when you say "many," is Detective
 8    Williams going to say that he saw a wanted poster for
 9    Mr. Allen?  Who exactly is going to say that?
10            MS. RYAN:  I know Brandon Ravelo, Detective Williams,
11    and possibly Sergeant Sanchez.
12            THE COURT:  What would the testimony be about the
13    wanted poster?
14            MS. RYAN:  They had seen a wanted poster that
15    plaintiff was wanted for an armed robbery, that he should be
16    considered armed and dangerous.  And it also had plaintiff's
17    address, which is the location where the officers ended up
18    encountering plaintiff on that day.
19            THE COURT:  Did this come out in discovery?
20            MR. KNUDSEN:  In depositions they testified that --
21    one testified that they had seen the video, they were unclear
22    whether there was a warrant out or not, and then one said that
23    they had seen a wanted poster.
24            Again, all of this would only go to state of mind when
25    approaching the car and not to any other issue.  And it seems
```

J48TALL1

1  to be any reference to extraneous material to basically

2  substantiate their state of mind is unnecessary.  That was

3  similar to cases I had cited in my brief on Saturday regarding

4  the sources of information.

5       THE COURT:  I will allow testimony about seeing the

6  wanted poster.  First of all, it seems like it came out in

7  discovery, so it's not coming as a surprise.  Secondly, I think

8  it's fair to allow defendants to put in additional evidence on

9  this point other than simply they were told, if in fact they

10  saw a wanted poster stating that the defendant was expected to

11  be armed and/or that the suspect was expected to be armed and

12  listed the address, I think that's relevant to their state of

13  mind.

14       So I don't want any reference to video, because I

15  don't think that really adds anything, but I will allow

16  testimony about the wanted poster.  If that was observed by one

17  or more of the defendants, they will be allowed to testify

18  about it.

19       MR. KNUDSEN:  Thank you, your Honor.  I had a question

20  about the -- you allowed in questioning of Mr. Allen about his

21  federal criminal conviction.

22       THE COURT:  Yes.

23       MR. KNUDSEN:  And there's two points.  One is in your

24  discussion on Friday you indicated 72 months, and in

25  defendants' submission on the issue they said eight years, and

J48TALL1

```
 1    the order is actually 72 months.  So I don't want them to say

 2    eight years when it's actually 72 months.

 3              MS. RYAN:  Your Honor, if I may, I looked at the

 4    docket this morning on this point.  It's actually 96 months,

 5    because he received 36 months on the first three charges

 6    running concurrently, and then an additional five years on the

 7    firearms charge to run consecutive, for a total of eight years.

 8              THE COURT:  It's actually not.  The judgment and

 9    conviction controls.  Do you have the judgment and conviction?

10              MR. KNUDSEN:  I have the order from Judge Nathan

11    indicating Mr. Allen was sentenced to a term of 72 months

12    imprisonment.

13              THE COURT:  What controls is something called a

14    judgment.

15              MR. KNUDSEN:  I have the judgment as well.

16              THE COURT:  And if you look at the judgment and

17    conviction, it says quite clearly that the sentence is 72

18    months, so that is what will control.

19              MR. KNUDSEN:  Then the other issue is the date of

20    conviction for the federal, which is what you allowed in.

21    There will be testimony about Mr. Allen and Officer Williams

22    testifying in the federal trial.

23              THE COURT:  Sorry, there's going to be testimony about

24    their testimony in the federal trial, is that what you said?

25              MR. KNUDSEN:  Yes, it's prior statements that were
```

J48TALL1

1    made.  Now if you say the date of conviction is November 13,

2    and Mr. Allen, you testified on November 9, I think the jury

3    may actually connect those two, which I don't think was

4    intentional.  So I would request permission that the date of

5    conviction for the federal conviction not be allowed in

6    because --

7         THE COURT:  Well, I don't know if this helps you, but

8    the date of conviction would be the date the judgment and

9    conviction was signed.  So I don't happen to know off the top

10   of my head what the date was that the judgment of conviction

11   was signed by the judge, but you seem to be suggesting that the

12   conviction date in your mind is the day that the jury came in

13   with a guilty verdict.  Is that what you're suggesting?

14        MR. KNUDSEN:  I was, incorrectly, as you point out.  I

15   don't think -- I'm not sure the date -- well, I guess maybe --

16   the date on the judgment is June 20, 2018, the testimony is in

17   November 2017, so I guess --

18        THE COURT:  As a federal matter -- I don't know how it

19   works in state court, but as a federal matter a conviction

20   occurs at the time sentence is imposed and a judgment of

21   conviction is entered.  So whatever date is on the judgment of

22   conviction in the case before Judge Nathan, that's the date

23   that the parties should be talking about.

24        MR. KNUDSEN:  Yeah, my concern was that the jury may

25   tie it, but given the length of time, I don't see that as

J48TALL1

1    potentially that big an issue anymore.

2            I have one issue that I want to raise now before the

3    openings, and it's about a statement that Mr. Allen made in his

4    plea allocution.  And the parties already stipulated that he

5    allocuted and pled guilty to attempted possession of a weapon.

6    I'm not sure if this issue has been discussed before your

7    Honor, but during the allocution the judge asked the wrong

8    question.

9            THE COURT:  Asked what?

10           MR. KNUDSEN:  A wrong question.  The judge asked

11   Mr. Allen:  Isn't it true you possessed a weapon on that day?

12   And Mr. Allen said yes.  And then the judge, two sentences

13   later, says:  Oops, I mean did you attempt to possess a weapon?

14   And he says yes.

15           So I am asking that the statement -- the incorrect

16   statement be excluded as unduly prejudicial and misleading,

17   because most admissions are -- there's some sort of spontaneity

18   to them or something along these lines.  Mr. Allen is in a

19   situation where he's expected to answer questions to someone of

20   authority like a judge, and he has -- there's three attorneys

21   in the room, he has his own attorney who says nothing at the

22   time, the other two attorneys say nothing at the time that

23   would indicate that the question is wrong, the only person who

24   actually fixes it is the judge when the judge realizes that she

25   has made an error.

J48TALL1

1          So this is not a situation typically where someone has

2     voluntarily given a statement that you would consider an

3     admission, here he is sitting there with all these legal people

4     in the room, he has no understanding -- he's expected to say

5     yes to these questions, and he doesn't understand that the

6     question is not the right question.  So he says yes, the judge

7     corrects it.

8          I think it's, first of all, misleading because of

9     that, and then I think it's unduly prejudicial because that's

10    basically they want to say he admitted in that allocution, that

11    he actually possessed the weapon at the time.  I think it's

12    unduly prejudicial, when no one says it, the attorneys who

13    should have probably objected at the time, and the DA should

14    have probably said something, that's the wrong question, none

15    of that happened.  And then the Supreme Court says unfair

16    prejudice is evidence that has an undue tending to support a

17    decision on an improper basis.  And I think that fits exactly

18    this category.  I don't want to admit it and I definitely -- I

19    assume they're going to say in the opening, and so I don't want

20    them to say it in the opening either.

21              THE COURT:  I need the transcript.

22              MS. RYAN:  Your Honor, it's in the defendant's exhibit

23    binder, Exhibit E.

24              THE COURT:  What page do you want to direct me to?

25              MS. RYAN:  Page 7, your Honor.

J48TALL1

1          THE COURT:  All right.  Ms. Ryan, do you want to

2     address the issue?

3          MS. RYAN:  Yes, your Honor.  We do not intend to

4     elicit the statement during opening statements, but we believe

5     it's proper questioning for cross-examination.  The plaintiff

6     was under oath when he's answering these questions and giving

7     these statements.  He also testified about this in his federal

8     trial.

9          THE COURT:  Sorry?

10          MS. RYAN:  He testified about this as well in his

11     federal testimony, and since it's a sworn prior statement of

12     Mr. Allen's, we should be able to question him on that.

13          THE COURT:  I agree.  The objection is overruled.

14          Anything else?

15          MR. KNUDSEN:  Not from me, your Honor.

16          THE COURT:  Ms. Ryan, are there other issues you want

17     to raise?

18          MS. RYAN:  Yes, your Honor, two quick things.  Under

19     your Honor's decision this morning, we want to state for the

20     record while your Honor is allowing an amendment before trial

21     under Rule 15, we would note that the statute of limitations

22     ran over a year ago, so this matter would be outside of that

23     statute of limitations.

24          Also your Honor mentioned that on the summary judgment

25     the disputed fact would have prevented any finding of summary

J48TALL1

1    judgment even if there had been a failure to intervene claim.

2    We would just note on summary judgment, the claims of excessive

3    force and failure to intervene would have different standards

4    that plaintiff would have had to prove.  There's nothing in the

5    record to show any of these officers had an opportunity to

6    actually intervene.  There's nothing in discovery about that.

7    And we believe we would have succeeded on that fashion in

8    summary judgment, as there's nothing plaintiff would have

9    pointed to that these officers observed, stood by, and had

10   actual time to step in.

11          THE COURT:  Mr. Knudsen, do you want to address the

12   point?  I assume that plaintiff testified in his deposition

13   that the four officers were all present when what happened

14   happened.

15          MR. KNUDSEN:  Well, he says -- we discussed it a

16   little bit on Friday.  Mr. Allen is face down on the street for

17   much of this interaction, he suffers a fractured hand, other

18   officers were there, so presumably one individual would have

19   fractured the hand, other people -- there were two officers

20   that admitted that they were holding Mr. Allen while that

21   happened, so one at least would have the opportunity to

22   intervene if he saw that another officer was using excessive

23   force in that type of situation.

24          The testimony by Mr. Allen is the other two defendants

25   were there as well.  He's not able to identify specifically --

J48TALL1

with a lot of specifics about who is exactly where for much of

the situation because he is taken out of the car and put face

down onto the street, so he can't see everything that is

happening to him.  So I think a jury would be allowed to infer

that we're fine, for example, that one officer would have had

the opportunity to intervene if someone was using such force

that would fracture his hand, and they would have an

opportunity to stop it since they were standing right there.

            THE COURT:  All right.  I continue to believe there

are issues of fact even as to the failure to intervene claim.

I mean most obviously if there was no excessive force then

there was no failure to intervene.  There is clearly a factual

dispute about whether there was excessive force, in light of

what Mr. Knudsen said, and it seems there is a basis for which

a jury could find that at least two of the officers were

present even though the plaintiff may not be in a position to

identify them.

            So I'm not persuaded that there was ever a meritorious

summary judgment motion as to either excessive force or failure

to intervene, and as I already said but it bears repeating, I

have not decided that a failure to intervene claim will go to

the jury.  I haven't made that decision.  It may well be that

no failure to intervene claim actually goes to the jury.

            But I need to hear the evidence, because at this point

it's a very confused record.  We have a complaint in which the

J48TALL1

plaintiff is very specific about what each officer did, very

specifically says that each officer assaulted him, and there's

nothing about I was laying face down, I couldn't see anything,

nothing about that at all.  So that's how the case started, and

it sounds like it's changed over time.  What the testimony is

going to be now, I really have no idea, but I have not made a

decision that a failure to intervene claim will be presented to

the jury.  I'm waiting to see what the evidence is going to be.

Anything else?

MR. MANNINGHAM:  One last thing, your Honor, just

about the gun.  The first thing is we wanted to use it in our

opening, and we're just wondering -- we want to bring it to the

Court's attention now to see if that would be allowed.

THE COURT:  This was the gun that was recovered on

January 9, 2015?

MR. MANNINGHAM:  Yes, that's correct.

THE COURT:  You may show it to the jury.

MR. MANNINGHAM:  Thank you, your Honor.

And the other issue with the gun is once we introduce

it into evidence through Detective Williams, we're not going to

hand it to the jury, but we are wondering if your Honor had a

preference for where we should set it in case they wanted to

examine it.

THE COURT:  Usually what happens is the prosecutor

will show it to the jury, they walk up and down the jury box.

J48TALL1

1    After that, I think it belongs on your table.

2              MR. MANNINGHAM:  Thank you, your Honor.

3              THE COURT:  Anything else?

4              MR. MANNINGHAM:  No, your Honor.

5              THE COURT:  All right.  So the panel is on their way.

6    Just to review, we will be qualifying 22 jurors, we will select

7    eight, each side will have three challenges, they will be

8    exercised simultaneously.  Any questions?

9              We'll resume as soon as the panel arrives.

10             (Recess taken)

11             (Voir dire proceedings conducted off the record)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J48TALL1

```
 1              (Jury panel not present)

 2              THE COURT:  Do we have our list?

 3              MS. RYAN:  Yes, your Honor.

 4              THE COURT:  All right, the plaintiff has excused juror

 5    number seven, Mr. Grasso, juror number ten, Ms. Scanlon, and

 6    juror number eleven, Mr. Pasquier.

 7              The defendants have excused juror number five,

 8    Ms. Perez, juror number eight, Mr. Gennett, juror number

 9    eleven, Mr. Pasquier.  So he was excused by both sides.

10              All right.  So Mr. Ruocco, could you tell us now who

11    are the eight that have survived the process?

12              DEPUTY CLERK:  Juror number one will be John Chan,

13    juror two will be Faith Bowen, juror three will be Frank

14    Caputo, juror number four will be Christopher Andrianos, juror

15    five will be Angela Ginty, juror six will be Ivette Agosto,

16    juror number seven will be Kelly Bit, and juror number eight

17    will be Barbara Welsh.

18              THE COURT:  Does either side have any objections to

19    the procedures that were used to select the jury in the case?

20              MR. KNUDSEN:  We do not.

21              MS. RYAN:  No, your Honor.

22              THE COURT:  Okay.  Then Mr. Ruocco, I ask you to

23    please bring in the panel.

24              DEPUTY CLERK:  Yes, your Honor.

25              (Jury panel present)
```

J48TALL1

1          THE COURT:  Mr. Ruocco, would you please read the

2    names of those selected as a juror.

3          DEPUTY CLERK:  John Chan, Faith Bowen, Frank Caputo,

4    juror four will be Christopher Andrianos, juror five will be

5    Angela Ginty, juror six will be Ivette Agosto, juror seven will

6    be Kelly Bit, and juror eight will be Barbara Welsh.

7          THE COURT:  Ladies and gentlemen, if your name was not

8    called, I thank you very much for your service.  Mr. Ruocco

9    will give you the jury cards and direct you back to the jury

10   assembly room.  Thank you very much.  I appreciate your time.

11         Please swear the jury.

12         (Jury sworn)

13         THE COURT:  Ladies and gentlemen, you are now a jury.

14   There is no higher function in our legal system.  From now on

15   whenever you enter or leave the courtroom as a jury, Mr. Ruocco

16   will instruct the parties and the audience to rise the same as

17   he does for me, because you are every bit as powerful and

18   important as any judge.

19         I want to reintroduce you to some of the people here

20   in the courtroom.  As I told you, my name is Paul Gardephe, and

21   I will be the judge presiding.  We are in Courtroom 705.  If

22   you happen to forget what courtroom we're in, just tell the

23   security people downstairs that you are on trial before me, and

24   they will be happy to direct you up here to the seventh floor.

25         You already met Mr. Allen and his lawyer, Mr. Knudsen,

J48TALL1

1    and you have met Detective Williams, Detective Ravelo, Sergeant

2    Sanchez and Officer Tass and their lawyers, Ms. Ryan,

3    Mr. Manningham, and Ms. Jacobs.

4         Mr. Ruocco, seated in front of me here, is my

5    courtroom deputy, and he's the person to speak with if you have

6    any questions or difficulties during the trial.  Terra Hittson,

7    seated at the table to my right, is my law clerk, and her job

8    is to help me research any legal issues that might come up

9    during the trial.

10         Let me tell you what our schedule will be.  I have a

11    few preliminary instructions that will take about ten minutes

12    or so, then I will excuse you for lunch.  When you come back

13    from lunch we'll hear opening statements and then well go right

14    into receiving testimony.  So that will be our schedule for

15    today.

16         So I have some preliminary instructions that I need to

17    give you before we break for lunch, and I will do that now.

18         Ladies and gentlemen of the jury, in the American

19    system of justice, as I told you, the judge and the jury have

20    separate roles.  My job, as I told you, is to instruct you as

21    to the law that governs or controls this case.  I will give you

22    some instructions now.  I may give you others during the trial

23    from time to time, and at the end of the trial I will give you

24    detailed instructions about the law you will need to apply when

25    you deliberate.

J48TALL1

1          Your job as jurors is to determine the facts, that is,

2     what happened based on the evidence that will be presented at

3     trial.  As I told you, you are the only triers of fact, and

4     your decisions on the factual issues will determine the outcome

5     of the case.

6          You must not take anything I may say or do during the

7     trial as indicating what your verdict should be.  Don't be

8     influenced by my taking notes.  What I write down may have

9     nothing to do with this trial or the factual issues that you

10    will have to resolve at the end of the trial.

11         You must pay close attention to all the evidence that

12    is presented.  The evidence consists, first, of testimony from

13    witnesses, also documents and other things that are admitted

14    into evidence.  And you will hear the lawyers say that they

15    offer an exhibit, and I will say, "Received."  At that point

16    evidence has been received and becomes available to you for

17    your consideration.

18         Sometimes the parties enter into what are called

19    stipulations, which are agreements as to certain facts.  Where

20    that happens you are to consider and accept the facts that the

21    lawyers have agreed to on behalf of their clients.

22         There is much that is not evidence and that you must

23    not consider as evidence.  For example, arguments by lawyers

24    are not evidence.  The lawyers will make arguments to you about

25    what they think the evidence will show or has shown, and

J48TALL1

arguments about how they think you should analyze the evidence.
You should give these arguments only as much weight as is
consistent with your own common sense, and you should under no
circumstances consider these arguments as evidence.

Any statement I may make to you is not evidence.

Questions by lawyers are also not evidence.  Only the
answers given by the witness are evidence.  The question that
the attorney asks is only important insofar as it places the
witness's answer in context.  For example, if a witness were
asked, "It was raining on June 2nd, wasn't it," and the witness
answered "No," then based on that question and answer, there's
no evidence in the case that it was raining on June 2nd.

Lawyers' objections to questions are also not
evidence.  Lawyers have an obligation to make an objection when
they believe that evidence being offered is improper under the
rules of evidence.  You shouldn't be influenced merely by the
making of an objection.  If I sustain the objection, you must
ignore the question and any answer that may have been given.
If I overrule the objection, you should treat the answer just
like any other.

Any testimony that I exclude or strike or tell you to
disregard is not evidence and you must not consider it.  If I
instruct you that some evidence is only to be considered for a
particular purpose, you must follow that instruction.  Anything
you may have seen or heard about the case outside the courtroom

J48TALL1

1    is not evidence and must be disregarded.  As I said, you must

2    decide the case based solely on the evidence that will be

3    presented here in this courtroom.

4         In deciding the facts of the case, you're going to

5    have to make decisions about the credibility of the witnesses,

6    that is, how truthful and believable they are.

7         How do you decide what to believe and what not to

8    believe?  You will listen carefully to witnesses, you will

9    watch them and observe them, and then decide as you would

10   decide such questions in your ordinary lives.  Did the witness

11   know what he or she was talking about?  Was the witness candid,

12   honest, open, and truthful, or did the witness appear to be

13   falsifying, exaggerating, or distorting what happened?  Is

14   there any reason to think the witness might be lying or just

15   plain mistaken about what he or she is telling you?

16        Sometimes it's not so much what a witness says but how

17   he or she says it that might give you a clue as to whether or

18   not to accept that witness' version of an incident or an event

19   as credible or believable.  In short, the way a witness

20   testifies may play an important part in your reaching a

21   judgment as to whether or not you can accept the witness's

22   testimony as reliable.  You need to use your common sense and

23   life experience in evaluating each witness's testimony.

24        As the trial proceeds, you may develop impressions of

25   a witness or impressions about a particular issue.  You must

J48TALL1

not allow these impressions to become fixed or hardened.  In
other words, you can't make up your mind right away.  If you
do, in a sense you prevent yourself from considering the
testimony of other witnesses or other evidence that may be
presented after the witness or witnesses you have heard.  This
would be unfair to one side or the other.

        A case can only be presented step by step, witness by
witness.  We know from experience that frequently one person's
initial description of an event might sound impressive, and
even compelling, but when we hear another person's version of
the same event, or even the same witness cross-examined about
the event, what seemed to be very compelling and impressive may
fall apart or become less convincing.

        Please remember that there may be another side to any
witness's story.  You will use your common sense and good
judgment to evaluate each witness's testimony based on all the
circumstances.

        You must keep an open mind until the trial is over.
You should not reach any conclusions until you have all the
evidence before you.

        You may take notes during the trial, if you wish.  If
you do take notes, be sure that your note taking doesn't
interfere with listening to and considering all the evidence.
Your notes are to be used solely to assist you and are not to
substitute for your recollection of the evidence in the case.

J48TALL1

Any notes that you may take are not evidence.  And the fact
that a juror has taken notes entitles that juror's views to no
greater weight than those of any other juror.  And your notes
are not to be shown to any other juror during your
deliberations.

         If, during your deliberations, you have a doubt as to
any of the testimony, you can request that portions of the
trial transcript be read back to you.

         Lastly, if you do take notes, you must leave your
notes in the jury room at the end of each day.

         In order to ensure that you decide the case based
solely on the evidence and that you not be influenced in any
way by anything that might occur outside the courtroom, I must
give you the following instructions:

         First, don't discuss the case amongst yourselves or
with anyone else, including members of your family or your
friends.  You may tell your friends and family that you are a
juror in a case, but don't tell them anything else until you
have you have been discharged at the conclusion of the case.

         If you normally communicate with your friends or
family electronically, for example, through email or text
messages or on a blog or Facebook or Twitter or some other form
of social media, you should not mention anything about the case
by those means either.

         Also, you may discuss the case amongst yourselves only

J48TALL1

after all the evidence is in and the case has been given to you
to discuss and to decide in the jury room.  This rule is
important because experience has shown that when someone
expressions an opinion about a witness or some other aspect of
the case, that person begins to identify more strongly with
that opinion.  And since it is critically important that you
keep an open mind until you have heard all the evidence, you
should not discuss the case with anyone, including your fellow
jurors, or communicate about the case in any fashion until the
case is given to you at the end for you to reach your verdict.

It's also critically important that you don't read
anything in the print media, social media, in other internet
locations or anyplace else about this case.  Don't listen to or
watch any reporting about this case if it should be broadcast
on TV or the radio or someplace else.  Failing to follow this
rule would constitute a violation of your promise, oath, and
responsibility to decide this case based solely on the evidence
that will be presented here in this courtroom.

Also, don't let anyone speak to you about the case.
If you're approached by anyone to speak about it, tell them
that the judge has directed you not to do so.  If anyone seeks
to contact you or contacts you about the case, you must
immediately report that to me.

Don't do any research or any investigation on your own
about this case.  Don't look for information about the parties

J48TALL1

1    or anything else related to the case on the internet or use

2    Google or Yahoo or some other search engine to find information

3    about the parties or the case.  Don't go to visit anyplace you

4    may hear described during the trial.  Again, the point is that

5    your verdict must be based solely and exclusively on the

6    evidence that you will hear and see in this courtroom.

7            If anyone you know happens to come into the courtroom

8    during the trial, please let me know.  This is a public trial,

9    so that could happen.  But it's important that the jury not

10   hear from someone sitting in the courtroom what may have

11   happened in the courtroom while the jury was not present.  So

12   if you should see a friend or acquaintance come into the

13   courtroom, please send a note to me through Mr. Ruocco at your

14   earliest convenience.

15           Also, the attorneys, the parties, and the witnesses

16   are not supposed to talk to the jury outside the courtroom even

17   to say a friendly hello.  So if you happen to see the lawyers,

18   the parties, or the witnesses outside the courtroom, they will

19   not and should not speak to you.  Please don't take any

20   offense, they will only be acting properly.

21           The parties are entitled to have you render a verdict

22   in this case on the basis of your independent evaluation of the

23   evidence presented here in the courtroom.  Obviously, speaking

24   to others about the case or exposing yourself to information

25   concerning this case outside the courtroom would compromise

J48TALL1

your service and the duty of fairness that you owe to both

sides.

Finally, I will say a few words about our procedure.
The trial has three parts.  First, the lawyers have the
opportunity to make opening statements to you.  As I said,
these statements are not evidence.  The purpose of opening
statements is for the lawyers to give you a preview or a road
map of what they think the evidence will be.  Actual evidence,
however, only comes from the witnesses and the exhibits that
are received in evidence and through stipulations or agreements
as I have discussed.

Second, after the opening statements, you will hear
testimony from witnesses.  The plaintiff calls witnesses first.
Each witness will first give direct testimony and then he or
she may be cross-examined by the other side.  Sometimes there's
redirect testimony and recross examination.  Also exhibits and
stipulations or agreements as to certain facts may be received
in evidence.

After the plaintiff's case, the defendants may present
witnesses and other evidence.  Those witnesses will be examined
and cross-examined in the same fashion.  After the defendants
present evidence, it's possible the plaintiff may then present
some rebuttal to that evidence.

After all the evidence has been received, the lawyers
will have another opportunity to make closing arguments to you.

J48TALL1

1    They will review the evidence with you and make arguments as to

2    what conclusions they think you should or should not draw from

3    the evidence.  As I said, these arguments are not evidence, but

4    they may be helpful to you in reviewing the evidence during

5    your deliberations.

6         After these arguments or summations, as they are

7    called, I will give you detailed instructions as to the law

8    that applies and governs this case.  And as I said, you must

9    follow those instructions.  You will then go into the jury room

10   to deliberate and to discuss the evidence in order to decide

11   the facts, decide what happened, and render your verdict.

12        From time to time during the trial it might be

13   necessary for me to talk with the lawyers outside the hearing

14   of the jury either by having a conference up here at the bench

15   if the jury is present in the courtroom, or by calling a

16   recess.  The lawyers and I will do this as little as possible.

17   Please understand that while you are waiting, we are working.

18   The purpose of any conference outside your hearing is not to

19   keep relevant information from you, but rather for me to decide

20   procedural issues or how proposed evidence should be treated

21   under the rules of evidence.

22        Finally, in just a moment Mr. Ruocco is going to show

23   you to the jury room.  That's where you will report each

24   morning.  He will give you his telephone number where you can

25   reach him if there's an emergency of some sort, and he will ask

J48TALL1

1   you to give him a telephone number where you could be reached

2   in the evening.  Our trials days will begin at 9:30 and

3   generally end around 5:00.  We'll take a break at some point

4   around 12:30 or so for lunch, as well as a short recess in the

5   morning and a short recess in the afternoon.

6        If anyone needs a recess at any other time, just raise

7   your hand and we'll take a recess.  I do ask you to be on time

8   after breaks and in the morning, because if you are late, you

9   will be keeping everyone waiting.

10        So ladies and gentlemen, now the time is almost

11   quarter to one, we are going to break for lunch, so I will ask

12   you to return at quarter to two at which time we will hear the

13   opening statements and then begin to receive testimony.

14        So don't discuss the case, you haven't heard anything

15   yet, keep an open mind, you haven't heard anything yet, and

16   we'll look for you at quarter to two to begin with the opening

17   statements.

18        Thank you all very much.

19        (Jury not present)

20        THE COURT:  As I was reading through my preliminary

21   remarks, it did occur to me:  What are we going to do if

22   there's a note later that says we want to hear the testimony,

23   we want the testimony?  So what's the city's position on

24   ordering the transcripts?

25        All that I would say is if we don't have a transcript

J48TALL1

1    during deliberations and we receive a note saying we want to

2    hear the testimony of so-and-so, it's going to be difficult.

3            So anyway, Ms. Ryan, what --

4            MS. RYAN:  I defer.

5            THE COURT:  Ms. Jacobs, the ball has been handed to

6    you.

7            MS. JACOBS:  Your Honor, I can take it.  Our policy is

8    we don't order the transcript unless your Honor orders us to do

9    so.  It's a financial cost to us.  That is our policy.

10           THE COURT:  I understand that and I appreciate that,

11   and I'm sure it is a significant expense.  But I will tell you

12   in the last trial I did -- that was admittedly a criminal trial

13   that was quite a longer trial than this would be -- we got a

14   request for the testimony of about four or five witnesses.  Of

15   course, I have no idea whether there will be a request of such

16   sort here, but I do wonder how, practically speaking, we could

17   satisfy the jurors' request if we don't have a transcript.  So

18   I'm concerned about it, and based on what you told me, I direct

19   that you pay for the transcript.

20           MS. JACOBS:  Yes, your Honor.

21           THE COURT:  Anything anyone wants to raise before we

22   break for lunch?

23           MR. KNUDSEN:  Not from plaintiff, your Honor.

24           MS. RYAN:  Not from defendants.

25           THE COURT:  We'll resume at quarter to two.  Thank

J48TALL1

1    you.

2              MR. MANNINGHAM:    Thank you.

3              (Luncheon recess taken)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J488ALL2                              Opening – Mr. Knudsen

1                          AFTERNOON SESSION

2                              1:50 p.m.

3          THE COURT:  Are you prepared for opening statements?

4          MR. KNUDSEN:  Yes, your Honor.

5          THE COURT:  Please bring in the jury.

6          (Jury present)

7          THE COURT:  Ladies and gentlemen, we will now hear the

8    plaintiff's opening statement.

9          Mr. Knudsen.

10         MR. KNUDSEN:  Thank you, your Honor.

11         On January 9, 2015, Mr. Carleto Allen was doing

12   something he should not have been doing.  It was a winter

13   morning and he walked outside the house in the Bronx where he

14   lived and got into a parked car with a brother of a friend.  In

15   that car, Mr. Allen and this other individual were smoking

16   marijuana.

17         This was observed by officers from the New York City

18   Police Department.  At least two cars of NYPD officers stopped.

19   Mr. Allen was sitting in the passenger front seat of the car.

20   At least two of the defendants here, Officer Williams and

21   Officer Ravelo, got out of their unmarked police car and

22   approached the passenger side door.

23         Officer Williams opened the passenger door and took

24   the lit marijuana cigarette out of Mr. Allen's hand.  Mr. Allen

25   was then forcefully removed from the car and thrown to the

J488ALL2                        Opening – Mr. Knudsen

1   street to be arrested.  During this altercation with the

2   defendants, force was used on Mr. Allen and Mr. Allen suffered

3   injuries, including a fracture in his left hand.

4           Today, more than four years after the incident, in

5   January 2015, there is no explanation as to how Mr. Allen

6   suffered that hand fracture.  And all of what I have just told

7   you is not in dispute.

8           Good afternoon.  My name is John Knudsen and this is

9   Mr. Carleto Allen.  We are here to decide whether Mr. Carleto

10  Allen's constitutional rights were violated by the defendants

11  on January 9, 2015 during that arrest.

12          While that is a summary of the case, there are facts

13  in dispute, and the case has a bit more going on.

14          Officer Williams claims that when he opened the door

15  to the car, he saw that Mr. Allen had a gun.  Specifically,

16  Officer Williams claims that Mr. Allen had a gun in a pocket in

17  his jacket and that he reached for the gun.

18          The defense will also argue that prior to this arrest,

19  they had learned that Mr. Allen was wanted for questioning by

20  the police in Mount Vernon, which is a town just north of New

21  York City, for robbery with a gun.

22          Now, Mr. Allen denies that he had a gun on his person.

23  Instead, Mr. Allen says that there was a gun in the back seat

24  of the car.  Mr. Allen will testify that the other individual

25  in the car was the brother of a friend, but he did not really

J488ALL2                         Opening - Mr. Knudsen

1    know or spend time with that individual.  Mr. Allen will

2    testify that this other individual offered to sell him the gun,

3    and when Mr. Allen turned him down, the other individual put

4    the gun in the back seat.

5           So after Mr. Allen was forcefully removed from the

6    car, he was thrown on to the street.  At that time, the

7    defendants were using force on Mr. Allen, including punching

8    Mr. Allen.  The defendants will claim that Mr. Allen was

9    resisting arrest by moving his arms and kicking his legs.  Mr.

10   Allen will testify that he attempted to get up while he was on

11   the ground, and then he tried to go into the fetal position to

12   protect himself.

13          Mr. Allen was face down on the street with defendants

14   holding his arms up behind his back to put handcuffs on him.

15   Then, with Mr. Allen face down, unable to move because officers

16   were holding him down, and essentially defenseless, his hand

17   was deliberately broken.  Handcuffs were placed on him and he

18   was then put in an unmarked police car.

19          Mr. Allen was brought to the 47th precinct in the

20   Bronx, which is where all of the four defendants work.  As part

21   of standard procedure, Mr. Allen was brought to the desk

22   sergeant and a log was filled out about the arrest.  Officer

23   Williams then drafted up an arrest report and charged Mr. Allen

24   with various crimes related to smoking marijuana, resisting

25   arrest, and possession of a firearm.

1          Shortly after arriving at the 47th precinct, Mr. Allen
2     was taken by an ambulance to the hospital.  At the hospital,
3     Mr. Allen was diagnosed with a fractured fourth metacarpal
4     bone, which is here on his left hand.  Mr. Allen was put in a
5     cast, given painkillers, and then returned to the precinct.
6          After he returned to the 47th precinct, other NYPD
7     officers met with Mr. Allen.  These new officers brought Mr.
8     Allen four photo arrays of officers, each photo array
9     containing a picture of one of the four defendants.  Mr. Allen
10    picked out three of the four defendants as being involved in
11    his assault.
12         Mr. Allen eventually pled guilty to one of the
13    criminal charges against him, with the remaining charges being
14    dismissed.  He pled guilty to attempted possession of a
15    firearm; attempted possession, not possession, of a firearm.
16         There is one other aspect that we have not talked
17    about.  It's the fact that Mr. Allen was not the only person
18    arrested.  The other individual in the car was also arrested.
19    Sergeant Sanchez is going to testify that he personally
20    arrested the other individual in the car.  And why is the other
21    individual arrested?  Well, he is arrested for criminal
22    possession of a gun, the same gun that was supposedly on Mr.
23    Allen.
24         The defendants are adamant that the gun was on Mr.
25    Allen the whole time.  So why is the driver arrested for

J488ALL2                         Opening – Mr. Knudsen

1    possession of a gun if the gun is on Mr. Allen?  Well, if you

2    remember, Mr. Allen said the gun was actually in the back seat

3    of the car.  If the gun is actually in the back seat of the

4    car, and the officers do not know which of the two people in

5    the car actually possessed the gun, it seems much more logical

6    that you would charge both of them with possession of the gun.

7         And then you need to evaluate the case and the use of

8    force on Mr. Allen, with the knowledge that the defendants here

9    will tell you that the gun was on Mr. Allen, but then they

10   charged someone else with possession of the gun.

11        Over the next few days, you will hear testimony from

12   Mr. Allen and from the defendants, and perhaps from others as

13   well.  You will be able to see documents pertaining to the

14   arrest, including Mr. Allen's arrest report which was drafted

15   by Officer Williams after the arrest.  And you will be able to

16   evaluate Mr. Allen's claims that the officers gratuitously used

17   excessive force on him based upon the testimony and the

18   documents you see.

19        At the end of the case, I will speak with you again.

20   At that time, I am going to ask you to render a verdict for Mr.

21   Allen, and I am going to ask you to compensate him for the

22   painful ordeal he went through.  I will ask you to compensate

23   Mr. Allen for his pain and suffering, which are called

24   compensatory damages.  I will also ask you to award Mr. Allen

25   punitive damages, and punitive damages are awarded to punish

J488ALL2                    Opening - Mr. Manningham

1   deliberate malicious conduct by the defendants.

2        You have an important responsibility in this case.  In

3   our system of justice, a jury has the real power, because a

4   jury can rectify those wrongs that can't be fixed otherwise.

5   Here, you are sitting in judgment in a case where, at the end

6   the trial, you will conclude that a man has been subject to

7   excessive force by the police during an arrest, and that man is

8   Carleto Allen, and we trust that your verdict will be in favor

9   of Mr. Allen at the end of the trial.

10       Thank you.

11       THE COURT:  All right.  Ladies and gentlemen, we will

12  now hear defendants' opening statement.

13       MR. MANNINGHAM:  Good afternoon.

14       On January 9, 2015, plaintiff had a loaded gun in his

15  pocket.  He had this loaded gun in his pocket.  And when he saw

16  the police, he reached for it.  Then he fought with them as

17  they tried to arrest him.  Now we are here because plaintiff

18  wants you to give him money.

19       Let's talk about what happened that day.

20       These officers were looking to arrest plaintiff

21  because he was wanted for an armed robbery.  To be clear, armed

22  means armed with a gun.

23       On that particular day, Detective Williams drove down

24  the street where plaintiff lived, and he saw him sitting in a

25  parked car smoking marijuana.  So he called for backup because

J488ALL2                    Opening - Mr. Manningham

1    he thought he might have a gun and it could be dangerous.

2            These officers all met up around the block and then

3    drove two cars to where plaintiff was.  For tactical reasons,

4    which they will explain to you, Detective Williams and

5    Detective Ravelo went to the passenger side where plaintiff

6    was, and Sergeant Sanchez and Officer Tass went to the driver's

7    side where there was somebody else.

8            Detective Williams opened the passenger door where

9    plaintiff was and he yelled, Police, don't move.  But plaintiff

10   moved.  And he didn't just move.  He reached for a gun that was

11   sticking out of his right coat pocket, right here on his hip.

12           Let me just say that again.  Plaintiff saw the police

13   and the first thing he did was reach for a loaded gun.

14           Despite what plaintiff might claim, he knew these were

15   police officers.  In fact, he knew these particular officers

16   from previous interactions in the neighborhood.

17           Detective Williams quickly grabbed the gun and tried

18   to pull plaintiff out of the car, but plaintiff pulled away.

19   They got him out of the car and plaintiff continued fighting

20   with these officers.  He swung his arms, he kicked them,

21   punched them, tried to get away.  He refused to be handcuffed.

22           They got him to the ground and the struggle continued

23   on the ground.  Eventually they were able to handcuff

24   plaintiff.  They took him back to the precinct where he

25   complained that his hand hurt.  And because he complained that

J488ALL2                          Sanchez – Direct

1    his hand hurt, they took him to the hospital, where he was

2    diagnosed with a fracture of the fourth metacarpal bone.

3              Now, we are here today because plaintiff is claiming

4    that his hand was injured during that struggle with the police.

5    He is claiming that these officers used excessive force to

6    arrest him.  But remember, plaintiff reached for a loaded gun

7    and then resisted arrest.  Under these circumstances, you will

8    learn that the officers' use of force was not excessive, and we

9    are confident that at the end of the trial you will find a

10   verdict in favor of the defendants.

11             Thank you.

12             THE COURT:  All right.  Plaintiff will call its first

13   witness.

14             MR. KNUDSEN:  The plaintiff calls Sergeant Miguel

15   Sanchez, please.

16    MIGUEL SANCHEZ,

17        called as a witness by the plaintiff,

18        having been duly sworn, testified as follows:

19             THE DEPUTY CLERK:  Please state your full name and

20   spell it for the record.

21             THE WITNESS:  Sergeant Miguel Sanchez, M-I-G-U-E-L,

22   S-A-N-C-H-E-Z.

23             THE COURT:  Please proceed.

24   DIRECT EXAMINATION

25   BY MR. KNUDSEN:

J488ALL2                          Sanchez – Direct

1    Q.  Good afternoon, sergeant Sanchez.

2    A.  Good afternoon, sir.

3    Q.  When did you first start working as an NYPD officer?

4    A.  I started my career as an officer in 2006.

5    Q.  When were you assigned to the 47th precinct?

6    A.  I was assigned to the 47th precinct July of 2014.

7    Q.  When did you become a sergeant?

8    A.  I became a sergeant the month prior, in June.

9    Q.  So you were promoted to sergeant in 2014?

10   A.  Yes, sir.

11   Q.  On January 9, 2015, the day of the incident, what was your

12   title?

13   A.  I was the anticrime supervisor.

14   Q.  Officer Ravelo worked in anticrime with you at the time?

15   A.  Yes, he did.

16   Q.  Officer Williams did not work in anticrime?

17   A.  No, he did not.

18   Q.  You had worked with Officer Williams before that day?

19   A.  Yes, I had.

20   Q.  And you had worked with Officer Williams after that day?

21   A.  Yes, I had.

22   Q.  Given that Officer Ravelo was in anticrime with you, you

23   had worked with him previously?

24   A.  Yes, sir.

25   Q.  And you had worked with Officer Tass before?

J488ALL2                          Sanchez - Direct

1    A.  Yes.

2    Q.  And you worked with Officer Tass after the day in question?

3    A.  Yes.

4    Q.  Are you still in the 47th now?

5    A.  I am with the 47th precinct, yes, sir.

6    Q.  How many times have you testified in criminal trials?

7    A.  A lot.

8    Q.  On January 9, 2015, you were at the scene of the arrest of

9    the driver and Mr. Allen, correct?

10   A.  Yes, sir.

11   Q.  Officer Williams was there?

12   A.  Yes, he was.

13   Q.  And Officer Ravelo?

14   A.  Yes.

15   Q.  And Officer Tass?

16   A.  Yes.

17   Q.  And perhaps other officers as well?

18   A.  I don't remember any other officers, no.

19   Q.  As you said, you were a sergeant at the time, right?

20   A.  That is correct.

21   Q.  You were the highest ranking officer at the scene of the

22   arrest that day?

23   A.  Yes, sir.

24   Q.  The supervising officer at the scene of the arrest that

25   day?

J488ALL2                          Sanchez - Direct

1   A.  Yes, sir.

2   Q.  So you were effectively in charge of the other officers at

3   the scene of the arrest that day?

4   A.  Yes, I was.

5   Q.  If you made a decision, they would follow it, is that

6   right?

7   A.  Yes, sir.

8   Q.  And if you gave them an order, they would obey it?

9   A.  Yes, sir.

10  Q.  On January 9, 2015, at the scene of the arrest, were you

11  wearing a police uniform?

12  A.  No, I was not.

13  Q.  You were in plain clothes?

14  A.  Yes, I was.

15  Q.  Were all of the other officers in plain clothes as well?

16  A.  Yes, sir.

17  Q.  You were in an unmarked car?

18  A.  Yes.

19  Q.  Now, on January 9, 2015, you personally arrested the driver

20  of the vehicle, is that true?

21  A.  Yes, sir.

22  Q.  And Mr. Allen and the driver were in a red Honda?

23  A.  I believe so, a red vehicle, yes.

24  Q.  Red vehicle?

25  A.  Yes.

J488ALL2                          Sanchez - Direct

1    Q.  And you went to the driver's side of the red vehicle?

2    A.  Yes, sir.

3    Q.  When you got to the driver's side door, you instructed the

4    driver to show his hands?

5    A.  That's correct.

6    Q.  And then you opened the driver's side door?

7    A.  Yes, sir.

8    Q.  And then you told him to come out of the car, and he did?

9    A.  That is correct.

10   Q.  After the driver exited the vehicle, you escorted him to

11   your vehicle?

12   A.  Yes, sir.

13   Q.  What did you do when you got to your vehicle with the

14   driver?

15   A.  The driver was placed in the rear of my vehicle, and I came

16   around the red vehicle to make sure that my officers were OK.

17   Q.  Before you put the driver in your vehicle, did you do a

18   pat-down?

19   A.  Yes.  He was quickly patted down before he was put into the

20   vehicle.

21   Q.  Was he put in handcuffs?

22   A.  Yes, he was.

23   Q.  Then he was put in the back seat of your vehicle?

24   A.  That's correct.

25   Q.  Did you observe the driver of the vehicle smoking marijuana

J488ALL2                          Sanchez – Direct

1    that day?

2    A.   I did not.

3    Q.   Did the driver have any marijuana on him?

4    A.   I didn't recover any marijuana from the driver, no.

5    Q.   When you arrested the driver, did he have a weapon on him?

6    A.   No, he did not.

7    Q.   Did the driver resist arrest?

8    A.   He did not.

9    Q.   After you put the driver in the back seat, you spoke with

10   other officers at the scene, is that correct?

11   A.   Yes.

12   Q.   There was a discussion of what criminal charges to bring

13   against Mr. Allen and the driver, is that correct?

14   A.   I'm sorry.  You have to rephrase.  We are still at the

15   scene?

16   Q.   At the scene, yes.

17   A.   At the scene there was no discussion of any criminal

18   charges, no.

19   Q.   You did have a discussion with Officer Williams at the

20   scene of the arrest, though?

21   A.   Sorry, no.  There was no discussion, no.

22   Q.   You didn't have a discussion with Officer Williams after

23   you arrested the driver?

24   A.   No.

25   Q.   Did you have a discussion with Officer Ravelo after you

J488ALL2                    Sanchez - Direct

1   arrested the driver at the scene?

2   A.  No.

3   Q.  Officer Tass, no discussion with him either?

4   A.  No.

5   Q.  The red vehicle was searched, correct?

6   A.  I don't know if it was.

7   Q.  It's standard procedure to search the vehicle?

8   A.  For the most part, it is, but we will do that back at the

9   station house.

10  Q.  What was the last part?

11  A.  We will do that back at the command, at the 47 precinct, if

12  the vehicle is taken for vouchering.

13  Q.  Was the vehicle taken?

14  A.  I don't remember in this case if it was.

15  Q.  So you don't know whether it was searched at the scene or

16  if taken back to the precinct?

17  A.  No.  I was not present if it was searched.

18  Q.  So you didn't witness anyone personally searching the

19  vehicle?

20  A.  Not personally, no, sir.

21  Q.  If a gun -- strike that.

22         If in arresting people in a vehicle, and there is a

23  gun in the back seat, for example, and not on a person, there

24  is a specific procedure that the police should use to secure

25  that weapon at that time, correct?

1          MR. MANNINGHAM:  Objection?

2          THE COURT:  Sustained.  It's kind of vague and

3  confusing.

4  Q.  What is the procedure if you find a gun in the car and it's

5  not on a person; what do the police do at that time?

6  A.  If there is a gun found in a vehicle, usually we contact

7  our evidence collection team.  They will come out and they will

8  memorialize that weapon the way that it is found inside a

9  vehicle with pictures.  They will also do some sort of testing

10  and it will be vouchered and memorialize again that it was

11  found, the location it was found inside that vehicle.

12  Q.  If a gun is found on a person in a vehicle, that procedure

13  is not the same?

14  A.  It is not.

15  Q.  You went back to the 47th precinct after the arrest that

16  day?

17  A.  Yes.

18  Q.  Did you drive back?

19  A.  No.

20  Q.  Did someone else drive the vehicle back?

21  A.  My driver was Tass.  So I'm assuming he drove back.

22  Q.  But you were in a vehicle that drove back?

23  A.  Yes, sir.

24  Q.  About how long does it take to go back to the precinct?

25  A.  About five minutes from that location.

J488ALL2                          Sanchez - Direct

1    Q.  Was the driver brought back to the precinct?

2    A.  Yes, he was.

3    Q.  The driver was still in handcuffs?

4    A.  Yes, he was.

5    Q.  When you got to the precinct, the driver was still in

6    handcuffs?

7    A.  Yes, he was.

8    Q.  Did you have any discussion with any of the other officers

9    during the drive back to the precinct?

10   A.  During the drive back to the precinct?  I'm sorry.  Did I

11   have a discussion with other officers during the drive back?

12   No.

13   Q.  OK.  So you were in the car with Officer Tass and you

14   didn't talk to him?

15   A.  We didn't have a discussion.

16   Q.  OK.  For three to five minutes you didn't talk to Officer

17   Tass on the way back?

18          MR. MANNINGHAM:  Objection.

19          THE COURT:  Overruled.

20   A.  There might have been a normal conversation, but we didn't

21   have a discussion.

22   Q.  You did have a conversation with him?

23   A.  Like normal conversation.  Probably drive here, let's go,

24   we have got to get back.

25   Q.  During that conversation, did you talk about the arrests?

1   A.  No, we did not.

2   Q.  You were in an unmarked vehicle at the time?

3   A.  Yes, sir.

4   Q.  Officer Williams and Officer Ravelo were in an unmarked

5   vehicle at the time?

6   A.  Yes, they were.

7   Q.  Can you communicate vehicle to vehicle?

8   A.  We can, yeah, but we didn't at that point.

9   Q.  You didn't speak to the other vehicle at that time?

10  A.  At that point, no.

11  Q.  When you got to the precinct, the two arrestees, the driver

12  and Mr. Allen, were brought to the desk sergeant, is that

13  correct?

14  A.  Yes, sir.

15  Q.  Who was the desk sergeant that day?

16  A.  The desk sergeant that day was Sergeant O'Brien.

17  Q.  At the desk of the desk sergeant is something called a

18  command log?

19  A.  I'm sorry?

20  Q.  At the desk of the desk sergeant is something called a

21  command log?

22  A.  Yes, sir.

23  Q.  I am going to show you a document that's been previously

24  marked as Plaintiff's Exhibit 7.  I am only showing you Bates

25  stamped page D-068.

1           Do you recognize this document, Sergeant Sanchez?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  This is an arrest stamp in the command log.

5    Q.  I didn't hear you.

6    A.  It is a stamp of an arrest in the command log.

7           THE COURT:  Arrest stamp?

8           THE WITNESS:  Arrest stamp, yes, sir.

9    Q.  Is it a stamp of one arrest or two arrests?

10   A.  Right here is one arrest.

11          Actually, one and two on the bottom.  I'm sorry.  Two

12   arrests.

13   Q.  This is the portion of the command log pertaining to the

14   arrests of Mr. Allen and the driver, is that correct?

15   A.  Yes, sir.

16   Q.  And you drafted these command log entries after arriving

17   back at the precinct?

18   A.  Yes, that is my handwriting.

19          MR. KNUDSEN:  I am going to move Plaintiff's Exhibit 7

20   D-068 into evidence.

21          THE COURT:  We will just call it Plaintiff's 7.

22          Is there any objection?

23          MR. MANNINGHAM:  No objection.

24          THE COURT:  Plaintiff's Exhibit 7 is received.

25          (Plaintiff's Exhibit 7 received in evidence)

J488ALL2                              Sanchez - Direct

1          MR. KNUDSEN:  Your Honor, I would like to publish it

2     to the jury, please.

3          THE COURT:  Yes.  It may be published.

4          Ladies and gentlemen, you may notice there is some

5     black areas on Plaintiff's Exhibit 7.  That material has been,

6     lawyers would say, redacted.  It's been taken out of the

7     document because it's irrelevant to the issues in this case.

8     So what we have done is we have taken material that is

9     irrelevant and we blacked it out.  That's why the document

10    looks the way it does.

11         Go ahead, Mr. Knudsen.

12         MR. KNUDSEN:  Thank you, your Honor.

13    BY MR. KNUDSEN:

14    Q.  There are two entries here, correct?

15    A.  Yes, sir.

16    Q.  The top entry pertains to Mr. Allen?

17    A.  That is correct.

18    Q.  And these are not the most legible entries ever, correct?

19    A.  The copy is very poor.

20    Q.  Directing your attention to the top entry, that is the

21    entry for the arrest of Mr. Allen?

22    A.  Yes.

23    Q.  Does it say what time this log was filled out?

24    A.  I could assume it says 12:45, from trying to make it out,

25    just based on the top entry.

J488ALL2                        Sanchez - Direct

1  Q.  That was all the way at the top left?

2  A.  Top left, it says 12:45 arrest.

3  Q.  Next to that, to the right of that, what is the word that

4  is written there?

5  A.  It says "arrest."

6  Q.  Did you write that?

7  A.  Yes.

8  Q.  Then you said these are stamps that are put into the

9  command log?

10 A.  Stamped, yes, filled out the captions.

11 Q.  So that's the standard procedure, you stamp the command log

12 with a stamp and then fill in --

13 A.  The pedigree information, yes, sir.

14 Q.  For the arrest of Mr. Allen, does it say who the arresting

15 officer is?

16 A.  Yes.

17 Q.  Who is the arresting officer?

18 A.  Officer Williams.

19 Q.  What is a prisoner pedigree?

20 A.  Prisoner pedigree is basically pedigree information of the

21 prisoner being arrested.

22 Q.  Is that a card that is filled out by the arresting officer?

23 A.  Yes.

24         THE COURT:  What sort of information is pedigree

25 information?

J488ALL2                          Sanchez - Direct

1          THE WITNESS:  Name, date of birth, address.

2     Q.   Then the arresting officer would give that pedigree card

3     to, for example, you to fill it in --

4     A.   Correct.

5     Q.   -- in the command log, right?

6          Is this a typed written document, the prisoner

7     pedigree, or is it handwritten?

8     A.   The actual form is typed and you write in the captions.

9     Q.   OK.  So you would take that information and put it into the

10    command log?

11    A.   Correct.

12    Q.   So this document also indicates, for example, Officer

13    Williams's badge number?

14    A.   Yes.

15    Q.   And did you know that number at the time?

16    A.   Yes.

17    Q.   Was Officer Williams there with you at the desk when you

18    filled this out?

19    A.   Yes.

20    Q.   It lists the location of the arrest?

21    A.   Yes.

22    Q.   What does it say there?

23    A.   Corner of 220 Street, White Plains Road.

24    Q.   Then does it list what the charge is against Mr. Allen?

25    A.   Yes.

J488ALL2                              Sanchez - Direct

1    Q.  What does it say there?

2    A.  Criminal possession of a weapon, abbreviated.

3    Q.  Is that CPW?

4    A.  Yes, sir.

5    Q.  So that is the fifth line down.  Do you see that?

6    A.  Yes, sir.

7    Q.  Then did you sign the entry for this arrest of Mr. Allen in

8    the command log?

9    A.  Yes, I did.

10   Q.  And you wrote CPW?

11   A.  Yes, sir.  That's my handwriting.

12   Q.  What decided to put CPW in that command log?

13   A.  I did.

14   Q.  Did you have any conversation with any other officer before

15   putting CPW in the command log?

16   A.  Yeah.  I talked to my officers at the command.

17   Q.  So you spoke to your officers when you returned to the

18   precinct?

19   A.  Yes, when we returned back to the precinct, yes.

20   Q.  You spoke to Officer Williams?

21   A.  Yes.

22   Q.  And Officer Ravelo?

23   A.  Correct.

24   Q.  And Officer Tass about this?

25   A.  Yes.

J488ALL2                          Sanchez – Direct

 1   Q.  Directing your attention to the second entry, you see that?

 2   A.  Yes, sir.

 3   Q.  Again, the arresting officer is Officer Williams?

 4   A.  Yes.

 5   Q.  What is the location?

 6   A.  220 Street, White Plains Road.

 7   Q.  The same as Mr. Allen's location?

 8   A.  Correct.

 9   Q.  What is the charge there?

10   A.  CPW.

11   Q.  That's criminal possession of a weapon?

12   A.  Yes, sir.

13   Q.  And you wrote that entry?

14   A.  Yes, I did.

15   Q.  Who decided to charge the driver with criminal possession

16   of a weapon?

17   A.  I did.

18   Q.  And you signed that entry?

19   A.  Yes, I did.

20          MR. KNUDSEN:  Nothing further with this document at

21   this time.

22   Q.  At some point in the precinct you spoke with Mr. Allen?

23   A.  During his entries of pedigree, yes.

24   Q.  I'm sorry.  What did you say?

25   A.  When I was entering the pedigree information, yes, I did.

J488ALL2                              Sanchez - Direct

1   Q.  He told you he was injured?

2   A.  Yes, he did.

3   Q.  What did he say to you?

4   A.  He said his hand was hurting him.

5   Q.  Did he tell you he thought his hand was broken?

6   A.  No, he just said it was hurting.

7   Q.  Did you take any action at that time?

8   A.  Yes, I did.

9   Q.  What did you do?

10  A.  I requested an ambulance.

11  Q.  Did you take any other action at that time?

12  A.  Yes, I did.

13  Q.  What did you do?

14  A.  I also contacted our internal affairs bureau because he

15  was --

16          MR. MANNINGHAM:  Objection.

17          THE COURT:  Sustained.

18          MR. KNUDSEN:  Can we have a very quick sidebar?

19          THE COURT:  Yes.

20          (Continued on next page)

21

22

23

24

25

J488ALL2                          Sanchez – Direct

1              (At the sidebar)

2              MR. KNUDSEN:  I assumed he was going to say I

3     contacted other officers, which I thought was consistent with

4     our discussions the other day about this.  So that's why I

5     asked the question.

6              THE COURT:  I understand.

7              MR. KNUDSEN:  So I will rephrase and say, So you

8     contacted other officers?  OK?

9              THE COURT:  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J488ALL2                          Sanchez - Direct

 1                  (In open court)

 2    BY MR. KNUDSEN:

 3    Q.   You contacted other officers from the NYPD pertaining to

 4    Mr. Allen's allegation of an injury, correct?

 5    A.   Correct.

 6    Q.   Do you know how Mr. Allen suffered his hand fracture?

 7    A.   I do not.

 8    Q.   Have you ever drafted an arrest report as part of your

 9    duties as a police officer?

10    A.   Yes, I have.

11    Q.   What is an arrest report?

12    A.   An arrest report is a detailed information about a person

13    being arrested and the charges that are being brought against

14    that person.

15    Q.   What is the purpose of an arrest report?

16    A.   To formally charge a person with a crime.

17    Q.   Do you fill out your arrest reports as accurately as

18    possible?

19    A.   Yes, I do.

20    Q.   Why?

21    A.   It's important to.

22    Q.   You know they could be used to initiate a criminal

23    prosecution, correct?

24    A.   Yes.

25    Q.   And after an arrest report is filled out, a supervisor has

J488ALL2                         Sanchez – Direct

1    to approve it, is that right?

2    A.   Yes, sir.

3    Q.   I would like to show you a document that has been

4    previously marked as Plaintiff's Exhibit 14.

5            I am handing you a three-page document that has been

6    previously marked as Plaintiff's Exhibit 14, which is D-01071

7    through 1073.

8            Do you recognize this document, or this type of

9    document, I should say?

10   A.   Yes, sir.

11   Q.   What is it?

12   A.   It's a voided arrest report.

13   Q.   Have you seen this document before?

14   A.   This document, yes.

15   Q.   You have seen it?

16   A.   Yes.

17   Q.   This is the arrest report for the driver for the incident

18   in question, is that correct?

19   A.   I am going to assume because it's blacked out.

20   Q.   It's drafted by Officer Williams?

21   A.   Yes.

22   Q.   It's dated January 9, 2015, correct?

23   A.   Yes, sir.

24           MR. KNUDSEN:   I am going to move Plaintiff's Exhibit

25   14 into evidence.

J488ALL2                           Sanchez - Direct

1              THE COURT:  Any objection?

2              MR. MANNINGHAM:  No objection.

3              THE COURT:  Plaintiff's Exhibit 14 is received.

4              (Plaintiff's Exhibit 14 received in evidence)

5              MR. KNUDSEN:  I would like to publish to the jury,

6      your Honor.

7              THE COURT:  Yes.

8      BY MR. KNUDSEN:

9      Q.  I am going to direct your attention to page 1 of the

10     document.

11             It says "arrest location" at the top.  Do you see

12     that?

13     A.  Yes, sir.

14     Q.  What does that say?

15     A.  766 East 220 Street.

16     Q.  It has the arrest date?

17     A.  Yes.

18     Q.  What date is that?

19     A.  1/9/15.

20     Q.  That's the date of the arrest of the driver?

21     A.  Yes.

22     Q.  Then the arrest of Mr. Allen?

23     A.  Yes.

24     Q.  It says time 13:20.  What does that refer to?

25     A.  Time of arrest.

J488ALL2                          Sanchez - Direct

1   Q.  Then if you go down a little bit, there is a box called

2   "charges," maybe a third of the way down or 40 percent.  Do you

3   see that?

4   A.  Yes.

5   Q.  Does that list the charges against the driver?

6   A.  Correct.

7   Q.  What is the description of the charge?

8   A.  Criminal possession of a weapon, third degree, defaced

9   weapon.

10  Q.  Then if you go down a bit farther, there is a section

11  called "details."  Do you see that?

12  A.  Yes.

13  Q.  And that is where someone puts the details of what happened

14  into the arrest report, right?

15  A.  Correct.

16  Q.  Is there anything in that detail section that is correct

17  about the arrest of the driver?

18  A.  No.

19  Q.  So was the driver in possession of a loaded defaced black

20  .380 Lorcin firearm?

21  A.  No.

22  Q.  And was he smoking a lit marijuana cigarette in public?

23  A.  No, he was not.

24  Q.  Did the driver resist arrest by flaring his arms and

25  kicking PO in the legs?

J488ALL2                        Sanchez - Direct

1    A.  No.

2    Q.  Did he refuse to be handcuffed?

3    A.  No, he did not.

4    Q.  Was he in possession of counterfeit money?

5    A.  No.

6    Q.  Would you have approved this arrest report?

7    A.  No, I would have not.

8    Q.  Just to clarify, the blacked-out portions of this document

9    were not blacked out by you?

10   A.  No.

11   Q.  These were blacked out -- these are called redacted.  And

12   there are several redacted sections on this arrest report,

13   blacked-out sections on this arrest report?

14   A.  Yes.

15   Q.  There is a box in the middle there, it's not blacked out,

16   that says "physical force"?

17   A.  Yes, sir.

18   Q.  "None."  What does that entry refer to?

19   A.  No physical force used.

20   Q.  What does physical force mean in this context?

21   A.  In this context, I guess if there was any type of physical

22   force used to subdue the individual, I guess.

23   Q.  That's where you would put it?

24   A.  Normally, yes.

25   Q.  I am going to direct your attention to page 3 of this

J488ALL2                          Sanchez – Direct

1    police report.

2           At the bottom, going up, it says, "Arresting officer:

3    POM Jeremiah Williams."

4           What does POM stand for?

5    A.  Police officer male.

6    Q.  Has this arrest report been approved?

7    A.  Yes.

8    Q.  Who approved it?

9    A.  It looks like Sergeant Florio, Eric.

10   Q.  Did you speak to Officer Williams before he drafted this

11   arrest report?

12   A.  No.

13          MR. KNUDSEN:  Nothing further with this.

14   Q.  Why was the driver charged with criminal possession of a

15   weapon?

16          MR. MANNINGHAM:  Objection.

17          THE COURT:  Grounds.

18          MR. MANNINGHAM:  Mischaracterizing the testimony.  I

19   don't believe he was ever charged.

20          THE COURT:  Was the driver charged with criminal

21   possession of a weapon?

22          THE WITNESS:  He was not, sir.

23          THE COURT:  He was not.

24   Q.  Why was the driver arrested for criminal -- didn't it say

25   charge on the command log?

J488ALL2                         Sanchez – Direct

 1  A.  That's a preliminary.  Command log is a preliminary entry.

 2  It doesn't constitute any actual charges.

 3  Q.  OK.  So it's a preliminary charge?

 4  A.  It's what you're investigating at the time, yes.

 5  Q.  There's a preliminary basis to arrest someone?

 6  A.  Correct.

 7  Q.  It was the basis to arrest the driver, criminal possession

 8  of weapon?

 9  A.  That's what we were investigating at the time, correct.

10  Q.  So why was the driver put in handcuffs and brought back to

11  the precinct for criminal possession of a weapon?

12  A.  At the time, when we put the driver in handcuffs, it was a

13  safety issue.  Because, again, that's what was being

14  investigated.  And a weapon was recovered so we brought

15  everybody back.  Normally that's how it gets done.

16  Q.  So you put him in handcuffs and in the back of your vehicle

17  for safety?

18  A.  Correct.

19  Q.  But you brought him back and in the command log wrote

20  criminal possession of a weapon?

21  A.  That is correct.  We had a weapon recovered.

22  Q.  You had a weapon recovered from the driver?

23  A.  No, from the passenger.

24  Q.  And that being Mr. Allen?

25  A.  That is correct.

J488ALL2                           Sanchez - Direct

1   Q.  So what was the basis to believe that you could arrest the

2   driver of the car for criminal possession of a weapon?

3   A.  When there is a weapon in a vehicle, whether it's on the

4   person or in the compartment of the vehicle anywhere, everyone

5   in that vehicle goes back for investigation.

6   Q.  So are you saying that the driver was not arrested?

7   A.  He was brought back.  He wasn't formally charged, no.

8   Q.  That's not my question, Sergeant.  I said, are you saying

9   that the driver was not arrested?

10              MR. MANNINGHAM:  Objection.

11              THE COURT:  Overruled.

12  A.  The driver was put in handcuffs, he was detained and was

13  brought back.

14  Q.  And an arrest report was filled out charging him with --

15              THE COURT:  Please don't interrupt his answers.

16              MR. KNUDSEN:  I apologize.

17              Can you finish your answer?

18  A.  The arrest report that you were referring to before, that's

19  a voided arrest, which is a document that is made when there is

20  no charge.

21  Q.  Are you saying that the arrest report was not drafted at

22  some time?

23  A.  This is a voided arrest.  During the investigation of a

24  criminal possession of a weapon, if it's determined that that

25  person did not commit that crime, a voided arrest is then

J488ALL2                          Sanchez - Direct

1   produced.

2   Q.  Then what was the basis to bring back the driver to the

3   precinct?

4   A.  As part of the investigation, as I mentioned before.

5   Q.  The investigation into?

6   A.  Into the weapon that was recovered at the scene.

7   Q.  OK.  What is the legal basis to bring back the driver for a

8   gun in the car?

9           MR. MANNINGHAM:  Objection.

10          THE COURT:  Sustained.

11  Q.  Why did you think it was appropriate to bring back the

12  driver to the precinct for a gun in the car?

13  A.  When there is a weapon in a vehicle, whether on the person

14  or somewhere in that vehicle, we bring everyone back.  Until we

15  determine that that weapon was either part of one person that

16  owns up to that weapon or part of both, we bring everyone back

17  until our investigation is satisfied and we can determine

18  whether the person either is part of that crime or they had

19  nothing to do with the crime at all.

20  Q.  So you were only investigating the driver?

21  A.  At the time, yes.

22  Q.  So you hadn't arrested him?

23  A.  He was detained, yes.

24  Q.  Is there a difference between being detained and being

25  arrested in your opinion?

J488ALL2                          Sanchez - Direct

1    A.  Yes.

2    Q.  So you bring him back -- let's look at the command log

3    again, Plaintiff's Exhibit 7, which is in evidence.

4             If you see the second entry, the blacked-out entry to

5    the left of where PO Williams' name is, it says "arrest."  Does

6    it not say that in the command log?

7             MR. MANNINGHAM:  Objection?

8             THE COURT:  Grounds.

9             MR. MANNINGHAM:  Asked and answered.

10            THE COURT:  Overruled.

11   Q.  Didn't you write -- strike that.

12            Please answer the question.  Does it not say arrest in

13   the command log?

14   A.  Yes, sir.

15   Q.  Who wrote that?

16   A.  I did.

17   Q.  So you wrote arrest in the command log?

18   A.  Yes.

19   Q.  Now you're telling me he wasn't arrested?

20   A.  The arrest was voided.  I'm sorry.

21            THE WITNESS:  May I, your Honor?

22            THE COURT:  Yes.

23   A.  You're asking me if he was arrested and charged.  He was

24   arrested --

25   Q.  I didn't ask you that.  I asked you was he arrested?

J488ALL2                          Sanchez - Direct

1           MR. MANNINGHAM:  Objection.

2           THE COURT:  Overruled.

3           Please let him finish his answers.

4           MR. KNUDSEN:  I apologize, your Honor.

5           THE COURT:  Were you going to say something else?

6           THE WITNESS:  Yes, your Honor.

7    A.  The person was arrested and brought back as part of an

8    investigation, but he was not arrested and charged with any

9    crime.

10   Q.  And you have to have probable cause to arrest someone,

11   correct?

12   A.  Yes.

13   Q.  What was the probable cause to arrest the driver?

14   A.  There was none.  That's why there is a voided arrest.

15   Q.  So you arrested him without probable cause?

16          MR. MANNINGHAM:  Objection?

17          THE COURT:  Sustained.

18   Q.  So why were you investigating -- strike that.

19          So you brought the driver back to the precinct in

20   handcuffs, correct?

21   A.  Yes, sir.

22   Q.  And the basis was because there was a gun in the car?

23   A.  Yes, sir.

24   Q.  So there was a gun in the vehicle?

25   A.  There was a gun, someone had a gun in that vehicle, yes.

J488ALL2                           Sanchez – Direct

1    Q.  If someone has a gun in the vehicle or there is a gun in a

2    vehicle, what gives you the basis to bring everyone back to the

3    precinct to investigate?

4            THE COURT:  Sustained.  We are getting into legal

5    concepts here.

6            MR. KNUDSEN:  This is relevant, your Honor.

7            THE COURT:  You want to address it at sidebar?

8            MR. KNUDSEN:  Yes, I do.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J488ALL2                            Sanchez - Direct

1          (At the sidebar)

2          MR. KNUDSEN:  The basis is, under the penal law, there

3     is something called constructive possession, which allows you

4     to presume that a gun in a car is owned by anyone or everyone

5     in the car and you are allowed to charge them all.  That is

6     what he is trying to get at.  That's why I am bringing out the

7     penal law, and I want to address that with him.

8          THE COURT:  I don't actually know what he is trying to

9     get at.  He has answered your question several times now.  What

10    he said was, when there is a gun in a car, we bring everyone

11    back to sort it out.  That is what he said several times now.

12    The legal concepts that you are trying to get into, I don't

13    feel that the witness is going there.  That's where you go.

14    You want to talk about legal concepts.

15         MR. KNUDSEN:  I do want to bring it up because the

16    penal law says you cannot do what he just said.

17         MR. MANNINGHAM:  This is not a false arrest case with

18    the driver.

19         MR. KNUDSEN:  If you are going to arrest both of them,

20    the exception is, if the gun is on one person in the car, you

21    can't presume everyone else has the gun.  They have said the

22    gun was on Mr. Allen in the car and they have arrested the

23    driver for criminal possession of a weapon.  If the gun was in

24    the back seat, they are allowed to arrest the driver of

25    criminal possession of a weapon.  He knows this, and I am

J488ALL2                        Sanchez - Direct

1    allowed to cross-examine him on this.

2            THE COURT:  These are legal concepts, and I don't know

3    what he knows, actually.  I don't know what he knows.  And he

4    certainly hasn't brought up the subject of constructive

5    possession.  And I am concerned that we are getting pretty far

6    afield.  Why is this relevant?

7            MR. KNUDSEN:  Because it supports Mr. Allen's claim

8    that the gun was in the back seat.  They have arrested two

9    people in the car under the basis of constructive possession,

10   which is penal law 265.15, but the exception is that it does

11   not apply --

12           THE COURT:  The problem is there isn't any foundation

13   for this yet.  Nobody has said that the gun was in the back of

14   the car.  He hasn't said that.

15           MR. KNUDSEN:  He contradicts their version of the

16   evidence.

17           THE COURT:  But a factual predicate is missing.  There

18   is no evidence yet that the gun was found in the back of the

19   car.  Other than you saying that, I haven't heard any evidence

20   of that.

21           MR. KNUDSEN:  That's in dispute where the gun is.

22           I want to explore what actions they take that

23   contradict their version of events.

24           THE COURT:  This isn't a legal primer on probable

25   cause.

J488ALL2                          Sanchez - Direct

1          MR. KNUDSEN:  I don't want to bring up probable cause.

2          THE COURT:  But you are.  You have asked him about

3    probable cause.  I sustained that objection, and I will tell

4    you that to the extent you continue to pursue what I view as

5    legal concepts, it's likely I will sustain objections.  So we

6    will just have to see where it goes.

7          MR. KNUDSEN:  What do you mean by legal concepts?

8          THE COURT:  Probable cause is a legal concept.

9    Constructive possession is a legal concept.  He is here to

10   testify about facts.  He is not here to give us a primer on

11   probable cause or constructive possession.  He is here to

12   testify about facts.  He is not a legal expert.  Nor is he a

13   lawyer, by the way.

14         MR. KNUDSEN:  I understand that.  He is a police

15   officer and arrests people.

16         THE COURT:  You can ask the questions.  I will either

17   sustain the objections, if there are objections, or I won't,

18   depending on whether I believe it is relevant or not.  But I am

19   telling you he is not here as a legal expert on probable cause

20   or constructive possession or whatever.  If you want to explore

21   with him this constructive possession notion that you have, we

22   will see where it goes.

23         MR. KNUDSEN:  I want to try to do the best to remain

24   consistent with what you are telling me.

25         THE COURT:  It depends on the question.  So I can't

J488ALL2                        Sanchez - Direct

give you a road map about what is going to be sustained and
what is not.  I have tried to alert you to the fact, to the
extent you are getting heavily into legal concepts, it's
possible that I will sustain an objection.  Again, he is not
testifying as a legal expert and concepts such as probable
cause, constructive possession, these are legal concepts that
lawyers argue about.  How much a street cop like him focuses on
it, I don't know.

          MR. MANNINGHAM:  Your Honor, if I may.  He has already
testified to the fact that he arrested the driver because they
were doing an investigation because the gun was found on the
plaintiff in the car.  They needed to search the car.  They
didn't know if there were other weapons.  If he wants to ask
him was the gun found in the back seat, fine.  But if he is
going to come up with, well, the reason you did this, that is
just his argument that he can make on closing.

          THE COURT:  Actually, I don't know that there has been
any testimony where the gun was found.  He doesn't have any
personal knowledge of where the gun was found at all.  I think
that's one of the problems actually.

          MR. KNUDSEN:  But he did put in the arrest
report -- in the command log --

          THE COURT:  And he has explained that three times now
why it's there.

          MR. KNUDSEN:  And he said that they found a gun in the

J488ALL2                              Sanchez - Direct

1   car.  I think I am allowed to explore why he thinks that is a

2   sufficient basis to arrest the driver.

3              THE COURT:  He has explained that three times, and

4   it's not the answer you want, but he has explained it.

5              Just so the record is clear, what he said is, when we

6   find a gun in a car, we take everybody back and we figure out

7   whose gun it is.  He said that three times now.  I am not sure

8   that the answer is going to be any different.  We will see

9   where it goes, but he has answered the question three times.  I

10  suspect the answer is not going to change.  And guess what?  I

11  suspect he is not going to get into probable cause and

12  constructive possession and other things that lawyers like to

13  talk about.  I don't think that's where he is headed.  But you

14  are welcome to pursue it and see where it goes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J488ALL2                          Sanchez – Direct

1              (In open court)

2              MR. KNUDSEN:  Could you read the last question and

3    answer back, please.

4              (Record read)

5    BY MR. KNUDSEN:

6    Q.  Do you receive training as an NYPD officer?

7    A.  Yes, I have.

8    Q.  Do you receive training in the criminal law in New York?

9    A.  Yes, somewhat.

10   Q.  What we would call the penal law in New York?

11   A.  Yes.

12   Q.  And the penal law is a listing of crimes that the police

13   can arrest you for and charge you for, right?

14             MR. MANNINGHAM:  Objection.

15             THE COURT:  Overruled.

16   A.  Yes.

17   Q.  And as part of your training, you receive training on the

18   penal law?

19   A.  Yes.

20   Q.  Do you get handed -- are you given a copy of the penal law

21   as part of your responsibility as an NYPD officer?

22   A.  Yes.

23   Q.  Do you carry the penal law with you when you're on the job?

24   A.  No.

25   Q.  But you do have a copy of the New York penal law?

J488ALL2                          Sanchez – Direct

1    A.  Yes.

2    Q.  And if you have a question about some aspect of the penal

3    law, you can look at that document?

4    A.  Yes.

5    Q.  And the reason you were -- strike that.

6           You are trained in the penal law because part of your

7    job responsibilities is determining when someone has committed

8    a crime, right?

9           MR. MANNINGHAM:  Objection.

10          THE COURT:  Overruled.

11   A.  Yes.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J482all3                        Sanchez - Direct

1   Q.  Because you don't want to arrest people when they haven't

2   committed a crime, isn't that correct?

3   A.  That's correct.

4   Q.  I'm sorry?  What did you say?

5   A.  That is correct, sir.

6   Q.  And is this concept that you can arrest everyone in the

7   vehicle when you find a gun in the vehicle from the penal law?

8          MR. MANNINGHAM:  Objection.

9          THE COURT:  Overruled.

10  A.  The charge -- I'm sorry, you are going -- rephrase that

11  question.

12  Q.  Is the concept that you can arrest everyone in a vehicle

13  when there is a gun in the vehicle, is that from the penal law?

14  A.  Yes.

15  Q.  And do you know what penal law section that is?

16  A.  Not off the top of my head, no.

17  Q.  Have you read that section of the penal law before?

18  A.  I have read sections of the penal law, yeah, relating to

19  that.

20  Q.  It is Section 265.15 of the penal law that deals with

21  constructive possession of contraband, isn't it?

22         MR. MANNINGHAM:  Objection.

23         THE COURT:  Overruled.

24  A.  I'm not familiar with that.

25  Q.  So the answer is you don't know.

J482all3                        Sanchez - Direct

1   A.  No, I'm not familiar with it.

2   Q.  Let me show you a document, and you tell me if this

3   refreshes your recollection.

4           MS. RYAN:  Your Honor, we ask that we be able to see

5   that before he shows it to the witness.

6           THE COURT:  Sure.

7           (Pause)

8   BY MR. KNUDSEN:

9   Q.  Does that refresh your recollection as to what section of

10  the penal law deals with constructive possession of contraband?

11  A.  Yes.

12  Q.  And what penal law section is it?

13  A.  265.15.

14  Q.  And specifically 265.15(3) deals with contraband or --

15  strike that.

16          Specifically 265.15(3) deals with constructive

17  possession of when a firearm is found in an automobile.  Is

18  that correct?

19  A.  Yes.

20  Q.  And 265.15 says, "The presence in an automobile of a

21  firearm is presumptive evidence of its possession by all

22  persons occupying such automobile except if such weapon is

23  found upon the person of one of the occupants therein."  Does

24  it not say that?

25  A.  Yes.

J482all3                    Sanchez - Direct

1   Q.  So under that, was it appropriate to arrest the driver for

2   possession of a weapon?

3           MR. MANNINGHAM:  Objection.

4           THE COURT:  Sustained.

5   BY MR. KNUDSEN:

6   Q.  Under that, was it appropriate -- strike that.

7           Under that, could the driver have been found to be

8   constructively possessing the gun in the car?

9           MR. MANNINGHAM:  Objection.

10          THE COURT:  Sustained.  These are legal questions.

11  Sustained.

12  BY MR. KNUDSEN:

13  Q.  You had reviewed the penal law before -- this section of

14  the penal law before January 29, 2015, correct?

15  A.  Yes.

16  Q.  What investigation did you do into the arrest -- into the

17  detention of the driver?

18          THE COURT:  I don't understand the question.

19          MR. KNUDSEN:  I will rephrase.

20  BY MR. KNUDSEN:

21  Q.  You testified previously that you brought back the driver

22  to investigate the situation, correct?

23  A.  Yes, sir.

24  Q.  To your knowledge, what investigation was done that cleared

25  the arrest -- the detention of the driver or . . .

J482all3                          Sanchez - Direct

1          THE COURT:  You have got to rephrase it.

2   BY MR. KNUDSEN:

3   Q.  Did you speak to the driver after you got back to the

4   precinct?

5   A.  No, sir.

6   Q.  Do you know what investigation was done that cleared the

7   driver?

8   A.  I'm sorry.  Say that again.

9   Q.  The driver was not charged, you said previously.

10  A.  That's correct.

11  Q.  What investigation was done to determine that he should not

12  be charged?

13  A.  I supervised apprehension.  Once we got back to the command

14  and both substances were put into the command log, I didn't

15  have anything to do with the arrest processing of that arrest.

16  Detective Williams' direct supervisor dealt with that.

17  Q.  Under -- going back to constructive possession, if the gun

18  was found in the back seat of the car, it would be appropriate

19  to charge both the driver and Mr. Allen with criminal

20  possession of a weapon, correct?

21          MR. MANNINGHAM:  Objection.

22          THE COURT:  Sustained.

23          MR. KNUDSEN:  I will rephrase.

24  BY MR. KNUDSEN:

25  Q.  If the gun was found in the back seat of the car, it would

J482all3                         Sanchez – Direct

1    be appropriate to arrest both the driver and Mr. Allen,

2    correct?

3              MR. MANNINGHAM:  Objection.

4              THE COURT:  I will see the lawyers at the sidebar.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J482all3                        Sanchez - Direct

1          (At the sidebar)

2          THE COURT:  So the problem is with the form of the

3    question, because when you are saying it would have been

4    appropriate, you are asking for a legal determination, and

5    that's what I told you you can't do.

6          The way the question should be framed is tying it to

7    what he did do actually, in other words, whether he thought it

8    was appropriate to arrest the driver because of his

9    understanding of the penal law.  You could ask it that way

10   because that's not asking for a conclusion of law.  But when

11   you pose it as "it was appropriate to do this, that, and the

12   other thing," you are asking him for a legal determination.

13         MR. KNUDSEN:  Can I ask him the basis -- the

14   hypothetical is the gun was in the back seat of the car.

15         THE COURT:  We don't have to deal with hypotheticals.

16   We actually have reality here.  We have reality.  So if we can

17   ask him, you know, why he did what he did on this occasion, we

18   don't need to do hypotheticals and -- in any event, I just want

19   to tell you why I was sustaining the objection.  If the

20   question is posed in such a way that it is seeking a legal

21   conclusion from him, I will sustain the objection.

22         MR. KNUDSEN:  I am trying to find out why --

23         THE COURT:  Well, you are not asking him why, though.

24   You are asking him would it have been appropriate.  That calls

25   for a legal determination.  I can't really say -- I have said

J482all3                          Sanchez - Direct

1    it about four or five times now.  If you don't understand why I

2    am saying it, you are welcome to tell me, Judge, I don't

3    understand the point you are trying to make.  I think it is

4    pretty straightforward.

5            MR. KNUDSEN:  Yeah, no, my point is not to try to get

6    legal conclusion out of him.

7            THE COURT:  I am just telling you, you are seeking a

8    legal conclusion and I --

9            MR. KNUDSEN:  If I say "arrest," he says it is not an

10   arrest.  If I say "detention," he says it is not a detention.

11           THE COURT:  Well, then phrase it as "bringing him back

12   to the station."  The jury can draw their own conclusions

13   whether he was under arrest or not.  He was handcuffed.  I

14   don't think that is really going to be a struggle for them.

15   Okay?  So what I am suggesting to you is, pose the question in

16   a way that doesn't call for a legal conclusion if you want to

17   get an answer.  That's all I am saying.  And I have suggested a

18   way you can do that.  It is up to you, of course, whether or

19   not you choose to pursue it.

20           MR. KNUDSEN:  Thank you.

21           (Continued on next page)

22

23

24

25

J482all3                        Sanchez – Cross

1                  (In open court)

2       BY MR. KNUDSEN:

3       Q.  So the real reason that you brought back the driver and

4       wrote "criminal possession of a weapon" in the command log is

5       because the gun was actually found in the back seat of the car,

6       isn't that correct?

7       A.  That's not correct.

8                  MR. KNUDSEN:  Nothing further at this time.

9                  THE COURT:  All right.  Is the defense going to

10      conduct their examination now of Sergeant Sanchez?  Okay.  Go

11      ahead.

12      CROSS-EXAMINATION

13      BY MR. MANNINGHAM:

14      Q.  Good afternoon, Sergeant Sanchez.

15      A.  Good afternoon, sir.

16      Q.  You were asked a lot of questions about the driver.  Is the

17      driver here today?

18      A.  No, he is not.

19      Q.  Is the driver the plaintiff?

20      A.  No, he is not.

21      Q.  I want to show you what you were just shown, the voided

22      arrest report.

23                  THE COURT:  That is Plaintiff's Exhibit 14?

24                  MR. MANNINGHAM:  Yes, Plaintiff's Exhibit 14.

25      BY MR. MANNINGHAM:

J482all3                          Sanchez - Cross

1   Q.  Sergeant Sanchez, do you see where it says "voided"?

2   A.  Yes, sir.

3   Q.  What does that mean?

4   A.  That means it is not a valid document.

5   Q.  And would this document be used to charge someone with a

6   crime?

7   A.  No, it is not.

8   Q.  Would it be used to charge someone criminally?

9   A.  No.

10  Q.  Sergeant Sanchez, did you fill this document out?

11  A.  No, I did not.

12  Q.  Did you approve this document?

13  A.  No, I did not.

14  Q.  Okay.  Now I want to talk about the incident on January 9,

15  2015, okay?

16  A.  Yes, sir.

17  Q.  You said you were a supervisor on that day?

18  A.  Yes, I was.

19  Q.  And what did you supervise?

20  A.  I was supervising the anticrime team of the Four Seven

21  Precinct.

22  Q.  And you were involved with the plaintiff -- with an

23  incident that involved the plaintiff on that day, is that

24  correct?

25  A.  Yes, I did.

J482all3                        Sanchez – Cross

1    Q.  How did you first become involved?

2    A.  Detective Williams called to ask for assistance from my

3    team.

4    Q.  Was that common for them to call for assistance?

5    A.  Yes.

6    Q.  And do you know why they needed assistance?

7    A.  Yes.  They needed assistance because the plaintiff was

8    wanted in connection to an armed robbery in Mount Vernon.

9    Q.  So after you received this call for assistance, what did

10   you do?

11   A.  We came up with a plan on how to approach.

12   Q.  And what was that plan?

13   A.  I looked at the area where the vehicle was supposed to be

14   parked and we came up with a plan, well, I'll come up one way

15   and the other vehicle will come up and we will box him in.

16             MR. MANNINGHAM:  Your Honor, may I have permission to

17   show the witness what has been premarked as Exhibit H for

18   identification?

19             THE COURT:  This Defense Exhibit H?

20             MR. MANNINGHAM:  Yes.

21             THE COURT:  All right.  Go ahead.

22             MR. KNUDSEN:  Your Honor, we would object to this.

23             THE COURT:  I don't seem to have it.

24             MR. KNUDSEN:  There is no Defendant Exhibit H.

25             MR. MANNINGHAM:  I have a copy for your Honor.

J482all3                          Sanchez – Cross

1          (Pause)

2          MR. KNUDSEN:  Objection.

3          THE COURT:  You are objecting to this?

4          MR. KNUDSEN:  It is not on the JPTO.

5          THE COURT:  I'm sorry.

6          MR. KNUDSEN:  It's not on the JPTO.

7          THE COURT:  But it's for cross-examination.  If you

8   want to talk about it at sidebar, I will talk with you.

9          MR. KNUDSEN:  No, no.

10         THE COURT:  Do you wish to press the objection?

11         MR. KNUDSEN:  He hasn't moved to admit it in evidence.

12         THE COURT:  I suspect --

13         MR. MANNINGHAM:  I have to ask some questions, first,

14  your Honor.

15         THE COURT:  That's where he is headed, so if you have

16  an objection, we should talk about it at sidebar now.

17         (Pause)

18         MR. KNUDSEN:  No objection, your Honor.

19         THE COURT:  All right.  Received.

20         (Defendant's Exhibit H received in evidence)

21         MR. MANNINGHAM:  May I publish it to the jury, your

22  Honor?

23         THE COURT:  Defense Exhibit H is received.

24  BY MR. MANNINGHAM:

25  Q.  Sergeant Sanchez, what is this a picture of?

J482all3                          Sanchez - Cross

1    A.  This is a picture of the area of 220th Street between

2    Barnes Avenue and White Plains Road in the confines of the Four

3    Seven Precinct in the Bronx.

4               THE COURT:  So it's a map?

5               THE WITNESS:  Yes, sir.

6    BY MR. MANNINGHAM:

7    Q.  Does this map accurately depict the location where you

8    encountered the plaintiff on January 9, 2015?

9    A.  Yes, sir.

10   Q.  Where on this map did you first encounter the plaintiff?

11   A.  Around this area right here (indicating).

12   Q.  After you came up with the plan, where did you go?

13              THE COURT:  So you have to indicate for the record

14   what the -- what area it is that the witness has circled.

15              MR. MANNINGHAM:  So the witness has circled an area of

16   220th Street between White Plains Road and -- I am trying to

17   get it in focus here -- and Barnes Avenue.

18              THE COURT:  Right.  He circled an area in the middle

19   of the block between Barnes and White Plains Road on 220th.

20   BY MR. MANNINGHAM:

21   Q.  Sergeant Sanchez, after you came up with a plan, where did

22   you go?

23   A.  My vehicle was positioned on White Plains Road and 220

24   Street, so right around here.

25              MR. MANNINGHAM:  So the witness is drawing an X on the

J482all3                          Sanchez - Cross

1    corner of White Plains Road and 220th Street.

2              THE COURT:  It is the southeast corner.

3    BY MR. MANNINGHAM:

4    Q.  Was it the southeast corner, Sergeant Sanchez?

5    A.  I think it was the north.

6              THE COURT:  Northeast?

7              THE WITNESS:  Northeast.  I'm sorry, yeah.

8              THE COURT:  That's okay.

9    BY MR. MANNINGHAM:

10   Q.  And you said there was a second car, is that correct?

11   A.  Yes.

12   Q.  And where was that second car?

13   A.  The second car was in the intersection of Barnes Avenue and

14   220 Street.

15   Q.  And can you draw where they were?

16   A.  Right there.

17             MR. MANNINGHAM:  And the witness is drawing an X on

18   the corner of Barnes Avenue and 220th Street.

19   BY MR. MANNINGHAM:

20   Q.  Do you know which side of the road they were on?

21   A.  That I don't know because, like I said, I was on White

22   Plains Road and Barnes, but I know they were on that corner.

23   Q.  And why did you have two cars approach plaintiff?

24   A.  It was a safety issue, tactical approach.  220 Street is a

25   one-way going west.  I positioned myself on White Plains Road

J482all3                          Sanchez – Cross

1    and waited for all traffic to empty out from that block.  The

2    vehicle that was positioned in Barnes and 220 waited until

3    there was no one in that block, and then once we were

4    comfortable there were no other vehicles on the road, we

5    approached.

6    Q.  What was the other vehicle doing at that time?

7    A.  The vehicle was blocking traffic up on top.

8    Q.  And you were waiting for the rest of the traffic to get

9    past White Plains Road?

10   A.  That is correct.

11   Q.  And is that because you were coming down the wrong way?

12   A.  Yes, I was coming up the wrong way.

13   Q.  Did there come a time when all the vehicles passed?

14   A.  Yes.

15   Q.  What happened then?

16   A.  Once the road was safe, we moved up, I came up the one way

17   up to where the circle is and the other team came in from the

18   right way of traffic, the way traffic flows.

19   Q.  And when you got to plaintiff's location, where did you go?

20   A.  My vehicle was in front of where the plaintiff's vehicle

21   was and the other car was right behind it, so we boxed him in.

22   Q.  And did you go to one side of the car?

23   A.  Yes.

24   Q.  Which side?

25   A.  I went to the sidewalk side where the driver was.

J482all3                          Sanchez – Cross

1   Q.  Did you have your weapon out as you approached?

2   A.  Yes.

3   Q.  Why?

4   A.  Again, we –– the person was wanted in connections to an

5   armed robbery.  We had reasons to believe that the person was

6   armed.

7   Q.  Were you wearing a shield?

8   A.  Yes.

9   Q.  Where was that shield?

10  A.  Prominently displayed in front of me on my chest.

11  Q.  Was it on some sort of chain?

12  A.  Yes, Gray Wolf Lodge, kind of like a little rope, and

13  hooked to that.

14  Q.  Did anyone else go to the driver's side with you?

15  A.  Yes.

16  Q.  Who was that?

17  A.  Officer Tass.

18  Q.  What did you do when you got to the driver's side?

19  A.  We instructed the driver to show his hands.

20  Q.  And did he?

21  A.  Yes, he did.

22  Q.  What happened next?

23  A.  We also instructed him to come out of the vehicle and he

24  did.

25  Q.  So he complied?

J482all3                          Sanchez - Cross

1   A.  He complied with all of our orders.

2   Q.  What happened next?

3   A.  The driver was coming out of the vehicle, and we was

4   turning him around to put his hands up on top of the hood of

5   the car.  There was some sort of scuffle on the other side, and

6   someone yelled out "gun."

7   Q.  Do you know who yelled "gun"?

8   A.  I don't know.

9   Q.  But it was someone from the other side?

10  A.  One of the -- one of my other two guys yelled "gun."

11  Q.  What did you think when you heard "gun"?

12  A.  There is a source -- sense of urgency at the time, because

13  having worked with these guys for a while, I know how confident

14  they are in what they do, so when you hear the sense of urgency

15  in their voice, you know that something is not right.

16  Q.  Did you have a belief as to who had the gun?

17          MR. KNUDSEN:  Objection.

18          THE COURT:  Sustained.

19  BY MR. MANNINGHAM:

20  Q.  What did you do after you heard "gun"?

21  A.  We grabbed the driver, quick patdown, cuffed him and

22  brought him back to my vehicle.

23  Q.  And how did you feel when you heard "gun"?

24          MR. KNUDSEN:  Objection.

25          THE COURT:  Sustained.

J482all3                         Sanchez – Cross

1              MS. RYAN:  Your Honor, may we be heard on that?

2              THE COURT:  Yes.

3              (Continued on next page)

J482all3                          Sanchez – Cross

1              (At the sidebar)

2              MR. MANNINGHAM:  I am just trying to get state of

3     mind, why it was relevant --

4              THE COURT:  I'm not sure it is relevant to this

5     witness, because I'm not sure there is anybody who is

6     contending that he laid a finger on the plaintiff.  So I'm not

7     sure his state of mind on this point matters, but let me find

8     out.

9              MR. KNUDSEN:  That's what I thought.  I don't see what

10    his state of mind is pertinent to.

11             THE COURT:  Just so the record is clear, you are not

12    contending Sergeant Sanchez played any role in the assault

13    of --

14             MR. KNUDSEN:  No, I'm not contending that --

15             THE COURT:  -- alleged assault of Mr. Allen.

16             MR. KNUDSEN:  -- I don't --

17             THE COURT:  You can't have it both ways.

18             MS. RYAN:  Exactly.

19             THE COURT:  If you are going to be arguing to the jury

20    later that he played a role in the assault, then I can't keep

21    out evidence about his state of mind.

22             MR. KNUDSEN:  Okay.

23             THE COURT:  Okay.

24             MR. MANNINGHAM:  So I can ask the question?

25             THE COURT:  Yes, you can reask the question.

J482all3                          Sanchez – Cross

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J482all3                    Sanchez – Cross

1           (In open court)

2    BY MR. MANNINGHAM:

3    Q.   Sergeant Sanchez, when you heard "gun," how did you feel?

4    A.   Concern, concern for the safety of my guys.

5    Q.   What did you do after you heard "gun"?

6    A.   Once we placed the driver in the rear of my vehicle, I ran

7    back around to -- around the vehicle and went to see make sure

8    my guys were okay.

9    Q.   So what did you do with the driver?

10   A.   He was in the back of my car.

11   Q.   You said you secured him?

12   A.   Yes.

13   Q.   How did you -- what do you mean by that?

14   A.   He was handcuffed and he was placed in the back of my

15   vehicle.

16   Q.   So after -- did you place him in the back of your vehicle?

17   A.   Just me and Officer Tass.  I don't remember if it was me

18   personally or him, but we both brought him back.

19   Q.   After that, then what happened?  Then where did you go?

20   A.   I ran back around the red vehicle, and I came from the rear

21   to made sure my guys were okay.

22   Q.   And when you got there, what did you see?

23   A.   At that point, the plaintiff was already handcuffed and he

24   was being led up.

25   Q.   Was he saying anything, the plaintiff?

J482all3                        Sanchez - Cross

1    A.  He was cursing a lot.

2    Q.  From the time you first approached the driver's side to the

3    time you saw plaintiff handcuffed, how much time passed?

4    A.  Approximately a minute.

5    Q.  What happened next?

6    A.  Once I made sure my guys were okay, I went -- like I said,

7    the plaintiff was cursing a lot.  I actually said:  Everything

8    okay?  Again, he cursed at me a few more times, so at that

9    point I said:  Let's just go back.  We brought him back.

10   Q.  And you went back to the precinct?

11   A.  Went back to the precinct, yes.

12   Q.  You testified a little bit about the procedures for

13   recovering a gun in a vehicle.  Can you just explain what that

14   procedure is.

15   A.  Yes.  Normally when there is a weapon found either on a

16   person, in a vehicle, or in a compartment or somewhere in that

17   vehicle, normal procedure, we will bring everyone back for

18   investigation.  Doesn't mean we arrest them.  We just bring

19   them back until we are sure that we have either enough to

20   charge someone with a crime, and that's the reason why everyone

21   gets brought back.

22   Q.  You also testified about something called the evidence

23   collection team, is that correct?

24   A.  That is correct.

25   Q.  Can you explain what -- why you would call the evidence

J482all3                          Sanchez - Cross

1   collection team?

2   A.  Okay.  So, again, referring to the weapon, if the weapon is

3   found in that vehicle and once the occupants are out and

4   secured and there is no danger of that weapon being either

5   grabbed by someone, it is left where it is at for our evidence

6   collection team to come out, they will photograph it, they will

7   take prints, they will fume it.  There are certain things that

8   they do to voucher that weapon.

9   Q.  Did you do that here?

10  A.  No.

11  Q.  Why not?

12  A.  Because the weapon was found in his person.

13          MR. KNUDSEN:  Objection.

14          THE COURT:  Well, you don't have any personal

15  knowledge of where the weapon was found, do you?  Or do you?

16          THE WITNESS:  My officers informed me that the weapon

17  was found in his person.

18          THE COURT:  But you didn't see the weapon being

19  recovered, right?

20          THE WITNESS:  No, I didn't see the actual recovery of

21  the weapon.

22          THE COURT:  Okay.

23  BY MR. MANNINGHAM:

24  Q.  Sergeant Sanchez, did you punch the plaintiff at any point?

25  A.  No, I did not.

J482all3                          Sanchez – Redirect

1    Q.  Did you kick the plaintiff at any point?

2    A.  No, sir.

3    Q.  Did you help put the plaintiff in handcuffs?

4    A.  No, I did not.

5    Q.  Did you even touch the plaintiff at any point?

6    A.  No, sir.

7         MR. MANNINGHAM:  May I have a moment to confer with my

8    co-counsel?

9         THE COURT:  Yes.

10        (Counsel confer)

11        MR. MANNINGHAM:  Nothing further.

12        THE COURT:  All right.  Mr. Knudsen, any redirect.

13        MR. KNUDSEN:  Yes.

14   REDIRECT EXAMINATION

15   BY MR. KNUDSEN:

16   Q.  So you did not witness the arrest of Mr. Allen?

17        MR. MANNINGHAM:  Objection.

18        THE COURT:  Overruled.

19   A.  I was present for the arrest of Mr. Allen, yes.

20   Q.  You did not see the arrest of Mr. Allen, is that correct?

21   A.  I was present at the scene, sir.

22   Q.  That was not my question.  Did you see Mr. Allen being

23   arrested?

24        MR. MANNINGHAM:  Objection.

25        THE COURT:  Overruled.

J482all3                          Sanchez - Redirect

1           THE WITNESS:  I'm sorry, your Honor.  I am a bit

2    confused.

3           THE COURT:  Okay.  So there are two concepts here.

4    One is presence at the scene of an arrest.  That's concept one.

5    Concept two is, did you see Mr. Allen being arrested?  That's a

6    different concept.

7           So counsel is asking you whether you saw him placed

8    under arrest.  Is that what you are getting at, Mr. Knudsen.

9           MR. KNUDSEN:  Yes.

10          THE COURT:  So did you, for example, see handcuffs

11   being put on Mr. Allen?  Did you see that?

12          THE WITNESS:  No, your Honor, no.

13          THE COURT:  Okay.

14   BY MR. KNUDSEN:

15   Q.  You did not see Mr. Allen resist arrest, correct?

16   A.  No, sir.

17   Q.  You did not see Mr. Allen in possession of the gun.

18   A.  No, I did not.

19   Q.  Who decided to write "CPW," or "criminal possession of a

20   weapon," in the command log for Mr. Allen?

21          MR. MANNINGHAM:  Objection.

22          THE COURT:  Overruled.

23   A.  I did.

24   Q.  So by that time, had someone told you that Mr. Allen was in

25   possession of the gun?

J482all3                         Sanchez - Recross

1    A.  Yes, sir.

2    Q.  Who had told you that?

3    A.  One of my officers.

4    Q.  Do you remember who?

5    A.  No, I don't.

6           MR. KNUDSEN:  I have nothing further, your Honor.

7           THE COURT:  All right.  Anything else?

8           MR. MANNINGHAM:  Yes, your Honor, just one quick

9    question.

10   RECROSS EXAMINATION

11   BY MR. MANNINGHAM:

12   Q.  Sergeant Sanchez you just testified that you couldn't see

13   plaintiff resisting, is that correct?

14   A.  That is correct.

15   Q.  Where were you located during the struggle that you heard?

16   A.  I was on the driver's side of the vehicle.

17   Q.  And Sergeant Sanchez, how tall are you?

18   A.  5' 4" on good days.

19   Q.  And what was your focus when the struggle was happening?

20   A.  Again, I had the driver.  The driver was out.  Once I heard

21   the word "gun" and the struggle, now your mind goes different

22   places, so I'm thinking, maybe this guy has a gun.  So we are

23   trying to work a thousand things at the same time.  So my focus

24   was on the guy that I had at hand right now.  So I put him in

25   handcuffs, making sure everything was good on this side, and

J482all3                     Ravelo - Direct

1    that way that didn't get out of hand for us.  So once I was

2    safe with that, I brought him back, and that's what I focused

3    on.

4              MR. MANNINGHAM:  Thank you, Sergeant Sanchez.

5              Nothing further, your Honor.

6              THE COURT:  Anything else?

7              MR. KNUDSEN:  Nothing for plaintiff, your Honor.

8              THE COURT:  You can step down, Sergeant.

9              Plaintiff call his next witness.

10             MR. KNUDSEN:  Were we going to take a mid-afternoon

11   break?

12             THE COURT:  Yes.  I generally do that a little bit

13   later.

14             MR. KNUDSEN:  I don't care.  I can start now.  That's

15   fine.

16             THE COURT:  Somewhere between 3:45 and 4:00.

17             MR. KNUDSEN:  Very good.

18             Plaintiff is going to call Officer Brandon Ravelo.

19    BRANDON RAVELO,

20        called as a witness by the plaintiff,

21        having been duly sworn, testified as follows:

22             THE COURT:  Please proceed.

23   DIRECT EXAMINATION

24   BY MR. KNUDSEN:

25   Q.  Good afternoon, Detective Ravelo.

J482all3                          Ravelo - Direct

1   A.  Good afternoon.

2   Q.  On January 9, 2015, you were working it the 47th Precinct?

3   A.  Yes, I was.

4   Q.  Were you a detective at the time?

5   A.  I was a police officer.

6   Q.  And you had worked for about five years at that point?

7   A.  Approximately.

8   Q.  I apologize if I asked this, but you were working at the

9   47th?

10  A.  Correct.

11  Q.  What was your assignment at the time?

12  A.  Anticrime.

13  Q.  Who were your partners that day?

14  A.  I believe it was Sergeant Sanchez and Officer Shelley.

15  Q.  And Sanchez was your supervisor?

16  A.  Correct.

17  Q.  You had all worked with Sergeant Sanchez before?

18  A.  Yes, sir.

19  Q.  You had worked with Officer Williams before?

20  A.  Yes, sir.

21  Q.  And you had worked with Officer Tass before?

22  A.  Yes, sir.

23  Q.  And you worked with Sergeant Sanchez after that?

24  A.  Yes, sir.

25  Q.  And Officer Williams after?

J482all3                        Ravelo - Direct

```
1    A.  Correct.

2    Q.  And Officer Tass after, as well?

3    A.  Correct.

4    Q.  Were you in uniform that day?

5    A.  No, I was not.

6    Q.  You were in plainclothes?

7    A.  Yes, I was.

8    Q.  On January 9, 2015, when you arrived at the scene of

9    Mr. Allen -- where Mr. Allen was located, did you come in an

10   unmarked car?

11   A.  Yes, I did.

12   Q.  And how many other cars arrived at the scene where

13   Mr. Allen was located?

14   A.  From what I remember, it was one other vehicle.

15   Q.  Was that an unmarked car as well?

16   A.  Yes, sir.

17   Q.  And when you arrived at the scene, you were in a car with

18   Officer Williams?

19   A.  I believe so, yes.

20   Q.  Do you think you were in the car with anyone else?

21   A.  No.

22   Q.  And Mr. Allen was in a red Honda that day?

23   A.  I know the car was red.  I'm not sure it was a Honda.

24   Q.  When you approached the red vehicle, you approached the

25   passenger side, right?
```

1    A.  Yes, sir.

2    Q.  And the passenger window was closed --

3    A.  I believe so.

4    Q.  -- as you approached?  Hmm?

5    A.  I believe so.

6    Q.  You believe that the occupants were hotboxing, isn't that

7    correct?

8    A.  Yes, sir.

9    Q.  And what is hotboxing?

10   A.  Basically when you are smoking marijuana in the car and the

11   windows are up and it fills up and you get more -- I don't

12   smoke marijuana, but I guess you get a stronger effect.

13   Q.  And when you got to the passenger side door, you were with

14   Officer Williams?

15   A.  Yes, sir.

16   Q.  And the passenger door was opened?

17   A.  Yes, it was.

18   Q.  And you and Officer Williams were trying to pull Mr. Allen

19   out of the car, is that correct?

20   A.  Yes.

21   Q.  And Mr. Allen was kind of like leaning his body toward the

22   driver's side of the car in response to that, right?

23   A.  He was actively resisting, yes.

24   Q.  Yes, but he was actively resisting by leaning into the car?

25   A.  Yes, pulling his body away from us.

J482all3                          Ravelo - Direct

1   Q.  Okay.  And this went on for about 20 to 30 seconds?

2   A.  I believe so.

3   Q.  And during that 20 to 30 seconds, Mr. Allen was not doing

4   anything else, just kind of leaning away from you.

5   A.  No.  That's not correct.

6   Q.  So he was -- how else was he resisting arrest during those

7   20 to 30 seconds?

8   A.  He was pulling his arm away from us, he was kicking, he was

9   trying to get away.

10  Q.  You were deposed in this case?

11  A.  Yes, sir.

12  Q.  You were deposed on August 8, 2018, is that correct?

13  A.  I don't remember the date, but I believe so.

14  Q.  You -- it sounds about right, in August 2018?

15  A.  Yes, sir.

16  Q.  And you were sworn in by a court reporter at that time?

17  A.  Yes, sir.

18  Q.  And you swore to tell the truth?

19  A.  Whole truth, nothing but the truth.

20  Q.  Right.

21       And then you were asked a series of questions, right?

22  A.  Yes, sir.

23  Q.  And you gave answers to those questions?

24  A.  Yes, sir.

25       MR. KNUDSEN:  I'm going to give you a copy of --

J482all3                          Ravelo - Direct

1              MS. RYAN:  Your Honor, the defendants have provided a

2       binder with all relevant deposition and trial testimony.  If

3       counsel could just direct us to a page?

4       BY MR. KNUDSEN:

5       Q.  Directing your attention to page 51, starting at line 3:

6       "Q   He was going toward the driver?

7       "A   Well, he was pulling his body toward the driver's side of

8       the car, yes.

9       "Q   Anything else that you recall Mr. Allen doing during the

10      20 to 30 seconds that you were trying to remove him from the

11      vehicle?

12      "A   In the vehicle part?

13      "Q   Yes.

14      "A   Just pulling away from us."

15              Okay.  Do you remember getting those questions and

16      giving those answers.

17      A.  Yes, sir.

18      Q.  So now you say he was doing something different?

19      A.  Well, pulling away from us depends on what you consider.

20      It's resisting arrest.

21      Q.  When Mr. Allen was brought out of the car, he was brought

22      down to the ground face first, right?

23      A.  Correct.

24      Q.  And he was brought down to the ground face first with

25      force, correct?

J482all3                         Ravelo – Direct

 1   A.  Correct.

 2   Q.  And he was brought down to the ground face first by you and

 3   Officer Williams, correct?

 4   A.  Correct.

 5   Q.  And then you were on top of Mr. Allen after he was on the

 6   ground?

 7   A.  Yes, I was.

 8   Q.  And Mr. Allen was –– after Mr. Allen was brought out of the

 9   car and to the ground, you believe other officers came around

10   and helped you with the arrest of Mr. Allen, correct?

11   A.  Correct.

12   Q.  So Officer Tass came over to assist?

13   A.  I couldn't tell you who came around.

14   Q.  Did Sergeant Sanchez come over to assist?

15   A.  I couldn't tell you.

16   Q.  You believe other officers came over, you just don't know

17   which ones?

18   A.  Yes.

19   Q.  So it's possible that Officer Tass came over to assist?

20           MS. RYAN:  Objection.

21           THE COURT:  Sustained.

22           Do you recall how many officers came over to assist

23   you and Detective Williams?

24           THE WITNESS:  No.  During the struggle, I could just

25   hear them say, Are you okay?  I couldn't say if they actually

J482all3                        Ravelo - Direct

1    got involved.

2              MR. KNUDSEN:  Objection to this.  I mean, that was not

3    responsive to your question.

4              THE COURT:  I was just asking -- I was just focused on

5    a number, so my question was, because there has been a

6    reference to officers, which is plural, I was asking if you

7    knew whether one officer assisted you and Detective Williams or

8    whether it was more than one.

9              THE WITNESS:  I know that me and Williams were the

10   ones that had our hands on them.

11             THE COURT:  Right.  And with respect to other officers

12   who came over, do you know whether it was one officer or two

13   officers?

14             THE WITNESS:  No.

15             THE COURT:  Or you just don't know.

16             THE WITNESS:  I don't know.

17             THE COURT:  Okay.

18   BY MR. KNUDSEN:

19   Q.  So while Mr. Allen was face down on the street, you and

20   Officer Williams were holding his hands up behind his back,

21   correct?

22   A.  At which point?  You have to clarify.

23   Q.  When Mr. Allen was face down on the street you and Officer

24   Williams were holding his hands up behind his back, correct?

25   A.  It depends on which point of the fight you are talking

J482all3                              Ravelo - Direct

1    about.

2    Q.  So at some point while Mr. Allen was face down on the

3    street, you and Officer Williams were holding his hands up

4    behind his back?

5    A.  Yes, that's when we were able to get him in cuffs.

6    Q.  You had one of the arms?

7    A.  Correct.

8    Q.  And Officer Williams had one of the arms?

9    A.  I believe so, yes.

10   Q.  And you don't know how Mr. Allen sustained his hand

11   fracture?

12   A.  No.

13   Q.  So you were next to Officer Williams when the passenger

14   side door was open to the red vehicle, correct?

15   A.  Yes, sir.

16   Q.  And you were there assisting Officer Williams to get

17   Mr. Allen out of the car, right?

18   A.  Yes, sir.

19   Q.  And you claim that you yelled "gun" when Mr. Allen was

20   being pulled out of the car, is that correct?

21   A.  Mr. Williams, I believe, yelled it first, and I yelled it

22   second.

23   Q.  And then you were down on the ground with Mr. Allen, is

24   that correct?

25   A.  After we got him out of the car, we brought him down to the

J482all3                         Ravelo - Direct

1   ground.

2   Q.  And then you were with him on the ground until handcuffs

3   were applied to Mr. Allen, correct?

4   A.  Correct.

5   Q.  During that entire time, you never saw the gun at the scene

6   of the arrest of Mr. Allen, isn't that correct?

7   A.  That is correct.

8   Q.  And Mr. Allen did not have the gun on him while he was out

9   of the car on the ground, isn't that correct?

10  A.  Correct.

11          MR. KNUDSEN:  Nothing further, your Honor.

12          THE COURT:  All right.  Cross-examination.

13          MS. RYAN:  Yes, your Honor, or would your Honor prefer

14  to take a mid-afternoon break at this time.

15          THE COURT:  Okay.  Ladies and gentlemen, as I

16  mentioned, we will take our mid-afternoon break, so we will be

17  back to you in about ten minutes.  Don't discuss the case.

18  Keep an open mind.  There is more evidence.  We will be back to

19  you shortly.  Thank you all very much.

20          (Continued on next page)

21

22

23

24

25

J482all3                          Ravelo – Direct

1                (Jury not present)

2                THE COURT:  All right.  We will resume shortly.

3                (Recess)

4                (Jury not present)

5                THE COURT:  Are we ready to proceed?

6                MS. RYAN:  Yes, your Honor.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J482all3                          Ravelo - Cross

1         (Jury present)

2              THE COURT:  Please proceed.

3              MS. RYAN:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MS. RYAN:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  Detective, are you still currently employed with the NYPD?

9    A.  Yes, I am.

10   Q.  How long have you been with the NYPD?

11   A.  A little less than ten years.

12   Q.  And what is your current assignment?

13   A.  Citywide anticrime.

14   Q.  What are some of your responsibilities in that assignment?

15   A.  We are a citywide unit.  We get assigned to the most

16   violent commands in the city that are often shootings, and we

17   are responsible for taking illegal firearms and stopping

18   robberies in those precincts.

19   Q.  You mentioned on direct that on January 9, 2015, you were

20   assigned to the Four Seven Precinct, correct?

21   A.  Correct.

22   Q.  Can you tell us where is the Four Seven Precinct?

23   A.  It is in the confines of the Bronx, Wakefield section.

24   Q.  What was your assignment on January 9, 2014?

25   A.  Four Seven anticrime.

J482all3                         Ravelo – Cross

1   Q.  Did that differ from what you are doing now in citywide

2   anticrime?

3   A.  Basically the same thing, but you stay in the confines of

4   just that precinct.

5   Q.  And what tour did you work on January 9, 2015?

6   A.  11:30 by 8:05 p.m.

7   Q.  You mentioned that you were in plain clothes that day.

8   What does that mean?

9   A.  Civilian attire, most likely I was wearing a hoodie and

10  jeans.

11  Q.  Is plainclothes, is that the same as being undercover?

12  A.  No.

13  Q.  How is that different?

14  A.  In undercover, you will never know he is a police officer.

15  I'm identified with my shield displayed.

16  Q.  Before this incident, did you know the plaintiff, Carleto

17  Allen?

18  A.  Yes.

19  Q.  How so?

20  A.  I was in the Four Seven for the whole beginning of my

21  career.  I dealt with him when I was on foot posts, when I was

22  on patrol, when I went to anticrime, and I also knew him from

23  the wanted poster that he was wanted in Mount Vernon for a

24  gunpoint commercial robbery.

25  Q.  So turning your attention to January 9, 2015, you described

J482all3                              Ravelo - Cross

1    that there was a time you encountered the plaintiff that day,

2    correct?

3    A.  Correct.

4    Q.  So how did you get involved?

5    A.  I wasn't sure if it was me or my sergeant that received the

6    phone call, but we got a phone call from our field intelligence

7    office and told us that they needed help apprehending

8    Mr. Allen.

9    Q.  You said you and your supervisor.  Is that Sergeant Sanchez

10   you are talking about?

11   A.  Correct.

12   Q.  And you received a call from the FIO unit?

13   A.  Yes.

14   Q.  What is that?

15   A.  Field intelligence.

16   Q.  What is field intelligence?

17   A.  They deal with more CIs, getting information, conducting

18   search warrants and things of that nature.

19   Q.  In your experience as an anticrime officer, was that

20   typical for the FIO unit to ask for your team's help in

21   apprehending someone?

22   A.  Yes.  They would call us if it was something like somebody

23   was violent, somebody was going to fight or run, and they

24   needed help.

25   Q.  And did you know why plaintiff was being arrested that day?

J482all3                          Ravelo - Cross

1   A.  Yes.

2   Q.  What was that?

3   A.  I believe that he was wanted in Mount Vernon for a gunpoint

4   commercial robbery.

5           MR. KNUDSEN:  Objection.

6           THE COURT:  Grounds?

7           MR. KNUDSEN:  Why he was being arrested?  I mean --

8   all right.

9           THE COURT:  Yes, the objection is overruled.

10  BY MS. RYAN:

11  Q.  And how did you know that?  You mentioned a wanted flyer

12  earlier, but could you explain that a little bit more?

13  A.  Yes.  There was a wanted flyer posted all over the

14  precinct, mainly at the desk.  It had a picture of him, it had

15  a picture of, I believe, his home residence, and it had a brief

16  description of the incident, and it stated probable cause

17  warrant for arrest, considered armed and dangerous.

18  Q.  So once the FIO unit asked your team for help, what

19  happened?

20  A.  We met up and we formed a small TAC plan.

21  Q.  What's a TAC plan?

22  A.  Basically what each officer is going to do to make sure we

23  do it safely and make sure no civilians get hurt in the

24  apprehension.

25  Q.  You said that "we met up," who specifically met up?

J482all3                        Ravelo - Cross

```
 1    A.  It would be me, Sergeant Sanchez, Detective Williams and

 2    Officer Tass.

 3    Q.  And why was it necessary to have a TAC plan before

 4    approaching plaintiff?

 5    A.  For safety purposes.  Hopefully we don't get hurt and also

 6    they don't get hurt.

 7    Q.  Whose safety were you concerned about?

 8    A.  Our own and the civilians.

 9    Q.  Specifically what was your role going to be in that TAC

10    plan?

11    A.  I was going to drive down East 220 Street with

12    Detective Williams and approach the passenger side.

13    Q.  So once the team had this plan, what happened next?

14    A.  We executed it.

15    Q.  So you said you were going to drive to the location?

16    A.  Yes.

17    Q.  And what police equipment did you have on you that day?

18    A.  I had my firearm, my extra magazine, mace, handcuffs,

19    radio, my shield, and colored bay.

20    Q.  And where was your shield?

21    A.  On a lanyard around my neck, center mass on my chest.

22    Q.  And what location did you head to?

23    A.  East 220 Street between Barnes Avenue and White Plains

24    Road.

25    Q.  If I showed you a picture of that location, would you
```

J482all3                         Ravelo - Cross

1    recognize it?

2    A.  Yes, I would.

3            MS. RYAN:  Your Honor permission to show the witness

4    what's premarked as Defendant's Exhibit I for identification.

5            THE COURT:  All right.

6            MS. RYAN:  Your Honor, I have a copy for the court as

7    well.

8            THE COURT:  Thank you.

9    BY MS. RYAN:

10   Q.  Detective Ravelo, I'm showing you a street view from Google

11   Maps.  Do you recognize the location in that picture?

12   A.  Yes.

13   Q.  What location do you recognize it to be?

14   A.  It is East 220 Street facing White Plains Road.

15   Q.  And how do you recognize that location?

16   A.  Street, the train station, and it being in the confines of

17   the Four Seven Precinct.

18   Q.  Does this picture accurately depict the location where you

19   encountered the plaintiff on January 9, 2015?

20   A.  Yes.

21           MS. RYAN:  Your Honor, defendants offer Exhibit I into

22   evidence.

23           THE COURT:  Any objection?

24           MR. KNUDSEN:  No objection.

25           THE COURT:  Defense Exhibit I is received.

J482all3                          Ravelo – Cross

1              (Defendant's Exhibit I received in evidence)

2              MS. RYAN:  Permission to publish to the jury.

3              THE COURT:  Yes.

4    BY MS. RYAN:

5    Q.  Detective, can you describe what we are seeing in this

6    picture?

7    A.  East 220 Street.  It's a one-way street with one lane of

8    traffic and two lanes of parking left and right going towards

9    White Plains Road, which is an elevated train.

10   Q.  Can you just point -- I think you can touch the screen

11   there, show us what you are talking about when you say White

12   Plains Road.

13             For the record the witness has drawn a dot

14   approximately the middle of the diagram indicating White Plains

15   Road.

16             THE COURT:  Yes.

17   BY MS. RYAN:

18   Q.  We heard that plaintiff was sitting in a car.  Where was

19   that car?

20   A.  Approximately near that pump on the left.

21   Q.  Could you draw the car for us?

22             MS. RYAN:  For the record the witness has drawn a

23   rectangle in front of the fire hydrant on the middle part of

24   the drawing.

25             THE COURT:  On the left side of the street, yes.

J482all3                         Ravelo – Cross

1    BY MS. RYAN:

2    Q.  You said your team drove to the location.  What direction

3    did you approach from?

4    A.  With the flow of traffic towards Barnes Avenue going

5    towards White Plains Road.

6    Q.  So you would be going in the direction we see in this

7    picture?

8    A.  Correct.

9    Q.  Can you show us where your car parked in relation to

10   plaintiff's car?

11   A.  (Indicating).

12        MS. RYAN:  For the record, the witness has drawn a

13   rectangle to the right and slightly below the previously drawn

14   rectangle.

15        THE COURT:  Yes.

16   BY MS. RYAN:

17   Q.  We heard another police car came from another direction.

18   Can you show us where that car parked?

19   A.  (Witness complies).

20        MS. RYAN:  For the record, the witness has drawn a

21   square above the previously drawn rectangle.

22        THE COURT:  Yes.

23   BY MS. RYAN:

24   Q.  So that other car came from White Plains Road, then?

25   A.  Correct.

J482all3                         Ravelo - Cross

1   Q.  So once you arrive on the scene, what happens?

2   A.  We exit the vehicle and we approached the driver's side.

3   Q.  When you say "we," who do you mean?

4   A.  Me and Detective Williams.

5   Q.  So you were in a car with Detective Williams at the time?

6   A.  Correct.

7   Q.  So you exited your vehicle and where did you go?

8   A.  I exited from I believe the passenger side and walked

9   around the back side of the trunk, where the trunk would be,

10  and then towards his vehicle.

11  Q.  So to be clear, you walked around the trunk of your car?

12  A.  Yes.

13  Q.  Towards the car plaintiff was sitting in?

14  A.  Yes.

15  Q.  And then what happened next?

16  A.  We opened up the passenger door.

17  Q.  Do you remember who opened the door?

18  A.  I don't recall, but I do believe it was Detective Williams.

19

20  Q.  What, if anything, happened when the door opened?

21  A.  Large smoke -- smell of marijuana and smoke of marijuana

22  exited the vehicle.

23  Q.  And when the door was opened, did either you or

24  Detective Williams say anything?

25  A.  Yes.

J482all3                              Ravelo – Cross

1    Q.  What did you say?

2    A.  Step out of the vehicle.

3    Q.  And who were you saying that to?

4    A.  Mr. Allen.

5    Q.  Mr. Allen, the plaintiff?

6    A.  Correct.

7    Q.  And what did plaintiff do in response?

8    A.  He failed to comply.

9    Q.  Did he do anything else?

10   A.  Yes.

11   Q.  What did he do?

12   A.  He reached towards his jacket pocket.

13   Q.  So after you saw plaintiff reach toward a jacket pocket,

14   what happened next?

15   A.  I heard Detective Williams yell "gun."

16   Q.  And where were you standing in relation to

17   Detective Williams?

18   A.  Right beside him.

19   Q.  And who was closer to the plaintiff would you say?

20   A.  Williams first.

21   Q.  So Williams was closer to plaintiff and you were to his

22   side but behind him?

23   A.  Yes.

24   Q.  So you heard Detective Williams yell "gun"?

25   A.  Correct.

J482all3                    Ravelo - Cross

1   Q.  And what did you do?

2   A.  I squeezed in right next to him and tried to gain

3   compliance of his hands.

4   Q.  Of whose hands?

5   A.  The plaintiff.

6   Q.  And why did you do that?

7   A.  To make sure he wouldn't be able to reach what I believed

8   Detective Williams saw was a gun.

9   Q.  Is that what you believed after you heard Williams say

10  "gun"?

11  A.  Yes.

12  Q.  So what happened next?

13  A.  When I reached in for his hand, my arm brushed against the

14  jacket pocket, and I also yelled "gun" because I believed what

15  I felt was a firearm in that pocket.

16  Q.  Can you describe what you felt?

17  A.  Heavy metal object, steel.

18  Q.  And what about it made you think that it was a gun?

19  A.  The statements that were made by Williams, what I knew he

20  was wanted for, and what I felt.

21  Q.  And how did that make you feel?

22  A.  I was nervous and scared.

23  Q.  Why?

24  A.  I got a family to go home to.  I don't want to get shot.

25  Q.  So what did you do?

J482all3                           Ravelo - Cross

A.  I tried to gain compliance of his hands and pull him out of
the car.

Q.  Did you say anything?

A.  To get out of the car.

Q.  And did plaintiff comply?

A.  No, he did not.

          THE COURT:  Now, what type of jacket did he have on.

          THE WITNESS:  I -- it was like -- I think like a light
winter coat, but I don't remember.

          THE COURT:  And the pocket that you say he was
reaching for, could you tell us where on the jacket the pocket
was?

          THE WITNESS:  I don't remember if it was left or
right.  It was -- we were literally in the tight confines, and
when I went to grab his hands is when I hit it.

          THE COURT:  And was the pocket on the side of the
jacket or was it on the chest?

          THE WITNESS:  I believe it was like how my jacket is
sitting here, like sitting on the lap area.

          THE COURT:  Okay.  Go ahead.

          MR. KNUDSEN:  What was that?  Could you repeat that
last answer?  What did he say?

          THE COURT:  Yes.  He said he pointed to the pocket in
his jacket which is resting against his leg.

          MR. KNUDSEN:  And said?

J482all3                              Ravelo - Cross

1          THE COURT:  Indicating that the pocket of the jacket

2     that he has referred to was laying on the leg of Mr. Allen.

3          THE WITNESS:  Or lap.

4          THE COURT:  Or lap, leg or lap.

5     BY MS. RYAN:

6     Q.  So, I'm sorry, what did you say to the plaintiff, if

7     anything?

8     A.  I told him to, first, stop resisting and to get out of the

9     car.

10    Q.  And did he comply?

11    A.  No.

12    Q.  Why were you trying to get plaintiff out of the car?

13    A.  To get him in handcuffs and get him as far away from that

14    object as possible.

15    Q.  And you say plaintiff was resisting.  How so?

16    A.  He was pulling his body away from us and, like I said,

17    kicking.

18    Q.  So by pulling his body away, was he pulling his weight

19    further into the car?

20    A.  He was pulling towards the driver's side.

21    Q.  How long would you say you were struggling with the

22    plaintiff to get him out of the car?

23    A.  20 to 30 seconds.

24    Q.  Were you able to get plaintiff out of the car?

25    A.  Yes.

J482all3                          Ravelo - Cross

1    Q.  So what happened next?

2    A.  Got him outside the car, we were able to get him down to

3    the ground.

4    Q.  Can you describe how you brought him to the ground?

5    A.  Grabbed him by his waist, used my body weight to bring him

6    down to the ground.

7    Q.  And why did you bring plaintiff to the ground?

8    A.  To secure him and to get him handcuffs.

9    Q.  Why is that important?

10   A.  Handcuffs, basically if you have his hands, you know he

11   can't reach for anything, and it's the safest way you can be.

12   Q.  And do you know where plaintiff's hands were when you

13   brought him to the ground?

14   A.  They were underneath his body like tight up in a ball, like

15   in a fighting, you know, tense.

16          MS. RYAN:  And for the record, your Honor, the witness

17   is making fists with his hands.

18          THE COURT:  All right.

19   BY MS. RYAN:

20   Q.  So you got plaintiff to the ground and you seemed to

21   indicate he went face first?

22   A.  Yes.

23   Q.  So once you are on the ground, what happened?

24   A.  When we got down to the ground, I actually injured myself

25   as well.  I believe it was his body weight landing on my arm,

J482all3                        Ravelo - Cross

1    and I basically held all my body weight on top of him, trying

2    to keep him pinned down to the ground.

3    Q.  At this point did any other officers come to assist you?

4    A.  Yes.  It was me and Detective Williams.

5    Q.  Anyone else?

6    A.  Not that I remember, no.

7    Q.  And where was Detective Williams compared to you?

8    A.  Side by side.  It was in the tight confines in between the

9    two cars, if you look at the picture.

10   Q.  So in between these rectangles that you had drawn here?

11   A.  Yes.

12   Q.  At this point did you see any other officers put hands on

13   plaintiff?

14   A.  No.

15   Q.  You said you put your body weight on the plaintiff.  Why

16   did you do that?

17   A.  To pin him down so he couldn't get away.

18   Q.  Was there something that made you concerned that he was

19   trying to get away?

20   A.  Yes.  He was throwing elbows, kicking, and trying to push

21   his body weight off the floor.

22   Q.  What about that made you think he was trying to get away?

23   A.  What other reason would you fight with the police?

24   Q.  You mentioned --

25            MR. KNUDSEN:  Objection to that question and answer.

J482all3                      Ravelo - Cross

1          THE COURT:  Sustained.

2    BY MS. RYAN:

3    Q.  You described trying to handcuff the plaintiff, so can you

4    walk us through how you did that?

5    A.  I had him pinned down to the ground.  At some point I'm

6    able to get my body weight on top of him, most likely I went

7    knee to the shoulder and was pulling his arm back by the elbow,

8    at which point I used it as a pivot point to place his arm

9    behind his back.

10   Q.  Would you be able to demonstrate this for us?

11   A.  Yes, I can.

12          MS. RYAN:  Your Honor, could I ask maybe my co-counsel

13   to come up so the detective could show the jury exactly how he

14   would gain control over someone's arm?

15          THE COURT:  Okay.

16          MS. RYAN:  I ask that the witness maybe be able to

17   step down in front of the jury.

18          MR. KNUDSEN:  Is he going to say what he did that day

19   in question or is he just going to say in general what he was

20   doing.

21          THE COURT:  I had understood this to be a showing of

22   what happened that day, right?

23          MS. RYAN:  Yes, your Honor.

24          THE COURT:  Okay.

25   BY MS. RYAN:

J482all3                              Ravelo - Cross

1    Q.  Be gentle with him, Detective.

2    A.  This would be laying on the floor, arm was here, pressure

3    here on the elbow, grab the wrist by the forearm and pull it

4    back behind him.

5    Q.  And how can you be sure that that's what you did on the day

6    in question?

7    A.  It's what I always do.

8    Q.  To be clear, in that demonstration you just did, would you

9    grab or pull on plaintiff's hand in any way?

10   A.  No.  There would be no grip.  The moment he pulls away, you

11   are going to -- he is going to -- you got to grab him by the

12   forearm, so when he pulls away, the hand is there to secure the

13   grip.

14   Q.  So you would secure him by his elbow and his wrist?

15   A.  By his forearm right here.

16   Q.  Thank you.

17        Detective, while you were trying to gain control over

18   plaintiff's arm, what was plaintiff doing?

19   A.  He was actively fighting with us.

20   Q.  How so?

21   A.  Kicking his feet, throwing elbows, anything he could do to

22   get away.

23   Q.  And you mentioned that when you went to the ground,

24   plaintiff's hands were in front of him.  Did his hands remain

25   under him during this time?

J482all3                       Ravelo - Cross

1   A.  I believe when we went down to the ground they were

2   underneath him, yes.

3   Q.  And is that a safety concern for his hands to be underneath

4   him?

5   A.  Yes.  You can't see what he is grabbing or if he is

6   attempting to pull anything out of his pockets.

7   Q.  Was plaintiff saying anything while you were on the ground?

8   A.  Not -- the adrenaline was pumping.  Not that I remember.

9   Q.  Were you saying anything while you were on the ground?

10  A.  Yes.  I was yelling:  Stop resisting.

11  Q.  And did plaintiff comply?

12  A.  No, he failed to comply.

13  Q.  Did there come a time you were able to get plaintiff in

14  handcuffs?

15  A.  Yes.

16  Q.  How long would you say that took?

17  A.  I want to say approximately another 20 or 30 seconds.

18  Q.  That's on the ground?

19  A.  Yes.

20  Q.  At this point, did any other officers come to assist you?

21  A.  Well, it was me and Detective Williams at that point.

22  Q.  Did any other officers get involved at this point?

23  A.  Not that I remember.

24  Q.  Besides you and Detective Williams, did you see any other

25  officers put their hands on plaintiff during this struggle?

J482all3                    Ravelo - Cross

 1  A.  No.

 2  Q.  From the time you approached plaintiff to the time he was

 3  in handcuffs, how much time would you say elapsed?

 4  A.  Approximately a minute.

 5  Q.  So it happened pretty quickly, then?

 6  A.  Yes.

 7  Q.  So once plaintiff was in handcuffs, what happened next?

 8  A.  He was transported back to the Four Seven Precinct.

 9  Q.  And what did you do?

10  A.  I also went back to the Four Seven Precinct to my anticrime

11  office.

12  Q.  Did you do anything at the precinct?

13  A.  Yes, I did.

14  Q.  What was that?

15  A.  I made my sergeant aware that during the incident I had

16  injured myself.

17  Q.  You mentioned earlier you injured your wrist?

18  A.  I believe -- it was my hand or wrist, yes.

19  Q.  How did you think you sustained that injury?

20  A.  When he was resisting and we brought him down to the

21  ground, I believe his body weight fell on top of my mine and my

22  hand hit the concrete and his weight fell on top of it.

23  Q.  Did you ever get any treatment for that?

24  A.  Yes.  I went to the hospital.

25  Q.  On January 9, 2015, did the plaintiff ever complain to you

J482all3                          Ravelo – Cross

1    of any injury?

2    A.   No.

3    Q.   Did you observe any physical injuries on plaintiff?

4    A.   No.

5    Q.   Did you have any further interactions with plaintiff after

6    you got back to the precinct?

7    A.   No.

8    Q.   Did you fill out any paperwork relating to plaintiff's

9    arrest or any of his injuries?

10   A.   No.

11   Q.   At any time during this interaction with plaintiff did you

12   punch him?

13   A.   No.

14   Q.   Did you see any officer punch him?

15   A.   No.

16   Q.   Did you deliberately break plaintiff's hand?

17   A.   Absolutely not.

18   Q.   Did you pull on plaintiff's fingers?

19   A.   No, I did not.

20           MS. RYAN:   Your Honor, may I have a moment to confer

21   with my co-counsel?

22           THE COURT:   Yes.

23           (Counsel confer)

24           MS. RYAN:   No further questions at this time, your

25   Honor.

J482all3                           Ravelo – Redirect

1          THE COURT:  All right.

2          MS. RYAN:  Thank you, Detective.

3          THE COURT:  Anything else, Mr. Knudsen.

4          MR. KNUDSEN:  Yes, your Honor.

5   REDIRECT EXAMINATION

6   BY MR. KNUDSEN:

7   Q.  You testified you had prior interactions with Mr. Allen,

8   correct?

9   A.  Correct.

10  Q.  And you never had a problem with Mr. Allen before, correct?

11  A.  No, we never had a problem with each other.

12  Q.  And when you have had interactions with Mr. Allen, it was

13  over minor stuff and nothing serious, correct?

14  A.  Correct.

15  Q.  And you would even try to give Mr. Allen a word of advice,

16  try to steer him in the right direction at times.

17  A.  Correct.

18  Q.  And Mr. Allen has a nickname for you?

19  A.  Yes, he does.

20  Q.  What?

21  A.  I wouldn't say he has it, the neighborhood has a nickname

22  for me.

23  Q.  And Officer George he refers to you as?

24  A.  Correct.

25          (Continued on next page)

J488ALL4                          Ravelo – Redirect

1    Q.  So when you got back to the precinct -- strike that.

2          You testified that you had information that Mount

3    Vernon was looking for Mr. Allen, correct?

4    A.  Correct.

5    Q.  And when you got back to the precinct, you contacted Mount

6    Vernon to tell them he had been arrested, right?

7    A.  No.

8    Q.  So you described that Mr. Allen was resisting arrest,

9    correct?

10   A.  Correct.

11   Q.  Mr. Allen was not punching anyone when he was resisting

12   arrest?

13   A.  He was throwing his arms and throwing elbows, yes.

14   Q.  My question was, was he punching?

15   A.  Did I see him actually make contact?  No.  Was he punching?

16   Yes.

17   Q.  He was punching?

18   A.  He was actively resists.  When I say throwing his hands,

19   that's what I mean.

20   Q.  When was he punching?

21   A.  On the ground.

22   Q.  So when you say throwing your hands, you mean punching?

23   A.  Yes.

24   Q.  Why don't you just say punching?

25          MS. RYAN:  Objection.

J488ALL4                    Ravelo - Redirect

1          THE COURT:  Sustained.

2    Q.  I am going to direct your attention back to your deposition

3    on August 20, 2018.  On page 55, starting with line 7.

4    "Q.  What was Mr. Allen doing while you were attempting to put

5    handcuffs on him?

6    "A.  Kicking his feet, twisting his body, throwing his arms."

7          MS. RYAN:  Objection.  Improper impeachment, and I ask

8    that the entire answer be read.

9          MR. KNUDSEN:  I am not finished.

10   "A.  Mr. Allen did not want to go to jail.

11   "Q.  When you say he was throwing his arms, can you describe

12   what you mean by that?

13   "A.  Elbows back forward, back forward, twisting, trying to get

14   away."  Indicating in parentheses.

15          Do you recall that?

16   A.  Yes.

17          MS. RYAN:  Objection.

18          THE COURT:  Overruled.

19   A.  Yes.

20   Q.  So where in that did you say that Mr. Allen was punching?

21   A.  It says throwing his arms.  I told you that's what I meant

22   by throwing his arms.

23   Q.  So most people call it punching, you call it throwing your

24   arms?

25          MS. RYAN:  Objection.

1        THE COURT:  Sustained.

2   Q.  You testified that no other officers came to assist you

3   during the apprehension of Mr. Allen just now, didn't you?

4   A.  I said I don't remember.

5   Q.  You don't remember.

6        Previously you said, when I questioned you, that you

7   believe other officers did come around, isn't that correct?

8   A.  I said I couldn't tell you who it was.

9   Q.  But you do believe other officers assisted you in the

10  apprehension?

11  A.  Yes, I do.

12  Q.  So when you say no one --

13       THE COURT:  Excuse me.  When you say other officers

14  assisted you, at what point?

15       THE WITNESS:  That's a perfect question.  What I meant

16  was, I see Sergeant Sanchez, after he put the driver in the

17  car, how he came around, that's assisting me.  He's coming to

18  help me, make sure I'm all right, make sure everything is OK.

19       Did I actually see any other officer besides me and

20  Detective Williams put our hands on him?  No.

21  Q.  So you believe that after Mr. Allen is in the car and

22  Sergeant Sanchez comes around to talk to you, he is actually

23  assisting in the apprehension of Mr. Allen?

24       MS. RYAN:  Objection.

25       THE COURT:  Sustained.

J488ALL4                          Ravelo - Redirect

1   Q.  You have testified at trials before?

2   A.  Yes, sir.

3   Q.  A lot?

4   A.  Yes.

5   Q.  You testified before, in response to questions by counsel,

6   that while Mr. Allen was in the car he was kicking?

7   A.  Correct.

8   Q.  When you were deposed, you said that Mr. Allen was only

9   putting his weight into the car to resist being pulled out,

10  correct?

11          MS. RYAN:  Objection.  Is there impeachment?

12          THE COURT:  He is asking a question about what officer

13  Ravelo testified to at his deposition.

14          Do you remember what you said at your deposition on

15  this subject?

16          THE WITNESS:  I believe he was pulling away from us

17  actively resisting.

18  Q.  So that's what you said in your deposition, correct?

19  A.  I believe so, yes.

20  Q.  Pulling away and actively resisting.

21          But you didn't testify that he was kicking?

22  A.  I don't believe the question was asked.

23  Q.  I will direct your attention to page 51 of the deposition

24  transcript, question starting at line 6.

25  "Q.  Anything --"

```
 1   A.  Sorry.  What page?

 2   Q.  It's 51, line 6.

 3           Specifically you were asked:

 4   "Q.  Anything else that you recall?

 5           THE COURT:  You need to start earlier than that.

 6           MR. KNUDSEN:  OK.

 7           THE COURT:  You probably have to start on the previous

 8   page.

 9           MR. KNUDSEN:  Let's start at page 50, line 18.

10   "Q.  What was Mr. Allen doing during this 20 to 30 seconds that

11   you were trying to remove him from the vehicle?

12   "A.  Pulling away from us.

13   "Q.  Can you describe what you mean by pulling away from us?

14   "A.  Trying to grab his arm to pull him out.  He resisted by

15   pulling in the opposite direction.

16   "Q.  He was going toward the driver?

17   "A.  Well, he was pulling his body toward the driver's side of

18   the car, yes.

19   "Q.  Anything else that you recall Mr. Allen doing during the

20   20 to 30 seconds that you were trying to remove him from the

21   vehicle?

22   "A.  In the vehicle part?

23   "Q.  Yes.

24   "A.  Just pulling away from us."

25           Do you recall that?
```

J488ALL4                          Ravelo - Redirect

1    A.  Yes, sir.

2    Q.  Where in that does it say that Mr. Allen was kicking while

3    he was in the car?

4    A.  I didn't state it.

5    Q.  So you testified that you felt a heavy object in his

6    pocket?

7    A.  Correct.

8    Q.  But you did not see the gun, correct?

9    A.  No, I did not.

10   Q.  Heavy object does not have to be a gun, is that correct?

11   A.  That is correct.

12   Q.  You also testified that you believed Mr. Allen was reaching

13   for a pocket?

14   A.  Correct.

15   Q.  And you don't recall which pocket he was reaching for?

16   A.  That's correct.

17   Q.  You also testified that you think that this jacket was on

18   his lap?

19   A.  Yes.  The pocket was on his lap.

20   Q.  The pocket was on his lap or the jacket?

21   A.  The jacket, pocket.

22   Q.  Was he wearing the jacket or not?

23   A.  That I don't remember.

24   Q.  And the jacket may have been on his lap, correct?

25   A.  Correct.

J488ALL4                          Ravelo - Redirect

1   Q.  You gave us a demonstration of how you subdue someone's arm

2   to put them in a handcuff, correct?

3   A.  Right.

4   Q.  You testified that you would grab them by the wrist with

5   their arm behind their back, correct?

6   A.  Grab them by the wrist and bring the arm behind the back.

7   Q.  You said break arm behind the back?

8   A.  No.  To bring his arm behind the back.

9   Q.  I apologize.  I misheard you.

10          So you would grab by the wrist and then bring his arm

11  behind his back, right?

12  A.  I keep hearing you say break.

13  Q.  I said bring.  I will speak closer to the microphone.

14          So your testimony is that you would grab him by the

15  wrist and then bring his arm behind his back, correct?

16  A.  Yes.

17  Q.  And the purpose is to lock his arm into place, correct?

18  A.  It's not lock; it's to get his hands into cuffs.

19  Q.  It's to put him in a position where he can't move his arm,

20  correct?

21  A.  Correct.

22  Q.  Right.  Then if he can't move his arm, he can't move his

23  hand, correct?

24  A.  You can still move your hand.

25  Q.  The hand is locked into a position at the end of the arm,

J488ALL4                          Ravelo – Redirect

1    is that correct?

2              MS. RYAN:  Objection.

3              THE COURT:  Overruled.

4    A.  No.  I can clearly grab the wrist and you can still move

5    your hand.

6    Q.  But he can't move the arm at that time?

7    A.  That's correct.

8    Q.  So where were you injured in the apprehension of Mr. Allen?

9    A.  I believe it was when we were going down to the ground.

10   Q.  Where on your body?

11   A.  My hand.

12   Q.  Your right hand?

13   A.  I don't remember which hand it was.

14   Q.  You received a contusion on your right hand?

15   A.  I don't remember.

16   Q.  You don't remember the specific injury you received?

17   A.  No, it was four years ago.

18   Q.  So it wasn't a major injury?

19   A.  No.  I believe it was diagnosed as a sprain.

20   Q.  A sprain of your hand?

21   A.  Hand, wrist, thumb.  I am not 100 percent sure.

22   Q.  Did you review your injury report before coming here today?

23   A.  Yes, I do.

24   Q.  And you don't recall specifically what the injury was?

25   A.  Like I said, I am going to testify to what I remember.  If

J488ALL4                          Ravelo - Redirect

1   you asking me what the paperwork said, I believe it said my

2   thumb.  But I don't remember it being my thumb.  I just

3   remember I hurt my hand.

4   Q.  When did you review your injury report before coming here?

5   A.  I want to say it was before the deposition.

6   Q.  Before the what?

7   A.  Before the dep.

8   Q.  You didn't review your injury report before coming here to

9   testify today?

10          MS. RYAN:  Objection.

11          THE COURT:  Overruled.

12  A.  Honestly, I don't remember.

13  Q.  Isn't it true that you were diagnosed with a right hand

14  contusion?

15  A.  I would have to see the paperwork.

16  Q.  Please take a look at that document and tell me if that

17  refreshes your recollection --

18          THE COURT:  You need to mark that as an exhibit.

19  Anything that is shown to the witness has to have an exhibit

20  number.

21          MR. KNUDSEN:  It was previously marked as Defendants'

22  Exhibit --

23          MS. RYAN:  It's Exhibit G, your Honor.

24          MR. KNUDSEN:  I am only using it to refresh

25  recollection.

J488ALL4                      Ravelo - Redirect

1        THE COURT:  So it's Defendants' Exhibit G?

2        MS. RYAN:  Yes.

3        MR. KNUDSEN:  One page of Defense Exhibit G.

4        THE COURT:  What is the Bates number on the document?

5        MR. KNUDSEN:  D-250.

6        THE COURT:  Thank you.

7   BY MR. KNUDSEN:

8   Q.  Does reviewing this document refresh your recollection

9   about the injury you were diagnosed with?

10  A.  Yes.  And I would like to clarify something.

11  Q.  What diagnosis were you given?

12  A.  Contusion to right hand.

13  Q.  When was the last time you reviewed this document?

14        MS. RYAN:  Objection.  Asked and answered.

15        THE COURT:  Overruled.

16  A.  Now seeing it, I did see that before we came over here

17  during prep.

18  Q.  Thank you for clarifying that.

19        Contusion is a fancy medical word for bruise, right?

20        MS. RYAN:  Objection.

21        THE COURT:  Sustained.

22  Q.  Do you know what a contusion is?

23  A.  Yes.

24  Q.  What is a contusion?

25  A.  Swelling, bruise, sprain, my understanding.

J488ALL4                        Ravelo – Redirect

1   Q.  So now you say sprain even though you're diagnosed with a

2   contusion?

3           MS. RYAN:  Objection.

4           THE COURT:  You asked him to define what contusion

5   meant and he is telling you.  So that's what he is doing; he is

6   responding to your question.

7   Q.  So you received a contusion on your right hand during the

8   arrest, correct?

9   A.  Correct.

10  Q.  And you got that contusion on your right hand by punching

11  Mr. Allen, correct?

12  A.  No.

13  Q.  Do you typically go to the hospital when you get a bruise

14  on your hand?

15  A.  I didn't know it was a bruise at the time.  All I felt was

16  pain.  You don't bruise up right away.

17  Q.  You were aware that officers went to speak to Mr. Allen

18  about his claim of an injury, correct?

19  A.  At what time?

20  Q.  Are you aware just in general?

21  A.  Eventually I found out, yes.

22  Q.  Eventually being when?

23  A.  I don't remember.

24  Q.  It happened that day?

25  A.  Yes, I believe so.

J488ALL4                          Ravelo – Redirect

1   Q.  And if anyone came to speak to you about it, after talking

2   to Mr. Allen, they may have noticed a contusion on your right

3   hand, correct?

4              MS. RYAN:  Objection.

5              THE COURT:  Sustained.

6   Q.  Were you concerned that if anyone came to speak to you,

7   that they may have noticed the contusion on your hand?

8              THE COURT:  Sustained.

9   Q.  You testified that Mr. Allen was resisting arrest when he

10  was brought outside of the vehicle, correct?

11  A.  Correct.

12  Q.  And he was resisting arrest by moving his arms?

13  A.  Correct.

14  Q.  Isn't it possible that Mr. Allen was moving his arms to

15  protect himself?

16             MS. RYAN:  Objection.

17             THE COURT:  Sustained.

18  Q.  You testified that you believed Mr. Allen was trying to get

19  up?

20  A.  Yes.

21  Q.  And that was because he was trying to get his legs under

22  his body?

23  A.  Trying to push up from the ground.

24  Q.  Push up with his arms?

25  A.  Yes, I believe so.

J488ALL4                          Ravelo – Recross

1   Q.  So at that time he had his arms on the ground?

2   A.  Yes.

3   Q.  And he was trying to push up, as you say?

4   A.  Correct.

5   Q.  During this entire time, you did not see Mr. Allen possess

6   the gun, right?

7   A.  No, I did not see it.

8            MR. KNUDSEN:  Nothing further, your Honor.

9            THE COURT:  Anything else?

10            MS. RYAN:  One moment, your Honor.

11   RECROSS-EXAMINATION

12   BY MS. RYAN:

13   Q.  Detective, you were just asked about a nickname that you

14   have, Officer George?

15   A.  Correct.

16   Q.  Who calls you Officer George?

17   A.  Most of the people in the 47 precinct.

18   Q.  Do you know why they call you Officer George?

19   A.  I have some believing, but I am not 100 percent sure.

20   There are two different versions.

21            MR. KNUDSEN:  Objection.

22            THE COURT:  Sustained.

23   Q.  You were also asked about going to the hospital for your

24   hand?

25   A.  Correct.

J488ALL4                          Ravelo - Recross

1    Q.  Why did you go to the hospital?

2    A.  It's department policy that if you injure yourself during

3    the line of duty, that you document it to make sure if anything

4    else more serious happens, that you are covered by the

5    department medically.

6    Q.  So any injury, minor or major, you are required to go to

7    the hospital?

8    A.  You're required to document it, yes.

9    Q.  And you were also asked about feeling this gun in Mr.

10   Allen's pocket.  Can you describe again, what exactly did you

11   feel?

12            MR. KNUDSEN:  Objection.

13            THE COURT:  Sustained.

14   Q.  What makes you sure that it was a gun as opposed to, say, a

15   cell phone?

16            THE COURT:  Sustained.

17            What did you feel?

18            THE WITNESS:  A heavy object, solid steel.

19   Q.  When you felt it, did you think it was a gun?

20   A.  Yes.

21            MR. KNUDSEN:  Objection.

22            THE COURT:  Overruled.

23   A.  Yes.

24   Q.  Why is that?

25   A.  Made multiple gun arrests, I carry a gun everyday, and

J488ALL4

1    everything about the situation, his body language, the

2    situation, knowing what he was wanted for and what I felt.

3    Q.  Thank you, Detective.

4         MS. RYAN:  No further questions, your Honor.

5         THE COURT:  Anything else?

6    REDIRECT EXAMINATION

7    BY MR. KNUDSEN:

8    Q.  You just said that you believed he had a gun because of his

9    body language.  Can you explain what you mean by that?

10   A.  It's everything; it's not just one thing, it's when you put

11   everything together.  I have been doing this for a long time.

12   Actively fighting, knowing what he was wanted for, him grabbing

13   the pocket, and me feeling what I felt.  And plus, Officer

14   Williams yelled out gun.

15        MR. KNUDSEN:  Nothing further, your Honor.

16        THE COURT:  Anything else?

17        MS. RYAN:  No, your Honor.

18        THE COURT:  You can step down.

19        (Witness excused)

20        THE COURT:  Ladies and gentlemen, I am going to break

21   a little bit early today because I have a sentence that I have

22   to do in another case.  So I am going to ask you not to discuss

23   the case with anyone.  Keep an open mind because you will hear

24   more evidence tomorrow.  We will resume at 9:30 tomorrow

25   morning.  Thank you very much.  Have a pleasant evening.

J488ALL4

1          (Jury exits courtroom)

2          THE COURT:  Is there anything we need to discuss

3     before we break for the evening?

4          MR. KNUDSEN:  I don't think so.

5          MS. RYAN:  I just want to get a sense of scheduling.

6     I assume the charge conference would be tomorrow afternoon,

7     summations Wednesday morning, or should we plan for summations

8     tomorrow?

9          THE COURT:  No, I don't think we will be reaching

10    summations tomorrow.

11         Mr. Knudsen, do you have a sense of how much longer

12    the proof is going to take?

13         MR. KNUDSEN:  I would say we would definitely wrap up

14    tomorrow.

15         THE COURT:  OK.

16         MR. KNUDSEN:  Then would we do the charging conference

17    tomorrow?

18         THE COURT:  If there's time, yes.  I don't know if

19    there will be.

20         Is there going to be a separate defense case?

21         MS. RYAN:  Not at this time.  We have nonparty

22    Sergeant O'Brien coming tomorrow, and my understanding is there

23    are still three more witnesses for plaintiff's case.

24         THE COURT:  Yes.  OK.  We will resume tomorrow at

25    9:30.  I do have another matter so I would ask you to clear the

J488ALL4

1    tables as soon as you can.

2              MS. RYAN:  Would you like the lawyers at 9 or 9:30?

3              THE COURT:  9:30, unless something emerges overnight

4    that would require us to talk beforehand.

5              MS. RYAN:  Thank you, your Honor.

6              (Adjourned to April 9, 2019, at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MIGUEL SANCHEZ

Direct By Mr. Knudsen . . . . . . . . . . . .49

Cross By Mr. Manningham . . . . . . . . . . .93

Redirect By Mr. Knudsen . . . . . . . . . . 108

Recross By Mr. Manningham . . . . . . . . . 110

 BRANDON RAVELO

Direct By Mr. Knudsen . . . . . . . . . . . 111

Cross By Ms. Ryan . . . . . . . . . . . . . 122

Redirect By Mr. Knudsen . . . . . . . . . . 142

Recross By Ms. Ryan . . . . . . . . . . . . 155

Redirect By Mr. Knudsen . . . . . . . . . . 157

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 7   . . . . . . . . . . . . . . . . . . . .59

 14    . . . . . . . . . . . . . . . . . . .69

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 H   . . . . . . . . . . . . . . . . . . . .96

 I   . . . . . . . . . . . . . . . . . . . 128