J4A8ALL1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CARLETO ALLEN,

4              Plaintiff,

5         v.                          16 CV 3403 (PGG)

6   JEREMIAH S. WILLIAMS, et al.,

7              Defendants.
                                      Trial
8   ------------------------------x
                                      New York, N.Y.
9                                     April 10, 2019
                                      10:15 a.m.
10

11  Before:

12                    HON. PAUL G. GARDEPHE,

13                                    District Judge
                                          and
14                                    a Jury

15
                         APPEARANCES
16
    LAW OFFICES OF JOHN KNUDSEN
17       Attorneys for Plaintiff
    BY:  JOHN KNUDSEN
18

19  NEW YORK CITY LAW DEPARTMENT
         Attorneys for Defendants
20  BY:  ERIN RYAN
         NICHOLAS MANNINGHAM
21       ELISSA JACOBS

22

23

24

25
```

1           (Trial resumed; jury not present)

2           THE COURT:  First, I want to report that we received a

3    call from Juror No. 3 this morning, Mr. Caputo.  You will

4    recall that he told us about 2:30 yesterday afternoon that he

5    was ill through food poisoning, and he asked that we break for

6    the day at that time, and also that we give him time to meet

7    with his physician this morning.  So based on that, we

8    adjourned at about 2:30 yesterday and I told the jury to return

9    at 12 noon.

10          When he called this morning, he said that he is still

11   feeling ill, that he has consulted with his physician and his

12   physician recommends that he stay home today.  So my suggestion

13   is that we proceed with seven and excuse Mr. Caputo.

14          What do you say, Mr. Knudsen?

15          MR. KNUDSEN:  I prefer him to be here, but if he

16   can't, then that's going to be what it is.

17          THE COURT:  We would not be able to sit today.  So

18   when the jury came in, I would have to tell them to go home.

19          MR. KNUDSEN:  Did you get any more detail about how

20   long he thinks he would be out?

21          THE COURT:  I don't think he knows.  He is still

22   feeling sick today, so will not be able to sit today.  I don't

23   know if there is any way to predict how he is going to feel

24   tomorrow.  So my inclination is to go forward with the seven.

25   Your thoughts.

J4A8ALL1

| | |
|---|---|
| 1 | MR. KNUDSEN:  If he can't make it in and we don't have |
| 2 | an estimate of when he can return, I think that's probably |
| 3 | correct. |
| 4 | THE COURT:  I will hear from the defendants. |
| 5 | MR. MANNINGHAM:  We agree with your Honor.  We think |
| 6 | that's fine proceeding with seven. |
| 7 | THE COURT:  So Mr. Ruocco, you can call Mr. Caputo and |
| 8 | tell him he is dismissed because of his illness. |
| 9 | Late last night I received proposed special |
| 10 | interrogatories from defendants. |
| 11 | Mr. Knudsen, did you receive a copy? |
| 12 | MR. KNUDSEN:  I did.  I submitted a letter to your |
| 13 | Honor this morning by ECF responding, objecting to the special |
| 14 | interrogatories. |
| 15 | THE COURT:  Can we get that letter?  I didn't see it. |
| 16 | You don't happen to have a copy of it, Mr. Knudsen. |
| 17 | MR. KNUDSEN:  I was a little rushed this morning. |
| 18 | THE COURT:  Do defendants have a copy? |
| 19 | MR. MANNINGHAM:  Not of his letter, no, your Honor. |
| 20 | THE COURT:  Can you give the defendants a copy too? |
| 21 | Go ahead. |
| 22 | MR. MANNINGHAM:  I had the opportunity to review the |
| 23 | letter.  I just don't have a copy with me. |
| 24 | THE COURT:  I'm sorry? |
| 25 | MR. MANNINGHAM:  I had an opportunity to review the |

J4A8ALL1

1    letter this morning.  I just don't have a copy.

2         THE COURT:  We will print you out a copy.  Let me just

3    take a second to read it.

4         So I have scanned Mr. Knudsen's letter, which is

5    docket number 97, and he makes a number of points that I agree

6    with.

7         So as an initial matter, if any interrogatory was to

8    be presented to the jury, it would have to indicate to the jury

9    that the defendant bears the burden on these issues.  So

10   currently it's framed as, Do you find that Detective Williams

11   reasonably believed, even if mistaken, that Carleto Allen posed

12   a safety risk to him or others on January 9?  And then the same

13   question is presented for each defendant.  And similar

14   questions, totaling 13 in number, are presented later in the

15   defendants' submission, which is docket number 96.

16        So the defendants bear the burden of proof.  So if any

17   interrogatory was to be presented to the jury, special

18   interrogatory, it would have to be framed as whether that

19   defendant had proven by a preponderance of the evidence, etc.

20        Secondly, Mr. Knudsen makes the point that defendants

21   have conflated the issues of objective and subjective intent.

22   And I agree with his comments on that point as well.

23        The issue of qualified immunity, as I will discuss in

24   more detail in a moment, is ultimately one for the judge.  In

25   certain cases it is useful to present special interrogatories

J4A8ALL1

1    to the jury as to factual questions on which the determination

2    of qualified immunity will turn.  And defendants'

3    interrogatories don't do that; they go to subjective intent.

4         So in the event we are going to ask the jury factual

5    questions, what should they be?  Well, one can envision a

6    question that goes to whether the defendants have proven, by a

7    preponderance of the evidence, that Mr. Allen resisted arrest?

8    That's one hypothetical question we could think about.  Another

9    question would be, have the defendants proven, by a

10   preponderance of the evidence, that Mr. Allen possessed a gun?

11        But as I will explain in a moment, I don't think those

12   types of interrogatories are necessary in this case.  So let me

13   just turn to my understanding of the law on the point, and my

14   reasoning as to why I don't believe that special

15   interrogatories are useful or necessary in this case.

16        So as I mentioned last night, defendants submitted

17   proposed special interrogatories that they want me to present

18   to the jury.  And as I said, that's docket number 96.  The

19   special interrogatories submitted by defendants -- which are 13

20   in number -- go to the issue of qualified immunity.  Defendants

21   have not submitted any legal authority in support of their

22   request, nor do they provide any argument as to why these

23   questions would be useful in the context of this case.

24        The Second Circuit has made clear that qualified

25   immunity is a question for the court and not for the jury.  *See*

J4A8ALL1

*Stephenson v. DOE*, 332 F.3d 68 at 80 (2d Cir. 2003). Where a

qualified immunity defense depends on disputed issues of fact,

however, special interrogatories may be useful. *See id.* "The

use of interrogatories is a matter for the judge's discretion."

*See id.* at 80 n. 19 (citing *Romano v. Howarth*, 998 F.2d 101, at

104 (2d Cir. 1993). As a general matter, where the disputed

issues of fact turn on a straightforward credibility

determination, special interrogatories generally would serve no

useful purpose. *See, e.g., Thomas v. Kelly*, 903 F.Supp.2d 237,

at 249 n. 5 (S.D.N.Y. 2012) (where excessive force claim and

defense of qualified immunity both turned on whether the jury

believed the plaintiff or the defendants, proposed special

interrogatories on excessive force would not have "aided the

court's qualified immunity inquiry"). Also, *Robertson v.*

*Sullivan*, 2010 WL 1930658, at *2 (E.D.N.Y. May 12, 2010)

("Though the reasonableness inquiry at the heart of the

qualified immunity analysis is distinct from the reasonableness

inquiry under the Fourth Amendment, they frequently coalesce.

In other words, where there is a stark factual dispute about

what happened, the merits of a plaintiff's Fourth Amendment

claim and the defendant's claim of qualified immunity can both

ride on whether the jury believes the plaintiff or the

defendant.")

      Finally, as I made clear at the outset of the trial,

the issues that the parties want me to present to the jury must

| | |
|---|---|
| 1 | be consistent with the theories of liability or defense that |
| 2 | were presented at trial. *See e.g., McCardle v. Haddad*, 131 |
| 3 | F.3d 43, at 52 (2d Cir. 1997) ("A party is not entitled to have |
| 4 | the court give the jury an instruction for which there is no |
| 5 | factual predicate in the record.")  Also, *Kelber v. Joint* |
| 6 | *Indus. Bd. of Elec. Indus.*, 27 F.3d 42, at 47 (2d Cir. 1994) |
| 7 | ("A plaintiff's claims and theories of law, if supported by the |
| 8 | evidence and brought to the attention of the trial court, |
| 9 | should be given to the jury.") |
| 10 | Here, in addition to the other problems I mentioned a |
| 11 | moment ago, it is clear that the interrogatories defendants |
| 12 | propose as to defendants Sanchez and Tass would not be |
| 13 | appropriate.  Their defense -- the defense of Sanchez and |
| 14 | Tass -- is that they never touched plaintiff.  Their defense is |
| 15 | not that they believed that he had a gun or that he was |
| 16 | resisting arrest.  Their defense is that they never laid a hand |
| 17 | on him.  In that context, it would make no sense for me to ask |
| 18 | questions along the lines of what defendants have proposed as |
| 19 | to those two witnesses.  We have a clear factual dispute, |
| 20 | credibility determination, that must be made, defendants |
| 21 | Sanchez and Tass, their position, that they never touched |
| 22 | plaintiff.  Plaintiff, of course, will argue otherwise, but |
| 23 | that's a factual dispute, credibility dispute, for the jury to |
| 24 | resolve. |
| 25 | As to defendants Williams and Ravelo, the record |

J4A8ALL1

1    likewise turns on a stark factual dispute and credibility

2    determination that the jury must make.  Defendant Williams has

3    testified that he saw a gun in plaintiff's jacket and that

4    plaintiff resisted arrest.  Defendant Ravelo says that he felt

5    a heavy metallic object in plaintiff's jacket, which he thought

6    might be a gun, and he also testified that plaintiff was

7    resisting arrest.  Plaintiff has testified that he had no gun

8    on his person, and that, in fact, the gun was on the back seat

9    of the car he was in.  Plaintiff further testified that he did

10   not resist arrest.  According to plaintiff, he was curled up in

11   a fetal position on the ground.  The testimony of the officers

12   and plaintiff thus presents a clear factual dispute and

13   credibility determination for the jury to make.  Given these

14   circumstances, I don't see any purpose that would be served in

15   presenting special interrogatories to the jury.

16           Having said that, I am happy to hear anything that the

17   defendants want to say on the subject before we turn to the

18   charge.

19           MS. JACOBS:  Just briefly, your Honor.  We proposed

20   these special interrogatories just as an aid.  We agree it is

21   up to your Honor to determine what questions would help you

22   with qualified immunity.

23           I understand your point.  I think our concern in this

24   case is that a jury may believe the defendants' version of

25   events, but for whatever reason -- and I think it would be

1    incorrect -- perhaps they would find that merely because

2    plaintiff was injured, therefore that was excessive force.  And

3    I think if the jury believed the defendants' version of events,

4    in addition to the fact that we should win, we would also be

5    entitled to qualified immunity.  So the reason for the

6    interrogatories is to get at that situation.

7         THE COURT:  It's to get at a situation where they are

8    just finding for plaintiff because he was injured, is that what

9    you're saying?

10        MS. JACOBS:  Correct.  Or perhaps that they believed

11   the defendants, but still find that it's excessive force.  And

12   it's our position that if you believe the defendants, they are

13   at the very least entitled to qualified immunity.

14        THE COURT:  So what I am struggling with here is what

15   you posited is that the jury believes the defendants, but

16   nonetheless finds that they exercised excessive force.  That's

17   what I am struggling with here.  Because as you know from the

18   jury charge, in order for the jury to find that excessive force

19   was used, they are going to have to find that the force that

20   was used was unreasonable under the circumstances.

21        MS. JACOBS:  Your Honor, I think that the force that

22   the defendants testified that they used was reasonable.  But

23   there is -- this is in part speaking from experience in other

24   cases.  I am sure your Honor has more than I do.  But there

25   certainly have been circumstances where a jury could say, they

J4A8ALL1

1    pulled him out of the car, they struggled with him, they fell

2    to the ground, but they should have done something different.

3    I don't know what they should have done, but we don't like that

4    he ended up with an injury; therefore, we are going to award

5    him some money.  In those circumstances, if that is why they

6    are making that decision, I think the defendants are entitled

7    to qualified immunity.

8         THE COURT:  Well, as I said, I am willing to consider

9    questions.  I explained why these questions don't help and why

10   they are inappropriate.  If you have other questions in mind,

11   or you have legal authority you want to cite to me, obviously I

12   am happy to look at it.  I do feel, as I have said, that we

13   have a very stark factual dispute here, very clear, very

14   straightforward, and so what you have suggested, in essence, is

15   that it's possibly more complicated than I think it is.  And of

16   course there is no way to predict what a jury is going to do,

17   but this is a trial that will likely be resolved in about two

18   and a half days of testimony.

19        The officers' account is starkly different than

20   plaintiff's, and vice versa, and to me turns on two very simple

21   questions:  one, did the plaintiff resist arrest?  And two, did

22   he have a gun on his person?  And I don't think the jury is

23   going to have any difficulty in focusing on those issues.  I

24   suspect they will be the centerpiece of the summations.  That's

25   what I suspect.  I expect that the jury's attention is going to

1  be drawn to those issues in summation, and certainly my

2  instructions on the excessive force point go directly to those

3  issues.

4       All I can tell you is that I don't find these

5  questions appropriate.  If you want to submit others, of course

6  I would look at them, although we are running out of time to do

7  that.  And generally speaking, with respect to legal matters,

8  what I look to is authority.  I had to find it on my own this

9  morning.  I welcome authority from the lawyers.  But based on

10 what I have read so far, I don't see the utility of special

11 interrogatories in the context of this case.

12      I will say more generally that special interrogatories

13 are frequently useful in false arrest cases, where police are

14 forced to make what can be complex determinations about whether

15 there is probable cause or not, and they are required to make

16 decisions quickly, about which reasonable people could differ.

17 With excessive force the issues tend to be much more

18 straightforward.  I feel that they are straightforward in this

19 case.  So again, if you want to submit other questions, you're

20 welcome to do so, but I would need to see legal authority

21 supporting my asking the questions that you want.

22      MS. JACOBS:  Certainly, your Honor.  One idea might be

23 to ask those two questions that you mentioned:  Have defendants

24 proven, by a preponderance of the evidence, that plaintiff

25 resisted arrest?  And have defendants proven, by a

J4A8ALL1

1    preponderance of the evidence, that plaintiff possessed a gun?

2         If the jury answered those questions in the

3    affirmative, it would show that they believe defendants'

4    version of events and would allow us to make those arguments.

5    I know that was done by Judge Cote in another case where she

6    granted qualified immunity, and I can find the authority for

7    you later this morning or this afternoon.

8         THE COURT:  Mr. Knudsen, how do you feel about those

9    two questions?  Do they trouble you?

10        MR. KNUDSEN:  Yes.  Because even if, for example, they

11   were to find in the alternative, would qualified immunity be

12   appropriate if they said he resisted arrest but he didn't have

13   the gun?  How would that be handled?  Even if, for example, he

14   resisted arrest does not mean that the force was not excessive.

15        THE COURT:  But again, the qualified immunity decision

16   is ultimately up to me.  So the question is whether it might be

17   useful for me to have the jury's answer to those two questions

18   in making my decision about whether qualified immunity is

19   appropriate.  That's the issue.

20        MR. KNUDSEN:  These two questions are much better than

21   the ones that were proposed because they are more factually

22   based.  There is no doubt.  And it would be up to your Honor,

23   if your Honor feels that answering some questions may be

24   appropriate in a situation to assist you in making that

25   determination, of course.

1          THE COURT:  I don't see any harm in the questions.

2     They are focused on what I consider to be the central factual

3     issues, and no one can predict what the jury's verdict is going

4     to be.

5          MR. KNUDSEN:  In the end it would be your

6     determination, but I think even if they were to find one of

7     these two, it doesn't necessarily mean to me that that is going

8     to assist you in determining, because a lot of it is

9     credibility based, and they will have made a decision on

10    credibility, as your Honor has indicated, in large part, and

11    that is something that the Court has to credit.  Everyone has

12    to credit it if they don't believe the defendants' version.

13         So it does raise issues that I'm not sure going to be

14    dispositive in your analysis.  So I think that would be -- and

15    I think a lot of the reasoning that you talked about in your

16    decision applies to these two questions as well, that it is

17    credibility.  But it is your Honor's decision if you feel there

18    are questions that would assist you in making that assessment.

19         THE COURT:  All right.  I will have it in the back of

20    my mind as we go through the charge this morning, and we will

21    come back to it.

22         MR. KNUDSEN:  Thank you.

23         THE COURT:  So I sent the proposed jury instructions

24    to the lawyers yesterday afternoon.  So the purpose of this

25    morning is to run through the draft and take comments from the

J4A8ALL1

1     lawyers.  So just shout out whoever has the first page with a

2     question or comment, and we will take it from there.

3              So the general instructions are at the beginning.

4     They are the first ten pages or so.  Anybody have a comment on

5     the general instructions?

6              MR. MANNINGHAM:  Yes, your Honor.

7              On page 4, we just propose that, after the first

8     sentence of the second paragraph, under burden of proof, to put

9     that here plaintiff has the burden of proof, or some language

10    to that effect.

11             THE COURT:  Let me make sure where that would go.

12             You said the second full paragraph, is that the

13    paragraph?

14             MR. MANNINGHAM:  Yes.  Which starts "to establish by a

15    preponderance of the evidence."

16             THE COURT:  So you would want me to add after that

17    first sentence that the plaintiff has the burden of proof on

18    all issues?

19             MR. MANNINGHAM:  That's correct, your Honor.

20             MR. KNUDSEN:  Can I respond?

21             THE COURT:  Yes.

22             MR. KNUDSEN:  It's repetitive of what is on page 9

23    already, where you point out in the parties instruction that

24    Mr. Allen has —— he has proven each element by a preponderance

25    of the evidence.  So it claims that there.  And then it raises

J4A8ALL1

| | |
|---|---|
| 1 | an issue with me, for example, if we are going to get into |
| 2 | special interrogatories, where you're saying that plaintiff has |
| 3 | the burden of proof on everything, and then they could |
| 4 | potentially get special interrogatories where Mr. Allen does |
| 5 | not have the burden of proof. So it does raise an affirmative |
| 6 | defense issue, like qualified immunity. |
| 7 | So given that concern, I think the way it's written is |
| 8 | perfectly appropriate and there would be no need since it is |
| 9 | redundant. |
| 10 | THE COURT: If I were to include the two questions |
| 11 | that we have talked about, I would have to say that the |
| 12 | defendants bear the burden of proof on those issues. So it |
| 13 | would be improper for me to say at this point that the |
| 14 | plaintiff bears the burden of proof on all issues. |
| 15 | MR. MANNINGHAM: Understood, your Honor. |
| 16 | THE COURT: Next page with a comment. |
| 17 | MR. KNUDSEN: I have one general about credibility. |
| 18 | You have allowed in plaintiff's criminal history, which we |
| 19 | talked about last week and this week. The discussion was that |
| 20 | it would go to Mr. Allen's credibility. It's not expressly |
| 21 | stated here, that that is the purpose. The wrinkle is, of |
| 22 | course, that the plea to attempted possession of a weapon |
| 23 | arising from his arrest could be evaluated as part of the |
| 24 | merits of the case. So I raise the issue because I think it is |
| 25 | something that would be typically considered or put in to the |

1 jury instructions in the credibility section, and it's not

2 there now.  I don't know if the jury is going to have a

3 question about it or not because of the wrinkle here with

4 specifics.

5 THE COURT:  Well, I guess the question is whether you

6 want me to call attention to the plaintiff's criminal record in

7 the jury charge.  I would be singling it out.  There are

8 circumstances where particular witnesses' credibility is

9 addressed, for example, cooperating witnesses in criminal

10 cases.  There is a special charge for cooperating witnesses

11 because they have motives that are different from everyone

12 else's motive.  Separate from that situation, where you have a

13 type of witness who has distinctive motives, I don't typically

14 single out witnesses for special attention.  However, if you

15 want me to do that, I can do it.

16 MR. KNUDSEN:  It was just that it wasn't in here.  I

17 am not actually asking you to do it.  I am just raising the

18 issue as something that I don't know if it was intentional or

19 not.  I don't think it's necessary in here.

20 THE COURT:  OK.

21 All right.  Next comment.

22 MR. MANNINGHAM:  Your Honor, on page 7, under witness

23 credibility, we propose adding the language -- so it would be

24 in the second paragraph, under witness credibility, after the

25 second sentence, "it is for you to decide, however, how much of

J4A8ALL1

1     that witness's testimony, if any, you wish to believe."  We

2     would propose including language that says:  You may reject

3     that witness's testimony in its entirety or you may accept only

4     those parts that you believe to be truthful or that are

5     corroborated by other independent evidence in the case.

6          MR. KNUDSEN:  I believe that concept was incorporated

7     somewhere else, if I recall.  I am trying to find it.  The idea

8     that you can reject a witness's testimony I think is in here.

9     I don't recall specifically where, but I can look through it.

10         Actually, the last sentence in that paragraph, "It is

11    for you to determine whether such inconsistencies are

12    significant or inconsequential, and whether to accept or reject

13    all, or to accept some and reject the balance of, that

14    witness's testimony."  I think that concept is already in

15    there.

16         THE COURT:  That's my reaction.

17         MR. MANNINGHAM:  That's, your Honor.

18         THE COURT:  What's next?

19         MR. MANNINGHAM:  Your Honor, on page 10, I think this

20    is the first point where Mr. Allen is referred to as Mr. Allen.

21    We would just propose that Mr. Allen be changed to plaintiff.

22    And that's because the defendants are identified as defendants

23    throughout the entire -- after they are identified in the

24    beginning, they are referred to as defendants.  So we would

25    propose to also refer to Mr. Allen as the plaintiff.  And that

J4A8ALL1

1    would be throughout the entire charge.

2              MR. KNUDSEN:  I would disagree with that.

3              THE COURT:  I am not going to make that change.  The

4    reason why Mr. Allen is referred to as Mr. Allen and the

5    defendants are referred to as defendants is there's four of

6    them.  So I can't, practically speaking, list all four

7    defendants every time I say defendants.  The charge would be

8    twice as long as it is.  If the case were Allen v. Williams

9    alone, I would probably refer to Detective Williams as Mr.

10   Williams or Detective Williams.  But with four defendants I

11   can't really do that.

12             So I don't really see any prejudice to the defendants

13   by referring to them as defendants together.  And so I am not

14   going to make that change.  I think it's clearer to say Mr.

15   Allen.  And it is my general practice, where I can use parties'

16   names as opposed to their legal titles, I try to use the name

17   because I think it's clearer.  I can't do that with respect to

18   the defendants here because there's four of them.

19             MR. MANNINGHAM:  Understood, your Honor.  We

20   understood that, because there are multiple defendants, you

21   wouldn't be able to refer to them by their name.  We just

22   wanted to propose changing Mr. Allen to plaintiff.  But we

23   understand.

24             THE COURT:  I should also say, in this version of the

25   charge, I have included references to cases and to other jury

1    charges.  That's just for the lawyers' benefit as well as the

2    Court of Appeals if there is an appeal.  So the version of the

3    instructions the jury get will not include any of the

4    footnotes.  I am sure you understood that, but just so you

5    know.

6              What's next?

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. MANNINGHAM:  On that page, your Honor, we would

2    just propose removing the section 1983 language.  We just don't

3    think it is necessary in this case.  Just the very last -- the

4    very end of page 10 where it says "section 1983 states that"

5    and then there is a quote.

6    THE COURT:  I'm going to charge what the statute says.

7    What is next?

8    MR. MANNINGHAM:  On the next page, your Honor, on page

9    11, right after "first, that the acts," we would propose

10   including that "the acts alleged by plaintiff," just so it is

11   clear that it has to be as alleged by plaintiff.

12   THE COURT:  What paragraph are you talking about?

13   MR. MANNINGHAM:  It is the second paragraph.  It

14   starts with "first" and "first" is underlined.

15   THE COURT:  I see "first element."  Is that what you

16   are talking about?  Or are you talking about something else?

17   MR. MANNINGHAM:  It is the first element.

18   THE COURT:  It says "first element, acting under

19   color" --

20   MR. MANNINGHAM:  I'm sorry, your Honor.  Above that.

21   So it says, "To establish a section 1983 claim" and then,

22   "first, the acts as alleged by plaintiff were committed by

23   defendant."

24   THE COURT:  So you want me to add "the acts alleged by

25   plaintiff"?

1          MR. MANNINGHAM:  "As alleged by plaintiff," correct.

2          THE COURT:  Do you have any problem with the insertion

3   of that language, Mr. Knudsen?  So it would say "First, that

4   the acts as alleged by plaintiff were committed by defendant

5   acting under color of state law.

6          MR. KNUDSEN:  I don't think it is necessary, but I

7   leave it to your Honor to decide --

8          THE COURT:  All right.  I will add it.  I don't think

9   it does any harm.

10          I will say it seems redundant to me because right

11   above that it reads "to establish a 1983 claim, the plaintiff

12   must prove by a preponderance of the evidence each of the

13   following elements.  First, that the acts complained of were

14   committed by defendant acting under color of state law."  The

15   introductory phrase says that the plaintiff has to prove these

16   things, so why is it necessary to add the plaintiff again in

17   the first line?  I don't understand how that makes it clearer.

18

19          MS. JACOBS:  I think, and this actually goes back a

20   little bit to our qualified immunity discussion, it is that

21   plaintiff has to prove the case as he alleged it, right?  This

22   is not the jury gets to make up some version in the middle but

23   that plaintiff proves the acts as he alleged them, so that's

24   the reason for the -- there is a slight difference, we think.

25          THE COURT:  All right.  I will include the language.

1    So it will read, "First, the acts as alleged by plaintiff were

2    committed by defendant acting under color of state law."

3          What's next?

4          MR. MANNINGHAM:  On that page, your Honor, under

5    "first element, acting under color of state law," we would

6    just -- because we don't contest that any of the defendants

7    were acting under color of state law, we would just propose

8    shortening that section to something along the lines of "the

9    parties do not dispute that the defendants were acting under

10   color of state law.  Accordingly, you need not consider it" or

11   something to that effect.

12         THE COURT:  What's your reaction, Mr. Knudsen?

13         MR. KNUDSEN:  I have no objection to that change.  I

14   think it is immaterial, but it would speed up the reading of

15   the charge, so . . .

16         THE COURT:  All right.  So that section will now read

17   as follows:  The first element of a Section 1983 claim is that

18   the conduct complained of was committed by a defendant acting

19   under color of state law.  Here, there is no dispute that each

20   defendant was acting under color of state law.  Accordingly,

21   this element has been proven."  And the next two paragraphs

22   would be struck.  Is that okay?

23         MR. MANNINGHAM:  Yes, your Honor.  Thank you.

24         MR. KNUDSEN:  Yes, your Honor.

25         THE COURT:  All right.  What's next?

1          MR. MANNINGHAM:  I have something on page 13.

2          THE COURT:  Okay.  All right.

3          MR. MANNINGHAM:  So the first point on this page would

4     be "under deprivation of a federal right, excessive force" in

5     the first sentence.

6          THE COURT:  Yes.

7          MR. MANNINGHAM:  We would just, instead of saying "all

8     four defendants," say "each defendant used excessive force."

9     We just believe that, as written, it lumps the defendants

10    together, and here the jury has to consider each -- the force

11    that each defendant used.

12         THE COURT:  Okay.  You don't have a problem with that,

13    do you, Mr. Knudsen?

14         MR. KNUDSEN:  We do not.

15         THE COURT:  So it will say "Mr. Allen claims that each

16    defendant."  All right.

17         MR. MANNINGHAM:  And then the next point on that page,

18    your Honor, would be after the next paragraph, paragraph ends

19    "the use of excessive force is impermissible even during an

20    otherwise lawful arrest."  We propose adding language that

21    states that "officers are entitled to use some degree of force

22    when effectuating an arrest," some language that just because

23    the sentence before is saying that excessive force is not

24    permitted even when it is a lawful arrest, so we would propose

25    saying "but you can use" -- "officers are entitled to use some

1   force when making an arrest."

2            THE COURT:  Why doesn't the sentence before that

3   address your concern?  That sentence reads, "A law enforcement

4   official may only employ the amount of force reasonably

5   necessary under the circumstances."

6            MR. MANNINGHAM:  We just think it is clearer that --

7   so the jury knows that officers are entitled to use some force.

8   And when -- yeah, when they are dealing with an arrest.

9   Because the sentence before just deals with reasonable amount

10  of force under the circumstances, and so -- and then the

11  sentence that follows is saying that excessive force is not

12  permitted even during a lawful arrest specifically but they are

13  entitled, when making an arrest, to use some force.

14           THE COURT:  Do you want to say something, Mr. Knudsen?

15           MR. KNUDSEN:  I think the prior sentence kind of dealt

16  with that issue.  I'm not sure anything needs to be added, and

17  I don't think that sentence needs to be added for sure.

18           THE COURT:  All right.  Well, what I would be inclined

19  to do is modify the sentence currently reading "a law

20  enforcement official may only employ the amount of force

21  reasonably necessary under the circumstances" to "while a law

22  enforcement official may use force to make an arrest, the

23  officer may only employ that amount of force which is

24  reasonably necessary under the circumstances."

25           Let me read it all over again.  "While a law

J4a2all2          Charge Conference

enforcement official may use force to make an arrest, the

officer may only employ that amount of force which is

reasonably necessary under the circumstances."

MR. MANNINGHAM:  That's fine with defendants, your

Honor.

THE COURT:  What do you say, Mr. Knudsen?

MR. KNUDSEN:  So the clause was before "a law

enforcement official?"  Is that --

THE COURT:  I will read it again.  "While a law

enforcement official may use force to make an arrest, the

officer may only employ that amount of force which is

reasonably necessary under the circumstances."

MR. KNUDSEN:  And then "the use of excessive force" --

THE COURT:  Yes, the next sentence would be left the

way it is.

MR. KNUDSEN:  I'm fine with that.  That works for me.

THE COURT:  Okay.  What's next?

MR. MANNINGHAM:  One more point on this page, in the

next paragraph, which reads, "To show that excessive force is

used, Mr. Allen must show that any force used was objectively

unreasonable in light of the facts and circumstances

confronting defendant."  We would just propose that be changed

to "that defendant at the time" and then "without regard to

that defendant's underlying intentions or motivations," just to

make clear, again, that the jury has to consider each

J4a2all2              Charge Conference

1    defendant's use of force under the circumstances.

2             THE COURT:  Okay.  So I am going to incorporate the

3    singular.  So it will read "to show that excessive force was

4    used, Mr. Allen must show that any force used was objectively

5    unreasonable in light of the facts and circumstances

6    confronting each defendant at the time without regard to that

7    defendant's underlying intentions or motivation."

8             What's next?

9             MR. MANNINGHAM:  On the next page, your Honor,

10   after -- at the end of the second paragraph, that ends "as the

11   officer reasonably believed them to be," we propose including

12   language which was from our proposed charges.  "Bear in mind

13   that minor scrapes, bumps, or bruises potentially could occur,

14   often unintended, during an arrest and an arresting officer may

15   not be held liable for every such incident."

16            THE COURT:  That concept is addressed at the beginning

17   of the paragraph where it says "when officers are effectuating

18   an arrest, not every push or shove by a police officer

19   constitutes excessive force even though the force used may

20   later seem unnecessary in the peace and quiet of a courtroom."

21            MR. MANNINGHAM:  Understood, your Honor.  We just

22   wanted to propose this language because in this case that

23   doesn't say that just because there are some, you know, minor

24   scrapes or bumps or bruises that the force is excessive and in

25   this case there is testimony that Mr. Allen had bruising on his

1  right hand as well as his forehead and cheek, I believe.  So we

2  just wanted to make clear that just because there are some

3  minor bruising doesn't mean that the force is excessive.

4            THE COURT:  Well, so the problem with that is what you

5  seem to be suggesting is that minor injuries of the nature of a

6  bruise or scrape are not good enough to constitute the type of

7  injury that will support a claim of excessive force.  I believe

8  that to be wrong under the law, which is to say that a minor

9  scrape or bruise could be, actually, a basis for a finding of

10 an excessive force if even that amount of force was unnecessary

11 under the circumstances; and that's a point that's made in the

12 next paragraph, where I tell the jury that the extent of the

13 injury is not dispositive.  So the import of that is that it

14 could be a minor injury.  And I go on to say, "Just as

15 reasonable force is not unconstitutional, even if it causes

16 injury, neither does unreasonable force become immunized from

17 challenge because it causes only minor injury."  So I can't

18 tell the jury, in essence, that a bruise or a scrape can't be

19 good enough because actually it could be good enough if no

20 force was really necessary to effectuate the arrest.

21           MS. JACOBS:  Your Honor, that is accurate.  I think

22 that this is a slightly different issue, which is -- and I

23 think the language is, you know, "minor scrapes or bruises

24 could occur unintended," it is this idea of sort of unintended

25 consequences.  And it is different than the language at the

beginning which is about "not every push or shove" that's about

the actions taken by the police officers.

It is also a little bit of difference in terms of the

extent of the injury.  It is essentially saying that, look,

just, again, these sorts of -- this is sort of differentiating

it from a negligence case, but not every -- bumps and bruises

that are sort of unintended and happen during arrest do not

necessarily mean excessive force was used, and I think, again,

that is the sort of slightly separate concept that this is

meant to address.

THE COURT:  I understand what you are saying.  You

want to make sure the jury understands that this is not subject

to a negligence standard.  But I have told them, in connection

with the second element, that in order to find that Mr. Allen

has prevailed, they must find that he has shown that the

defendant the jury is considering acted intentionally or

recklessly to deprive him of a constitutional right, and then I

go on to explain what "intentional" means, and I specifically

say it is not negligence.  So the paragraph on page 12 that

deals with this says "an act is intentional if it is done

voluntarily and deliberately and not because of mistake,

accident, negligence, or other innocent reason," and then I

similarly define what "reckless" means.  So to the extent you

are worried that mere negligence could be enough here, I have

already told the jury that it can't be enough.  I have told

J4a2all2          Charge Conference

them that explicitly.  So to the extent you are raising a

concern that the jury might find in Mr. Allen's favor based on

a negligence theory, I feel that is addressed squarely.

          What's next?

          MR. KNUDSEN:  I had a general question about the

failure to intervene.  I think I understand the answer why your

Honor has limited it to the two defendants.  I think we have

talked about this, but I do want to explore it.

          My understanding is that because they have testified

they were at the one side of the car and then came over and

that they had denied being involved in the actual physical

apprehension, that's why you had limited the failure to

intervene claim against those two and that you can't have an

excessive force and a failure to intervene against the same

defendant for the same circumstances.  Is that correct?

          THE COURT:  Well, I'm not sure that it is entirely

clear what you just said, but I will try to tell you my

reasoning.

          So there has been testimony, and this didn't really

happen until Detective Williams' testimony, but there has been

testimony that all four officers joined in in apprehending,

physically all four officers physically joined in in

apprehending the defendant.  So as a theoretical matter -- and

I am not commenting on the sufficiency of the evidence in any

way, shape, or form -- but as a theoretical matter, I felt that

1  an excessive force claim could be presented to the jury as to

2  all four.

3          With respect to failure to intervene, the plaintiff's

4  theory, quite clearly, is that Detective Williams and

5  Detective Ravelo were directly involved in apprehending him and

6  in using force, and of course both of them have already

7  testified that they were personally involved, physically

8  involved in apprehending Mr. Allen.  So I felt under those

9  circumstances the issue was squarely posed whether they used

10  excessive force and not whether -- in other words, there was no

11  intervention issue with respect to them.  It was a clear

12  factual dispute, credibility determination whether they used

13  excessive force in arresting Mr. Allen.

14          As to the other two, Sanchez and Tass, the evidence is

15  not clear that they actually were personally involved in

16  apprehending him.  There is very little evidence that they

17  were.  Certainly the plaintiff hasn't said that they were.  He

18  doesn't know who jumped in.  However, there is evidence that

19  they were on the scene and the jury could find that they could

20  see what was going on.  In one case, I think Sanchez said he

21  couldn't really see what was going on.  With respect to Tass, I

22  think he said he could.  So I felt there was some factual

23  predicate.  If the jury -- and of course this is a whole series

24  of "ifs," but if the jury could find or if the jury did find

25  that the force that was used was excessive, they could further

1    find that Officer Tass and Sergeant Sanchez were on the scene

2    and they could further find that they observed an excessive use

3    of force and they could further find, I suppose, that neither

4    one intervened.  And of course there are subsidiary issues

5    about whether they could see what was going on and whether they

6    had sufficient time to intervene, etc., etc.

7            But anyway, that was my logic, and if anyone has a

8    different view, I am happy to hear it, but that was the logic.

9            MR. KNUDSEN:  Thank you, your Honor.

10            THE COURT:  Okay.  What's next?

11            MR. MANNINGHAM:  Your Honor, on page 18, that very

12    first sentence from the last page, "Any physical injury, pain

13    and suffering caused by defendant's misconduct as well as any

14    expenses incurred in the past or that will be incurred in the

15    future."  There is no evidence of plaintiff having to pay any

16    expenses and there is no evidence that he is going to incur any

17    future expenses, so we would just propose removing that

18    language.

19            THE COURT:  I think that is probably right,

20    Mr. Knudsen.  There hasn't been any testimony --

21            MR. KNUDSEN:  This was page 18?

22            MS. RYAN:  Yes.

23            THE COURT:  It's in the compensatory damage section,

24    second paragraph.

25            MR. KNUDSEN:  Okay, because that's on my 17.  I'm

1    sorry.

2         I think the jury could infer -- Mr. Allen did go to

3    the hospital that one time.  There was no specific evidence on

4    that, but he had to go to the hospital and he did see the

5    physician, follow up about the -- his broken hand.  The jury

6    could infer there may be some expenses incurred with that

7    situation.

8         THE COURT:  There just hasn't been any evidence.  I

9    don't know whether Mr. Allen incurred any expense in terms of

10   his medical visits, and so it would just be speculation for the

11   jury to award him damages for medical expenses because there

12   has been zero evidence that he incurred any expense.  So I

13   can't allow the jury to award damages for medical expenses when

14   there hasn't been any evidence whatsoever that Mr. Allen

15   suffered medical expenses or was forced to pay medical

16   expenses.  So I am going to strike everything after "caused by

17   defendant's misconduct."

18        All right.  What's next?

19        MR. MANNINGHAM:  On page 20, your Honor, the second

20   paragraph, "Mr. Allen is not entitled to punitive damages as a

21   matter of right."  We would propose including language about

22   the burden, so language "the plaintiff has the burden of

23   proving by a preponderance of the evidence that the individual

24   defendants acted maliciously or wantonly with regard to the

25   plaintiff's rights," something along those lines or "the

J4a2all2          Charge Conference

1    plaintiff must prove by a preponderance of the evidence that he

2    is entitled to punitive damages."

3         THE COURT:  My inclination would be to include that

4    language right at the beginning.  So currently the first

5    paragraph under punitive damages reads, "Mr. Allen also seeks

6    an award of punitive damages.  If you find that Mr. Allen has

7    proven by a preponderance of the evidence that a defendant is

8    liable, then you must decide whether to award Mr. Allen

9    punitive damages."

10        All right?  So the sentence would read -- I have

11   already read the first two sentences in the first paragraph, so

12   what I am going to add to that first paragraph, after the first

13   two sentences, is what follows:  "Mr. Allen also bears the

14   burden of proof as to punitive damages and must demonstrate by

15   a preponderance of the evidence that punitive damages are

16   appropriate here."  Okay?

17        MR. MANNINGHAM:  Thank you, your Honor.

18        THE COURT:  All right.  We are now into the concluding

19   instructions.  Anything on the rest of it?

20        MR. MANNINGHAM:  Nothing further from defendants, your

21   Honor.

22        THE COURT:  Mr. Knudsen?

23        MR. KNUDSEN:  Could we go back to what that language

24   was that you -- could you reread that language you added,

25   please?

1          THE COURT:  On punitive damages?

2          MR. KNUDSEN:  Yes, please.

3          THE COURT:  Yes.  Why don't I just read the whole

4    paragraph?  So this is the first paragraph under punitive

5    damages:

6          "Mr. Allen also seeks an award of punitive damages.

7    If you find that Mr. Allen has proven by a preponderance of the

8    evidence that a defendant is liable, then you must decide

9    whether to award Mr. Allen punitive damages.  Mr. Allen also

10   bears the burden of proof as to punitive damages and must

11   demonstrate by a preponderance of the evidence that punitive

12   damages are appropriate here."

13         MR. KNUDSEN:  Okay.  I think that's correct.  The

14   only -- yeah, yeah, that's good.  Thank you.

15         THE COURT:  Mr. Knudsen, did you have anything else on

16   the charge?

17         MR. KNUDSEN:  I did not, your Honor.

18         THE COURT:  Okay.  So then we are back to the verdict

19   sheet.  Have you had a chance to look at the verdict sheet?

20         MS. JACOBS:  Yes, your Honor, we have.

21         THE COURT:  Mr. Knudsen, have you had a chance to look

22   at the verdict sheet?

23         MR. KNUDSEN:  Not really.  If I can have --

24         THE COURT:  Why don't you take some time to read it

25   over now, okay?

1     (Pause)

2     MR. KNUDSEN:  I have read the verdict sheet.

3     THE COURT:  Any comments?

4     MR. KNUDSEN:  I have no objection.

5     THE COURT:  All right, so I think --

6     MS. JACOBS:  Your Honor, we actually do have one

7     proposed change.

8     THE COURT:  Go ahead.

9     MS. JACOBS:  It is essentially the same discussion we

10    just had about punitive damages.  I think for the damages

11    question, I think that the question "should punitive damages be

12    awarded" should read "Has Carleto Allen proven by a

13    preponderance of the evidence that punitive damages should be

14    awarded against" and then the name of each officer.

15    THE COURT:  All right.  So the questions 9, 10, 11,

16    12, would be changed to read as follows:  "Has Carleto Allen

17    proven by a preponderance of the evidence that punitive damages

18    should be awarded against each defendant?"

19    MS. JACOBS:  That's fine, your Honor.  Thank you.

20    THE COURT:  Mr. Knudsen, any problem with that?

21    MR. KNUDSEN:  I don't.

22    I do want to ask just one clarification on question 8,

23    which is the award.  "If you answered 'yes' to Question 7,

24    state the amount that should be awarded as compensatory to

25    Carleto Allen."  So we have basically the part -- the reason

1  why you drafted it like that was because you felt it was one

2  specific injury in total and that it should be written like

3  that as opposed to separating it out, correct?

4            THE COURT:  Yes.  I think, practically speaking, it

5  makes sense.

6            MR. KNUDSEN:  Okay.  Thank you, your Honor.

7            THE COURT:  So the only remaining issue is whether to

8  insert these questions that we have talked about with respect

9  to qualified immunity on the verdict sheet; and, if they were

10  to be inserted, logically, they would come before damages.

11            MS. JACOBS:  Your Honor, I do have the name and the

12  docket number of the case.  Ms. Ryan will bring copies of it.

13  But if you would like, the case I was discussing about was in

14  front of Judge Cote.  It is 15 Civ. 2206 in this district, and

15  the order was docketed as No. 151.  And in that case it was

16  similar in some ways to this.  There was a very stark dispute

17  of facts about what had happened.  There were additional

18  claims, but there was an excessive force claim, and I believe

19  Judge Cote in that case posed a single question to the jury and

20  from that she sort of went to I think how the incident started

21  and from that she granted -- I actually think she granted

22  judgment notwithstanding the verdict, but she also granted

23  qualified immunity.  And, again, we will have copies of that

24  here for you later if you would like to look at it.

25            THE COURT:  Do you know what the question was that she

1   asked?

2          MS. JACOBS:  I can find it.  "Did defendants prove by

3   a preponderance of the evidence that they handcuffed the

4   plaintiff after the officers observed him down on the pavement

5   on June 1, 2014?"  Again, as I stand here right now, I can't

6   tell you the facts well enough to explain what that matter was.

7   I think it was a very specific question about how the incident

8   started, so in the end they indicated whose story they

9   believed.  And in that case the jurors, what she found was the

10  jurors found that excessive force was used and possibly other

11  claims as well but that effectively the jurors had believed

12  defendants' version of events and based on defendants' version

13  of events, there was no liability.

14          (Pause)

15          THE COURT:  So if I were to add the questions that we

16  have talked about, as I have said, they would come just before

17  the damages section.  And so the paragraph currently before the

18  damages section reads, "If you answered 'yes' to any of

19  Questions 1 through 6, you must proceed to consider damages."

20  So what I would have to do is change that to read, "You must

21  proceed to answer the remaining questions on this form."  And

22  then it goes on to say, "If you answered 'no' to all of the

23  Questions 1 through 6, then your deliberations are at an end

24  and the foreperson should sign and date the verdict sheet and

25  place it in an envelope and inform the marshal that the jury

1    has reached a verdict."  So I would have to make that change.

2    And then I would have to have a heading, and I want to have

3    some kind of neutral heading, so I think I would probably just

4    call it "interrogatories."  So there would be a heading that

5    would say "interrogatories."  And then there would be a

6    question "Did the defendants prove by a preponderance of the

7    evidence that Carleto Allen resisted arrest?"  And then the

8    second question would be "Did the defendants" -- and then, of

9    course, "yes" or "no."  And then the second question would be

10   "Did the defendants prove by a preponderance of the evidence

11   that Carleto Allen had a gun on his person at the time of his

12   arrest?"  Are those the questions we want?

13          MS. JACOBS:  I think for the second one I think we

14   would prefer something that says that "he possessed a gun at

15   the time of his arrest" as opposed to "if he had a gun on his

16   person."

17          THE COURT:  I don't think "possession" works because

18   the jury could find that the gun was in the car and

19   constructive position, blah, blah, blah.  That's not really

20   what we are talking about.  We are really talking about

21   whether -- it goes to the issue of whether the officers,

22   Detective Williams and Ravelo, whether they saw or felt a gun,

23   so I can't just say "possession."  I could say whether he had a

24   gun in his jacket because there is testimony that it was in his

25   jacket.

1          What do you think, Mr. Knudsen?

2          MR. KNUDSEN:  I object to these.  I don't think --

3    because even, for example, a jury could find, for example, that

4    Mr. Allen did resist arrest but still that the response was

5    inappropriate, and in that situation they made a credibility

6    determination that Mr. Allen may have done something and the

7    vagueness of resisting arrest is an issue, I think, because

8    what does that mean in the context?  Is him getting into the

9    fetal position or him not fully complying resisting arrest?

10   That is an issue.  Or, for example, if -- and I don't think

11   there has been any testimony that these people have acted any

12   differently, like they said he had this gun, so we had to take

13   action to disable him or anything like that.  That has not been

14   the testimony.  The testimony has been that we are holding him

15   on the ground and trying to put him in handcuffs, nothing to

16   explain the injury to his hand that was necessitated because of

17   the presence of a gun or because of resisting arrest.

18         THE COURT:  I disagree with you on that.  The

19   predicate for Detective Williams' testimony and the action that

20   he took is that he observed a gun.  That is why he pulled him

21   out of the car the way he did and threw him on the ground.  So

22   I can't agree with you on last point.

23         And what I will say to you as to the substance of the

24   questions, and I understand you don't want the questions asked

25   at all, I absorbed that point, but if you can bear with me for

J4a2all2          Charge Conference

 1   a moment, if a question was going to be asked along these

 2   lines, if you have any thoughts about what language should be

 3   used?  You both said that you don't think these questions

 4   really are going to help at all.  Fine.

 5        MR. KNUDSEN:  But I think there could be jury

 6   confusion, for example, on the resisting arrest, what exactly

 7   that means in the context.

 8        THE COURT:  All right.  What language would you

 9   suggest?

10        MR. KNUDSEN:  I'm not sure there is language that is

11   appropriate is the problem, and that is part of the problem

12   with the original ones is that I am not sure how you would

13   frame that question in a way that is appropriate.

14        MS. JACOBS:  Your Honor, if I may?  We don't object to

15   these questions.  I think if these are the questions your Honor

16   believes would be helpful, then we believe they should be put

17   to the jury.

18        As to resisting arrest, I think it is fairly clear, we

19   are not discussing sort of a legal criminal charge of resisting

20   arrest.  I think the words as they are the jury can certainly

21   understand what's meant by them.

22        THE COURT:  All right.  Well, it is so difficult to

23   know whether these questions would be useful or not in the

24   abstract, but first of all there are only two that we are

25   talking about and so there is no reason to think it is going to

1    delay unduly resolution, and I can't say that there is no set

2    of circumstances in which the questions might not be

3    illuminating to me on the qualified immunity point.  So I will

4    ask the first question, did the defendants prove by a

5    preponderance of the evidence that Carleto Allen resisted

6    arrest?  Yes or no."  And then with respect to the second

7    question, I think what I am going to change it to is the second

8    question will read:  "Did the defendants prove by a

9    preponderance of the evidence that Carleto Allen had a gun in

10    his jacket at the time of his arrest?"  And that's because

11    there has been testimony that he had a jacket on and that the

12    gun was in the jacket.  There was also testimony I believe that

13    the jacket was on his lap.  So that's why I am referring to "in

14    his jacket."  So I'm going to add those questions to the

15    verdict sheet.

16        We will make the other changes that the parties

17    requested and print out a verdict sheet and make sure that you

18    are okay with it.  Okay?

19        Anything else?  All right.  Well it's quarter to 12,

20    so we will be getting started shortly.

21        MR. KNUDSEN:  Thank you, your Honor.

22        THE COURT:  Thank you.

23        (Recess)

24

25

 1              (Jury not present)

 2              THE COURT:  Are we prepared to proceed?

 3              MR. KNUDSEN:  Plaintiff is, your Honor, yes.

 4              MR. MANNINGHAM:  Defendants as well?

 5              THE COURT:  All right.  Please bring in the jury.

 6              (Jury present)

 7              THE COURT:  Please be seated.

 8         Ladies and gentlemen, Mr. Caputo is still feeling ill

 9    this morning.  So we are going to be proceeding without him.

10         Detective Williams, you can retake the stand.

11     JEREMIAH WILLIAMS, resumed.

12              THE COURT:  Mr. Knudsen.

13         Detective Williams, you remain under oath.

14    DIRECT EXAMINATION (Continued)

15    BY MR. KNUDSEN:

16    Q.  Good afternoon, Detective Williams.

17    A.  Good afternoon.

18    Q.  We left off yesterday speaking about the jacket that Mr.

19    Allen was allegedly wearing, and we were on Plaintiff's Exhibit

20    5, which was the arrest report.  I would like to show you that

21    again.

22         I directed your attention to the details section over

23    here, where there is indications of clothing that were being

24    worn by Mr. Allen, and I had asked you to show me where in that

25    section it indicated that Mr. Allen had a jacket.

1          Could you show me where it says he had a jacket?

2    A.  It says sweater or vest.

3    Q.  So it does not say jacket?

4    A.  It's a pop-up screen; you hit it.

5    Q.  And the pop-up screen, you're testifying that there is no

6    jacket entry that you could add?

7    A.  Yeah.  Add or other.

8          THE COURT:  You could say what?

9          THE WITNESS:  Add or put down other for articles.

10         THE COURT:  So what you're saying is one of the

11   choices is not jacket.  That's not on the drop-down menu.

12         THE WITNESS:  It's a drop down, but I didn't put down

13   jacket.  It's just sweater or vest.

14         THE COURT:  Did you type in sweater or vest?

15         THE WITNESS:  Drop-down screen, and I just clicked on

16   sweater or vest part.

17         THE COURT:  So my question is, on the menu, the

18   drop-down menu, was one of the things on the menu jacket?

19         THE WITNESS:  Yes.

20         THE COURT:  But you checked off sweater or vest?

21         THE WITNESS:  By accident, yes.

22   BY MR. KNUDSEN:

23   Q.  So it was an accident that you didn't put in a jacket here,

24   is that correct?

25   A.  Correct.

1    Q.  Mr. Allen and the driver were in a red vehicle, correct?

2    A.  Yes.

3    Q.  Was the vehicle searched?

4    A.  Yes.

5    Q.  Who searched the vehicle?

6    A.  I did.

7    Q.  What did you do during the search?

8            THE COURT:  Could we start with, where did the search

9    take place?

10           MR. KNUDSEN:  Very good.

11           THE COURT:  Where did the search take place?

12           THE WITNESS:  The search took place at the confines of

13   the 47 precinct.

14           THE COURT:  Go ahead, Mr. Knudsen.

15   Q.  What did you do during the search?

16   A.  Searched the vehicle, the front, the back, the trunk, did

17   an inventory search.

18   Q.  You searched the glove compartment?

19   A.  I searched the entire vehicle.

20   Q.  OK.  Under the seats?

21   A.  Yes.

22   Q.  And the back seat as well?

23   A.  Yes.

24   Q.  And why was the car searched?

25   A.  I just recovered a gun off of Carleto Allen.  I was looking

1    inside the vehicle to make sure if there was anything else

2    inside the vehicle, so we did an investigatory search of the

3    vehicle.

4    Q.  Was anything found during the search?

5    A.  No.

6    Q.  Did you write up any documents about the search?

7    A.  No.

8    Q.  Do you recall giving testimony on November 8, 2017 about

9    the arrest of Mr. Allen?

10   A.  Yes.

11   Q.  During that testimony you were asked questions by an

12   attorney, is that correct?

13   A.  Yes.

14   Q.  You were sworn in?

15           THE COURT:  Do I have a copy?

16           Thank you.

17   Q.  You were sworn in by a court reporter at that time?

18   A.  Yes.

19           THE COURT:  He wasn't sworn in by a court reporter; he

20   was sworn in by a deputy.  But go ahead.

21           MR. KNUDSEN:  Thank you, your Honor.

22   Q.  And you swore to tell the truth?

23   A.  Yes.

24   Q.  And you did tell the truth that day?

25   A.  Yes.

J4A8WIL3                    Williams - Direct

1    Q.  I am going to direct your attention to pages 534 and 535,

2    starting at line 22 on 534.

3    A.  Yes.

4    "Q. Do you know who searched the vehicle?

5    "A. I do not know.

6    "Q. Did you search the vehicle?

7    "A. I had Carleto Allen in my possession the whole time.  I

8    can't speak for other officers.

9    "Q. Do you even know at all if the vehicle was searched at all?

10   "A. I'm sure the vehicle was searched.

11   "Q. By whom?

12   "A. My fellow coworkers."

13           Do you recall giving that testimony?

14   A.  Now reading it I do.

15   Q.  So when you testified on November 8, 2017, you most

16   definitely did not search the vehicle?

17           THE COURT:  Could you rephrase the question?

18   Q.  In that testimony on November 8, 2017, you indicated you

19   did not search the vehicle, is that correct?

20   A.  That's what it says, but I possibly could have

21   misunderstood the question.

22   Q.  Could you direct me to which question you possibly

23   misunderstood?

24           Was it the question, Do you know who searched the

25   vehicle?

1    A.  It's possible I could have understood the question at the

2    time of the incident or back at the station house.

3    Q.  Did you ask for a clarification of the question?

4    A.  No.

5    Q.  So on November 8, 2017, you testified you did not search

6    the vehicle, is that correct?

7    A.  That's what it says.

8    Q.  And today you testified that you did search the vehicle?

9    A.  Yes, I searched.

10   Q.  I am going to show you a document that has been previously

11   marked as Plaintiff's Exhibit 19.  This is a two-page document.

12           Do you recognize this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  This would be a property clerk invoice.

16   Q.  I didn't hear you.

17   A.  A property clerk invoice.

18   Q.  Is this the property clerk invoice you drafted for the

19   marijuana you seized from Mr. Allen?

20   A.  Yes.

21   Q.  And this voucher was drafted on January 9, 2015?

22   A.  Yes.

23           MR. KNUDSEN:  I would like to move Plaintiff's Exhibit

24   19 into evidence.

25           THE COURT:  Any objection?

1              MR. MANNINGHAM:  No objection.

2              THE COURT:  Plaintiff's Exhibit 19 is received.

3              (Plaintiff's Exhibit 19 received in evidence)

4    Q.   This is page 1 of the two-page exhibit.

5              What were you vouchering with this property invoice?

6    A.   This would be the marijuana lit cigarette that was

7    recovered from Carleto Allen.

8    Q.   It says under remarks here "one lit marijuana cigarette"?

9    A.   Yes.

10   Q.   That's what you were vouchering?

11   A.   Vouchering a marijuana cigarette, yes.

12   Q.   Then it says here, article, marijuana, one lit marijuana

13   cigarette?

14   A.   Right.

15   Q.   And you put that into this document?

16   A.   Yes.

17   Q.   No other marijuana was found on Mr. Allen?

18   A.   No.

19   Q.   And no marijuana was found in the vehicle?

20   A.   That's correct.

21   Q.   The second page of this document is indicating that you

22   entered this information into the invoice?

23   A.   Yes.

24   Q.   And that it was approved by your supervisor, correct?

25   A.   Yes.

1   Q.  Was the gun seized during the arrest tested for

2   fingerprints?

3   A.  Yes.

4   Q.  When a gun is seized as evidence, is it standard procedure

5   to test the gun for fingerprints?

6   A.  Yes.

7   Q.  And you asked the gun to be tested for fingerprints?

8   A.  We sent it out to the lab, yes.

9   Q.  Were fingerprints found on the gun?

10  A.  No.

11  Q.  I am going to show you a document that has been previously

12  marked as Plaintiff's Exhibit 20.

13          Do you recognize this document?

14  A.  Yes.

15  Q.  What is it?

16  A.  This would be the request for lab examination for the

17  firearm.

18  Q.  And this is the request for lab exam for the dusting of the

19  gun that was found during the arrest?

20  A.  Yes.

21  Q.  And this document was drafted on January 9, 2015?

22  A.  Yes.

23          MR. KNUDSEN:  I move Plaintiff's Exhibit 20 into

24  evidence.

25          MR. MANNINGHAM:  No objection.

1          THE COURT:  Plaintiff's Exhibit 20 is received.

2          (Plaintiff's Exhibit 20 received in evidence)

3    Q.  This is a one-page document.  I am going to direct your

4    attention to the last line in the middle section of the report,

5    starting with the word "firearm."

6    A.  Can you point to it again?

7    Q.  The last section, right here, it says "firearm."  Do you

8    see that?

9    A.  Yes.

10   Q.  It says firearm was dusted with negative results, is that

11   correct?

12   A.  Yes.

13   Q.  So that means there were no fingerprints found on the

14   weapon?

15   A.  When we send it off to the lab and everything --

16   Q.  I would like an answer to my question, sir.

17          My question was, there were -- I apologize.

18   A.  We sent it off to the lab and everything gets evaluated to

19   the firearm.  You don't always get fingerprints or DNA off the

20   gun.  It's actually not often do you find fingerprints or DNA

21   on the firearm.

22   Q.  My question was, were fingerprints found on the gun?

23   A.  No, there were not.

24   Q.  DNA swabs were taken from the gun as well, correct?

25   A.  Yes.

1   Q.  Has any of that DNA ever been matched to Mr. Allen?

2   A.  As I stated before, firearms, you usually don't get

3   any -- all the time do you get --

4           THE COURT:  If you could just focus on his question

5   and answer it, that will be helpful.

6           Would you repeat the question, Mr. Knudsen?

7   Q.  Has any of that DNA ever been matched to Mr. Allen?

8   A.  No.

9   Q.  You did not witness the driver being arrested?

10  A.  No.

11  Q.  You were the arresting officer for the driver as well,

12  correct?

13  A.  I was not.

14  Q.  I'm sorry.  What did you say?

15  A.  I did not.

16  Q.  You were the arresting officer for the driver though?

17  A.  No.

18  Q.  No?

19  A.  No.

20  Q.  On the arrest paperwork you're not the arresting officer?

21  A.  It was a voided arrest.

22  Q.  I am going to show you what has been previously marked as

23  Plaintiff's Exhibit 14.  This has already been entered into

24  evidence.

25          This is the arrest report you drafted for the driver,

1    correct?

2    A.  Yes.

3    Q.  On the third page of this document, it says arresting

4    officer name.  What name is there?

5    A.  It has my name on it.

6    Q.  So you were the arresting officer for the driver?

7    A.  It's a formality for the paperwork.  However, it was a

8    voided arrest.

9    Q.  And it says here, arresting officer, Jeremiah Williams,

10   doesn't it?

11   A.  Yes.

12   Q.  You filled out this arrest report?

13   A.  Yes.

14   Q.  And some of the information in this arrest report has been

15   blacked out, correct?

16   A.  Yes.

17   Q.  For example, on page 1 here, it says "defendant," and that

18   has been blacked out, correct?

19   A.  Yes.

20   Q.  That would have the driver's name there, correct?

21   A.  Yes.

22   Q.  And then the details section, you filled that section out

23   as well, correct?

24   A.  It's just a copy and paste from Carleto Allen.

25   Q.  But you did fill out that details section, correct?

J4A8WIL3                    Williams - Direct

1    A.  Yes.

2    Q.  Did the driver resist arrest?

3    A.  As I said, this is just a formality piece of paperwork.  It

4    was a voided arrest so it really didn't matter.

5    Q.  I will ask the question again.  Did the driver resist

6    arrest?

7    A.  No.

8    Q.  Was the driver smoking marijuana in public?

9    A.  No.

10   Q.  And did the driver possess a loaded black .380 Lorcin

11   firearm?

12   A.  No.

13   Q.  Did another officer tell you that the driver did that?

14          THE COURT:  Did what?

15   Q.  That he was in possession of a black firearm, black Lorcin

16   firearm?

17   A.  No.

18   Q.  Did another officer tell you that the driver was smoking

19   marijuana?

20   A.  No.

21   Q.  And did another officer tell you that the driver was

22   resisting arrest?

23   A.  No.

24   Q.  You spoke with Sergeant Sanchez before you wrote this

25   arrest report?

1    A.  I don't remember.

2    Q.  You spoke with Officer Tass before you wrote this arrest

3    report?

4              THE COURT:  Spoke to him about what?

5              MR. KNUDSEN:  I just asked if he spoke to Officer

6    Tass.

7              THE COURT:  No.

8    Q.  Did you speak --

9              THE COURT:  They could have talked about the weather.

10   We don't care about that.  So that's why I said about what.

11   Q.  You spoke to Sergeant Sanchez at the scene of the arrest?

12             MR. MANNINGHAM:  Objection.

13             THE COURT:  Grounds.

14             MR. MANNINGHAM:  The same as before.  About what?

15             THE COURT:  Sustained.  Again, it's got to be about

16   something that's relevant.

17   Q.  Did you speak to Sergeant Sanchez about the arrest of the

18   driver?

19             THE COURT:  At the scene?

20   Q.  We will start there.  Did you speak to Sergeant Sanchez

21   about the arrest of the driver at the scene of the arrest?

22   A.  No.

23   Q.  Did you speak to Sergeant Sanchez about the arrest of the

24   driver at the precinct?

25   A.  I don't remember.

1   Q.  You were with Sergeant Sanchez when he filled out the

2   command log when you arrived back at the precinct for these two

3   arrests, correct?

4   A.  Repeat that.

5   Q.  You were with Sergeant Sanchez when he filled out the

6   command log for these two arrests when you arrived at the

7   precinct, is that correct?

8   A.  Yes.

9   Q.  Is there anything in that details section that is correct?

10          THE COURT:  You mean as to the driver?

11          MR. KNUDSEN:  Yes.

12  Q.  On this arrest report of the driver, is there anything in

13  that details section that is correct?

14  A.  No.

15  Q.  And you knew all of it was not correct when you drafted it,

16  correct?

17  A.  I knew it was a voided arrest.

18  Q.  Let me show you, on page 3 --

19          THE COURT:  I want to make sure I understand your

20  testimony.  So is it your testimony that at the time you filled

21  this out, you knew that the arrest was going to be voided; is

22  that what you're saying?

23          THE WITNESS:  No.  At the time of the pedigree

24  information, no.  Later on, when my investigation was

25  completed, I knew the arrest was going to be voided.

1              THE COURT:  So at the time you prepared this document,

2     Plaintiff's Exhibit 14, did you know then that the arrest was

3     going to be voided?

4              THE WITNESS:  Yes.  When I was preparing the arrest

5     report, yes.

6     BY MR. KNUDSEN:

7     Q.  On page 3 of Plaintiff's Exhibit 14, it says "supervisor

8     approving"?

9     A.  Yes.

10    Q.  Do you see that?

11    A.  Yes.

12    Q.  So you submitted this to your supervisor to be approved?

13    A.  Yes.

14    Q.  And it was approved?

15    A.  Yes.

16    Q.  As we discussed before, you have given testimony about the

17    arrest of Mr. Allen on November 8, 2017, correct?

18    A.  Yes.

19    Q.  During that testimony, you were asked about the arrest of

20    the driver of the car, correct?

21    A.  Yes.

22    Q.  Directing your attention to page 481 and 482 of this

23    transcript, you were asked, starting at line 20 --

24    A.  I have got to get there.

25    Q.  You were asked, starting at line 20 --

1          THE COURT:  Sir, I don't see anything inconsistent.

2    So I don't know why you're reading the document.

3          MR. KNUDSEN:  It's a prior statement.

4          THE COURT:  I don't care.  He is here to testify.

5    You're welcome to ask him anything you want, but I am not going

6    to have you read from a document that's not in evidence unless

7    it's inconsistent.

8          MR. KNUDSEN:  OK.

9          THE COURT:  If it's inconsistent, you're welcome to do

10   that.  But he is here to testify, and you can ask him anything

11   you want.  And if he testifies inconsistently with a prior

12   statement, you are entitled to impeach him with that prior

13   testimony.  But we are not going to read from documents that

14   are not in evidence.

15   BY MR. KNUDSEN:

16   Q.  Do you recall testifying on November 8, 2017 that the

17   driver of the car was let go because there was nothing on the

18   individual at all?

19   A.  Yes.

20   Q.  And do you recall testifying that there was nothing -- no

21   illegal narcotics found in the car, and there was no firearm to

22   be found on the defendant?  Do you remember saying that?

23         THE COURT:  We are going to have approach.

24         (Continued on next page)

25         (At the sidebar)

1          THE COURT:  So this is misleading, and I am not going

2    to allow the jury to be misled.  His testimony is about the

3    driver.  His testimony at this point is about the driver.  It's

4    not about the defendant, meaning your client, it's about the

5    driver.  So what you're doing is misleading the jury.

6          MR. KNUDSEN:  I apologize.  I meant to say driver

7    instead of defendant because that was not my point.

8          THE COURT:  How is it inconsistent?

9          MR. KNUDSEN:  The arrest report, they have charged him

10   with criminal possession of a weapon.  And here it says there

11   is no firearm.

12         THE COURT:  That's false.  That's false and it's

13   misleading.  The reference on page 482 of the transcript is to

14   the driver.  It's clearly to the driver.

15         MR. KNUDSEN:  They charged the driver with criminal

16   possession of a weapon.

17         THE COURT:  I understand that.  But he has told you

18   six times that the arrest was voided.  So I don't see the

19   point.  But if you are going to talk about this, you have got

20   to be very clear in your language, and I don't want any

21   suggestion that this testimony constituted a statement that

22   Carleto Allen didn't have a firearm because that would be

23   utterly false.

24         MR. KNUDSEN:  That was not my intention.

25         THE COURT:  That's the way it came through.

J4A8WIL3                    Williams - Direct

1          MR. KNUDSEN:  He did say defendant.  Maybe I should

2     change that.  But my intention was not to say --

3          THE COURT:  Just to come back to reality for a minute.

4     This man was convicted of use, carry and possession of a

5     firearm, based on the firearm found in the car and found on his

6     person at that time.  So, frankly, it would be outrageous to

7     suggest that he testified at the trial Carleto Allen didn't

8     have the firearm.  That would be outrageous given that he was

9     convicted of it.

10          MR. KNUDSEN:  That was not my point.

11          THE COURT:  So be very careful in your language.

12          MR. KNUDSEN:  It's just about the driver.  Believe me,

13     that was not my intention.  It's not to suggest anything about

14     Mr. Allen.  It's the driver's arrest report.  He has talked

15     about the driver here.

16          THE COURT:  So what you want to bring out is he

17     testified at the trial that there was no firearm on the driver.

18     Is that what you want to bring out?

19          MR. KNUDSEN:  That was my intention.

20          THE COURT:  OK.

21          MR. KNUDSEN:  I am about to ask that question.

22          THE COURT:  You can do that, yes.

23          (Continued on next page)

24

25

1            (In open court)

2     BY MR. KNUDSEN:

3     Q.  Didn't you testify on November 8, 2017 that there was no

4     firearm to be found on the driver, correct?

5     A.  Yes.

6     Q.  Didn't you testify on November 8, 2017 that at that time

7     you had no idea who the driver was?

8     A.  Repeat that.

9     Q.  Didn't you testify on November 8, 2017, you said, to this

10    day I have no idea who the driver is?

11    A.  I don't because the name is lined out.

12            THE COURT:  I'm sorry?

13            THE WITNESS:  I don't know who the driver is because

14    the name is lined out.

15            THE COURT:  It's blacked out?

16            THE WITNESS:  Yes.

17    Q.  You did write the name of the driver into the arrest

18    report?

19    A.  Right.

20    Q.  And you also said that you did not write or take down the

21    driver's name, correct?

22    A.  I took down the driver's name for the pedigree.

23    Q.  On November 8, 2017, you said you did not write or take

24    down the driver's name, correct?

25    A.  I don't remember.

2            You were asked about the individual in the driver's

3    seat?

4    A.  What number?

5    Q.  Starting on line 4.

6    "Q. Now, you also said there was an individual who was in the

7    driver's seat, is that correct?

8    "A. That is correct.

9    "Q. Who was that individual?

10   "A. To this day I don't know.  I did not stop the driver.  I

11   stopped Carleto Allen.

12   "Q. Did you write down his name?

13   "A. Excuse me?

14   "Q. Did you take down his name?

15   "A. No, I did not."

16           Do you recall giving those answers to those questions?

17   A.  It says it here, but I had to have taken down his name for

18   the pedigree information.

19   Q.  And on November 8, 2017, you testified that -- you said, to

20   this day I don't know who the driver is, and that you did not

21   write or take down his name, isn't that correct?

22   A.  It says here, but I must have misunderstood.

23   Q.  So which question did you misunderstand?  Who was in the

24   individual in the driver's seat?  Was that the question you

25   misunderstood?

1   A.   That was back in November.  I don't remember.

2   Q.   On November 8, 2017?

3   A.   Right.  I don't remember.

4   Q.   That was a year and a half closer to the actual incident

5   than today, correct?

6   A.   Yes.

7   Q.   And you had written down the driver's name at that time,

8   correct?

9   A.   Yes.

10  Q.   And you had written it into the arrest report, correct?

11  A.   That is correct.

12  Q.   And you had written it in the pedigree card, isn't that

13  correct?

14  A.   That is correct.

15  Q.   And then you were asked if there was a rule that didn't

16  allow you to write down the license plate of the car, correct?

17          THE COURT:  Sorry?

18  Q.   You were asked whether there was a rule that didn't allow

19  you to write down the license plate of the car?

20  A.   I don't remember.

21  Q.   Didn't you testify that you would not have needed to take

22  down the information for the driver because he had nothing on

23  him; the driver was not in possession of anything illegal?

24  A.   I needed to take down whoever I bring in to the precinct.

25  However, it was a voided arrest.  It didn't matter.

J4A8WIL3                    Williams - Direct

1    Q.  On November 8, 2017, you said that you did not need to take

2    down the name or information about the driver because he had

3    nothing on him and the defendant -- strike that -- the driver

4    was not in possession of anything illegal.  Do you recall

5    saying that?

6    A.  No, I don't.  On the paper it says it, but --

7    Q.  I will direct your attention to page 533 to 534 of the

8    transcript.

9                THE COURT:  Is there a question?

10                MR. KNUDSEN:  He says he doesn't recall, and I am

11    directing him to the appropriate parts, and after he has

12    reviewed it I will see if he --

13    A.  What number am I looking at?

14    Q.  It's the bottom of page 533 to the top of page 534.

15    A.  So you're saying 24, 25?

16                THE COURT:  In fact, at this point, to speed things

17    up, why don't you just read into the record the question and

18    answer.

19    Q.  The question starting at the bottom of page 22.

20                THE COURT:  It's on the bottom of 533, line 22.

21    "Q. If there is a witness, like the driver to the car or the

22    owner to the car, is there a rule in your department that

23    prevents you from at least recording the name of that person

24    and the license plate number of the vehicle just in case it

25    should be needed later on or in the future?"

1              THE COURT:  It says "later on in the future."

2              MR. KNUDSEN:  I apologize, your Honor.

3    "A.  I would not have needed him.  He had nothing on him -- the

4    driver was not in possession of anything illegal.  So I did not

5    at that time, I did not myself.  My main focus, as I said

6    before, was Carleto Allen.  There was a possession of a

7    marijuana cigarette.  It was -- held an illegal firearm."

8              Do you recall giving those answers to those questions?

9    A.  Yes.

10   Q.  So on November 8, 2017, you testified that the driver was

11   not in possession of anything illegal, is that correct?

12   A.  That is correct.

13   Q.  At that time, when you gave that testimony, you knew you

14   had arrested the driver, correct?

15   A.  The driver was not arrested.

16   Q.  The driver -- you knew that the driver had been charged --

17   strike that.

18             You knew that the driver had been brought in on

19   criminal possession of a weapon, isn't that correct?

20   A.  The driver was brought in.  After I do my investigatory

21   search, the driver had nothing illegal nor had a firearm inside

22   the vehicle.  I let the driver go.

23   Q.  And you knew you were going to be giving testimony on

24   November 8, 2017, correct?

25   A.  No, not the specific date.

1    Q.  But you knew you were going to be giving this testimony

2    before you went in?

3    A.  No.

4    Q.  You didn't know you were going to be testifying about the

5    arrest of Mr. Allen on November 8, 2017?

6            MR. MANNINGHAM:  Objection.

7            THE COURT:  When?  When?  Do you mean the day before

8    the trial, or three weeks before the trial, or a month before

9    the trial?  When?

10   Q.  Did you spend time preparing for your testimony, in

11   anticipation of your testimony on November 8, 2017?

12   A.  Repeat that.

13   Q.  Did you do anything to prepare in anticipation of this

14   testimony you gave on November 8, 2017?

15   A.  I don't remember.

16   Q.  Were you shown any documents to prepare for this testimony

17   on November 8, 2017?

18   A.  I was showed some documents.  I don't remember exactly

19   which ones.

20   Q.  So you had given it some thought before you went in and

21   testified on November 8, 2017, correct?

22   A.  I don't remember.

23   Q.  Those were false statements in that testimony, correct?

24           MR. MANNINGHAM:  Objection.

25           THE COURT:  What statements are you talking about?

1   Q.  The false statements you gave on November 8.

2          THE COURT:  I don't know what you're talking about.  I

3   just said, what statements are you claiming were false?

4   Q.  That you had not written down the driver's name.  Was that

5   a false statement?

6   A.  No.

7   Q.  So when you testified on November 8, 2017 that you did not

8   write down the driver's name, that was not a false statement?

9   A.  I misunderstood the question.

10  Q.  You had written the pedigree card by that point, correct?

11  A.  Yes.

12  Q.  You had taken the pedigree information from the driver?

13  A.  Yes.

14  Q.  This was testimony given in federal court?

15  A.  Yes.

16  Q.  The reason why you gave those false statements, for

17  example, the driver's name, was to --

18         THE COURT:  You can't say the false statements.

19  Again, you have got to be specific what it is you're talking

20  about.

21  Q.  And the reason why you said that you did not write down the

22  driver's name was because you knew it would call into question

23  your claim that Mr. Allen had possession of the gun, correct?

24  A.  I'm not understanding what you're saying.

25  Q.  On November 8, 2017, in this testimony, you said that the

1    driver did not possess anything illegal, correct?

2    A.   Yes.

3    Q.   Do you believe that to be a truthful statement?

4    A.   Absolutely.

5    Q.   Even though you had charged and written an arrest report

6    charging the driver with criminal possession of a weapon?

7            MR. MANNINGHAM:  Objection.

8            THE COURT:  That's a compound question.  Sustained.

9    Q.   You believe that's a truthful statement even though you had

10   written an arrest report indicating that the driver was in

11   criminal possession of a weapon?

12   A.   Repeat that.

13   Q.   You believe that's a truthful statement even though you had

14   written an arrest report charging the driver with criminal

15   possession of a weapon?

16           MR. MANNINGHAM:  Objection.

17           THE COURT:  Sustained.

18   Q.   This testimony on November 8, 2017 occurred after Mr. Allen

19   had filed his complaint in this case, correct?

20   A.   I don't know.

21   Q.   You don't know when Mr. Allen filed his complaint in this

22   case?

23   A.   No.  Can you tell me the date?

24           THE COURT:  He is actually here to ask you questions

25   and you're here to give answers.  So no.

1            Move on.

2    Q.  I am going to show you a document and see if you recognize

3    this document or not.  It's been previously marked as

4    Plaintiff's Exhibit 16.

5            Have you ever seen that before?

6    A.  No.

7    Q.  Turn the document over so you can't see it.  Does that

8    refresh your recollection when Mr. Allen filed his complaint in

9    this case?  Without looking at the document, sir.

10   A.  I don't remember this at all.

11   Q.  So you don't recall at all when Mr. Allen filed his

12   complaint in this case, correct?

13   A.  No.

14   Q.  So it's possible --

15           THE COURT:  Sustained.

16           MR. KNUDSEN:  I have nothing further at this time.

17           THE COURT:  Cross-examination.

18           These exhibits up here, can someone get them.

19           MR. KNUDSEN:  I will pick them up.

20   CROSS-EXAMINATION

21   BY MR. MANNINGHAM:

22   Q.  Good afternoon, Detective Williams.

23   A.  How you doing.

24   Q.  I am going to show you Plaintiff's Exhibit 14, which is the

25   voided arrest report.

1            You said you filled this out, correct?

2   A.   Yes.

3   Q.   Why did you fill it out?

4   A.   Formality.

5   Q.   Can you explain what you mean by formality?

6   A.   When you bring somebody in under investigation, I brought

7   him in originally to investigate the situation, what had

8   occurred earlier, at which point he was in the precinct and the

9   arrest was voided.

10  Q.   So do you have to fill out an arrest report whenever

11  someone is brought back to the precinct?

12  A.   Yes.

13  Q.   When you filled this out, did you know that the arrest was

14  already voided?

15  A.   When I was filling this report out, yes, I did.

16  Q.   And you filled this voided arrest report out after you did

17  the inventory search of the car?

18  A.   After, yes.

19  Q.   And you didn't find any guns in the car?

20  A.   That is correct.

21  Q.   Any weapons?

22  A.   No.

23  Q.   Is this document used to initiate a criminal prosecution?

24  A.   No.

25  Q.   Could this document be used -- strike that.

1          Would this go on the driver's criminal record?

2   A.   No.

3   Q.   Now, you also testified about fingerprints, correct?

4   A.   Yes.

5   Q.   Do you always find fingerprints on a gun?

6   A.   No.

7   Q.   How often do you find fingerprints?

8   A.   I don't work in a lab, but from my years on the job --

9          MR. KNUDSEN:  Objection.

10          THE COURT:  Could you give us a sense of how often

11  you're involved in the seizure of a firearm?  How often does

12  that happen, or how often did it happen back in 2015, that

13  either yourself or officers you were working with seized a

14  firearm?

15          THE WITNESS:  Back then we seized numerous firearms.

16  However, we rarely got fingerprints or DNA coming back to a

17  firearm.

18  BY MR. MANNINGHAM:

19  Q.   In this case, do you know if they swabbed for DNA?

20  A.   I believe so.

21  Q.   Do you know if they recovered any DNA?

22  A.   No.

23  Q.   Does that mean they did not recover any DNA?

24  A.   They did not recover anything off the firearm.

25          MR. KNUDSEN:  Objection.

1          THE COURT:  Grounds.

2          MR. KNUDSEN:  It wasn't a clear question.  They did

3   not recover any DNA.

4   Q.  Did they recover any DNA off the firearm?

5   A.  No.

6   Q.  You testified that you recovered a firearm from the

7   plaintiff on January 9, 2015, is that correct?

8   A.  Yes.

9          MR. MANNINGHAM:  Your Honor, may I approach the

10  witness?

11         THE COURT:  Yes.

12  Q.  I just handed you what has been previously marked for

13  identification as Defendants' Exhibit A.

14         Detective Williams, do you recognize what I just

15  handed you?

16  A.  Yes.

17  Q.  What is it?

18  A.  That would be the black firearm that was on Carleto Allen.

19  Q.  And this is the gun that you recovered from the plaintiff?

20  A.  Yes.

21  Q.  How do you know?

22  A.  I vouchered it.

23  Q.  Is the voucher on what you're holding?

24  A.  Yes.

25  Q.  Is there anything unique about this particular gun?

A.  It's a black firearm that I recovered, as well as I put the

lead seal on the firearm.

Q.  What is a flex seal?

A.  A lead seal is when there is no serial number on the

firearm.  In this particular case, this firearm was defaced;

the numbers were not visible clearly.  So we placed a serial

number on it to have it go back so the gun could be ID'd.

Q.  So when you say numbers, you mean the serial numbers were

scratched off the gun?

A.  That's correct.

Q.  Is this gun in the same condition as when you recovered it

on January 9, 2015?

A.  No.

Q.  What is different?

A.  Well, the lead serial number is placed on here, as well as

there is a plastic strap going through the trigger and the

chamber to make sure the gun is safe.

Q.  So this gun has been made safe?

A.  Yes.

          MR. MANNINGHAM:  I would now like to offer into

evidence Defendants' Exhibit A.

          THE COURT:  Any objection?

          MR. KNUDSEN:  I objected previously.

          THE COURT:  Defendants' Exhibit A is received.

          (Defendants' Exhibit A received in evidence)

1          MR. MANNINGHAM:  Your Honor, may I have permission to

2     show it to the jury?

3          THE COURT:  Yes.

4          MR. MANNINGHAM:  Would you like to give an

5     instruction?

6          THE COURT:  Ladies and gentlemen, I am going to allow

7     defense counsel to pass the firearm to you so that you can feel

8     the weight and heft of the firearm.  He is going to hand it to

9     you now, and if you would hand it to each other I would

10    appreciate it.

11         Go ahead.

12    BY MR. MANNINGHAM:

13    Q.  Detective Williams, is there anything else in this bag that

14    the gun is in?

15    A.  Yes.

16    Q.  What else?

17    A.  The magazine is inside the bag.

18    Q.  Is there anything else other than the magazine?

19    A.  I believe there should be some live rounds.

20         MR. MANNINGHAM:  May I approach the witness, your

21    Honor?

22         THE COURT:  Yes.

23    Q.  What else is in the bag?

24    A.  That would be one cartridge, which is one live round that

25    was inside the chamber ready to be fired at any time, as well

1  as a magazine that belongs to the firearm.

2  Q.  So the gun was loaded when you recovered it, correct?

3  A.  Yes.

4  Q.  When you saw the gun, what did you do?

5  A.  When I saw the gun hanging out from Carleto Allen's pocket,

6  I immediately yelled "gun, gun, gun."  And I had placed my hand

7  on the firearm, as well as Carleto Allen placing his hand on

8  the firearm, as me and my partner were trying to bring Carleto

9  Allen out of the vehicle.

10  Q.  At any point did you kick the plaintiff?

11  A.  No.

12  Q.  Did you put the plaintiff in a headlock?

13  A.  No.

14  Q.  Did you stomp on the plaintiff's hand?

15  A.  No.

16  Q.  Did you find the gun in the back seat of the car?

17  A.  No.

18  Q.  Where did you find it?

19  A.  I found the gun on Carleto Allen.

20          MR. MANNINGHAM:  Your Honor, may I have a moment to

21  confer with my co-counsel.

22          THE COURT:  Yes.

23          MR. MANNINGHAM:  Nothing further.

24          THE COURT:  Any redirect, Mr. Knudsen?

25          MR. KNUDSEN:  Yes.

1   REDIRECT EXAMINATION

2   BY MR. KNUDSEN:

3   Q.  Nothing on the gun indicates that it was in the possession

4   of Mr. Allen, correct?

5           MR. MANNINGHAM:  Objection.

6           THE COURT:  Grounds.

7           MR. MANNINGHAM:  Confusing, vague.

8           THE COURT:  Overruled.

9   A.  Repeat the question.

10  Q.  Nothing on the gun indicates that it was on the possession

11  of Mr. Allen, correct?

12  A.  Only my arrest report.

13  Q.  My question was nothing on the gun itself indicates that it

14  was in the possession of Mr. Allen, correct?

15  A.  No.

16  Q.  And that is, your statement is all that puts the gun on Mr.

17  Allen, isn't that correct?

18  A.  Yes.

19  Q.  Mr. Allen did not have the gun on him when you opened that

20  car door, correct?

21  A.  That's not true.

22  Q.  When you opened that car door and saw that Mr. Allen didn't

23  have a gun you were annoyed, right?

24  A.  Carleto Allen had the firearm on him.  As he was grabbing

25  it, I was grabbing the firearm.

1  Q.  You had hoped to catch Mr. Allen with a gun when you opened

2  that car door, correct?

3  A.  No.

4  Q.  Then when he didn't have the gun you got angry, right?

5        THE COURT:  Sustained.

6  Q.  And then when you opened the door, you pulled Mr. Allen out

7  of the car, correct?

8  A.  I pulled Carleto Allen out of the vehicle, yes.

9  Q.  And after you pulled Mr. Allen out of the vehicle, you put

10 him on to the street, right?

11 A.  As I opened the door, Carleto Allen grabbed the firearm, I

12 grabbed the firearm, and we had a struggle.  Carleto Allen was

13 resisting arrest.

14 Q.  I asked, when you opened the car door, you pulled Mr. Allen

15 out and put him on the street, is that correct?

16 A.  Not right away.  He fought.

17 Q.  He fought?

18 A.  Yes.

19 Q.  How did he fight?

20 A.  Kicking, punching, flailing his arms, striking me several

21 times.

22 Q.  Then after that happened, did you throw him on the street?

23 A.  As I stated before, Carleto Allen had a firearm.  I am

24 trying to grab the firearm as well as him, and we went to the

25 ground.

1    Q.  You said that Mr. Allen was punching you?

2    A.  Yes.

3    Q.  Where did he punch you?

4    A.  All over the body.

5    Q.  All over the body?

6    A.  Trying to pretty much escape, run away.

7    Q.  When was this punching occurring?

8    A.  Right away.

9    Q.  Right away?

10   A.  Yes.

11   Q.  When you opened the car door, he started punching you?

12   A.  Right away he recognized me, went for the firearm, tried

13   getting -- I pulled him out of the car.  We were going back and

14   forth.  He had his hand on the firearm and we were fighting.

15   Q.  So when you opened the car door, did he start punching you?

16   A.  Yes.

17   Q.  How many times did he punch you?

18   A.  I don't recall.

19   Q.  Then when he was punching you, what else was he doing?

20   A.  Grabbing the firearm.

21   Q.  So he had one arm grabbing the firearm and the other hand

22   punching you?

23   A.  Yes.

24   Q.  And this is in the car?

25   A.  In and out.

1    Q.  In and out.  Let's talk specifically about in the car right

2    now.  What is Mr. Allen doing?

3    A.  He is grabbing the firearm, trying to kick, push, to leave

4    the vehicle.

5    Q.  I'm sorry.  What was that last?

6    A.  Trying to get out of the vehicle and push and kick,

7    preventing me from placing him under arrest.

8    Q.  So he is kicking at you in the vehicle?

9    A.  Excuse me?

10   Q.  I am unclear of your testimony.  While he is in the car, is

11   he kicking at you?

12   A.  He is grabbing the firearm and kicking, trying to strike,

13   trying to push me off of him.

14   Q.  How long did that happen in the car?

15   A.  I don't remember exactly how long.

16   Q.  Can you estimate?

17   A.  Maybe 15 seconds in the car, maybe a little longer.

18   Q.  And then at some point you're able to get him out of the

19   vehicle?

20   A.  Eventually, yes.

21   Q.  While he is in the vehicle, how many times does he attempt

22   to punch you?

23   A.  I don't recall exactly.

24   Q.  How many times did he hit you?

25   A.  Several.

1  Q.  Where?

2  A.  Amongst the body.

3  Q.  Amongst your body?

4  A.  Yes.

5  Q.  Could you be more specific?

6  A.  Arms, chest, face.

7  Q.  OK.  So he hit you at least three times while he is sitting

8  in the vehicle?

9  A.  Yes.

10  Q.  OK.  And how else?  He's kicking?

11  A.  He is placing his hand on the firearm trying to grab it.

12  Q.  Which hand is he trying to put on the firearm?

13  A.  I believe it was his right.

14  Q.  So he is punching you with one hand and trying to grab the

15  firearm with the other?

16  A.  Yes.

17  Q.  And he is kicking you at the same time?

18  A.  He is doing everything to not be arrested.

19  Q.  And this took about 15 to 20 seconds?

20  A.  Inside the vehicle, yes.

21  Q.  Then how does he get out of the vehicle?

22  A.  Finally, Officer Ravelo and I were able to pull Carleto

23  Allen out of the vehicle.

24  Q.  Was Officer Ravelo punched while Mr. Allen was in the

25  vehicle?

1           MR. MANNINGHAM:  Objection.

2           THE COURT:  Overruled.

3    A.  I don't know.

4    Q.  Was Officer Ravelo kicked while Mr. Allen was in the

5    vehicle?

6    A.  I was watching Carleto Allen with me and him.  I can't

7    speak for Officer Ravelo.

8    Q.  OK.  So he was only trying to kick and punch you?

9    A.  He was trying to strike both of us.

10   Q.  But he only hit you?

11   A.  He hit me.

12          THE COURT:  The question is not whether he hit you.

13   The question is whether you are aware of whether he hit

14   Detective Ravelo?

15          THE WITNESS:  He had to have struck Officer Ravelo

16   because we were in close proximity together, so yes.

17   Q.  How was Mr. Allen removed from the vehicle?

18   A.  He was removed by our hands, fighting, kicking, had to be

19   removed from the vehicle.

20   Q.  So Mr. Allen is punching and kicking in the vehicle,

21   correct?

22   A.  At us, yes.

23   Q.  What are you doing at that time?

24   A.  I'm trying to put my hand on the firearm, as well as him

25   trying to grab the firearm.

1    Q.  I'm sorry?

2    A.  I am grabbing the firearm with Carleto Allen.

3    Q.  When did he start kicking and punching you in the vehicle?

4    A.  Once I opened the car door, I said, please don't move.  I

5    saw the firearm hanging from the jacket.  I grabbed the

6    firearm.  He immediately started fighting.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did he start punching you before you took the lit cigarette

2    out of his hand?

3    A.  Repeat that.

4    Q.  Did he start punching you before you took the lit marijuana

5    cigarette out of his hand?

6    A.  I don't remember.

7    Q.  You do remember taking the lit marijuana cigarette out of

8    his hand, correct?

9    A.  Yes.

10   Q.  And putting it in your pocket?

11   A.  Simultaneously.

12   Q.  Simultaneously with what?

13   A.  You know, one move I saw the firearm, put my hand on the

14   firearm, I grabbed the marijuana and put it in my pocket, why,

15   I don't know, but I grabbed the firearm, grabbed the marijuana

16   cigarette.

17   Q.  How long after you opened the door to the vehicle did you

18   see the gun?

19   A.  I opened the car door within seconds.

20   Q.  Which pocket was it in in Mr. Allen's jacket?

21   A.  Right.

22   Q.  The right pocket.

23   A.  Yes.

24   Q.  Okay.  And which hand was he going for the gun?

25   A.  With his right.

1  Q.  He was going with his right hand into his right pocket.

2  A.  Yes.

3  Q.  And you don't have any recollection of the jacket itself,

4  isn't that correct?

5  A.  I remember him having a black jacket on.

6  Q.  A black jacket on.

7  A.  Yes.

8  Q.  But no other specifics?

9  A.  I don't remember exactly.  It was a black jacket.  Firearm

10  hanging out.

11  Q.  And where was the pocket?  In the jacket.  Where was the

12  pocket?

13  A.  On the right-hand side.

14  Q.  Was it an outside or inside jacket -- inside pocket?

15  A.  The firearm was hanging out of the jacket pocket, the butt

16  of the gun.

17  Q.  That was -- my question was, was the pocket on the outside

18  of the jacket or on the inside of the jacket?

19  A.  I'm not understanding that.

20  Q.  Was the pocket on the outside of the jacket or inside the

21  jacket?

22  A.  Oh, it was on the outside.

23  Q.  Okay.  And so he was going for it with his right hand, is

24  that your testimony?

25  A.  Yes.

1  Q.  And then which hand did you put on to -- you said you took

2  some action to stop him from doing that?

3  A.  Yes.

4  Q.  What action was that?

5  A.  He was going for the firearm.

6  Q.  What action --

7  A.  I was --

8  Q.  -- did you take?  I'm sorry.

9          THE COURT:  Please don't talk over each other.

10          What action did you take when you observed him

11  reaching for the gun in his pocket?

12          THE WITNESS:  I stated "gun, gun, gun" out loud and

13  immediately went to the firearm, grabbed it with my hand.

14  BY MR. KNUDSEN:

15  Q.  Which hand?

16  A.  My right.

17  Q.  Which hand did you take the marijuana cigarette out of his

18  mouth with?

19  A.  I don't remember.  It has to be my left.  I don't remember.

20  Q.  Are you a lefty or a righty?

21  A.  I am a righty.

22  Q.  After this 15 seconds or so where Mr. Allen is punching you

23  and potentially punching Officer Ravelo, he is removed from the

24  vehicle.

25  A.  Finally, yes.

1    Q.   How is he removed from the vehicle?

2    A.   Since Carleto Allen had a firearm, he was resisting arrest,

3    I had to use force to bring him out of the vehicle.

4    Q.   Can you explain how you used force to remove him from the

5    vehicle?

6    A.   Yes.  I pulled him out of the vehicle.

7    Q.   How?

8    A.   He was going -- his weight was going against mine, I was

9    going against him, and I was -- Officer Ravelo and I were able

10   to pull him out of the vehicle.

11   Q.   What is Officer Ravelo doing while Mr. Allen is kicking and

12   punching in the car?

13   A.   We are just trying -- we are just trying to get him out of

14   the vehicle.

15   Q.   What is Officer Ravelo doing while Mr. Allen is kicking and

16   punching in the car?

17   A.   He is trying to get control of the Carleto Allen's hand as

18   well as probably trying to put his hand towards the firearm as

19   well.

20   Q.   And who removed Mr. Allen from the car?

21   A.   Officer Ravelo and I.

22   Q.   And then after Mr. Allen is removed from the car, he is put

23   on to the ground, correct?

24   A.   Carleto Allen is now resisting, pushing, kicking, trying to

25   run away, escape, and we brought -- we were able to bring

J412all4                    Williams - Redirect

1    Carleto Allen to the ground.

2    Q.  How were you able to bring him to the ground?

3    A.  Well, my weight.

4    Q.  Where are you situated with respect to Mr. Allen when he is

5    brought to the ground?

6    A.  I just remember I was on the firearm side of Carleto Allen.

7    Q.  So the right side?

8    A.  Yes.

9    Q.  And Officer Ravelo was on the left side.  That's what you

10   believe?

11          THE COURT:  I guess it is unclear because we don't

12   know whose right or left you are talking about.

13          MR. KNUDSEN:  That is correct, your Honor.  Thank you.

14   Q.  Which right side are you referring to?

15   A.  I'm on Carleto Allen's right-hand side with the firearm.

16   Q.  And so --

17          THE COURT:  And which direction is he facing at that

18   point?  Is he facing the front end of the car or is he facing

19   the back end of the car or do you not remember?

20          THE WITNESS:  At the time I don't remember because

21   once I was able to remove Carleto Allen out of the vehicle, he

22   tried to run, so his body was going off over the -- all over

23   different ways, your Honor.

24          THE COURT:  All right.

25   BY MR. KNUDSEN:

1    Q.  So was your testimony just now that you don't recall which

2    way Mr. Allen was facing when he came out of the car?

3    A.  Or -- what I am saying is when Carleto Allen was removed

4    from the vehicle, I remember going in many different directions

5    because he was trying to run, push off, kick, strike, so I

6    don't remember exactly which way he was facing.

7    Q.  So he is trying to run and kick at the same time?

8    A.  Run, kick, punch.  He was resisting arrest.

9    Q.  Which hand was he punching with?

10   A.  Well, I had his right hand on the -- with the gun, so it

11   was his left.

12   Q.  Did he punch you when you were outside of the vehicle?

13   A.  I don't remember -- I remember him striking me.  I don't

14   remember exactly how many times or whereabouts on my body, but

15   I remember Carleto Allen was striking me.

16   Q.  And how long did it take to get Mr. Allen on to the ground?

17   A.  I don't remember exactly how long it took.  It was -- I

18   don't remember exactly how long.  It was a struggle, trying to

19   get the firearm from the defendant.  I don't remember exactly

20   how long.  I just remember it was a struggle trying to maintain

21   Carleto Allen from trying to remove the firearm from the

22   jacket.

23   Q.  How many times did he punch you outside the vehicle?

24   A.  I don't remember exactly how many times.

25   Q.  How many times did he kick you outside the vehicle?

J412all4                    Williams - Redirect

1    A.  I don't remember exactly how many times.

2    Q.  Was what Officer Tass doing at this time?

3    A.  I don't know.  Tass was not with him while I was on the

4    ground fighting with Carleto Allen.

5    Q.  Is this -- now you are on the ground with Mr. Allen or are

6    we still standing --

7    A.  You just asked me where is Tass?  Were you standing up or

8    were you on the ground?

9    Q.  I was asking while you were standing up, you are wrestling

10   with Mr. Allen, he is kicking you and he is punching you and he

11   is trying to run and he is trying to grab the gun all at the

12   same time, and how long did that take?

13              MR. MANNINGHAM:  Objection.

14              THE COURT:  Sustained.

15   Q.  How long were you -- how long did it take after Mr. Allen

16   was brought out of the vehicle to put on the ground, to be put

17   on the ground?

18   A.  Maybe another 15, 30 seconds?  I don't know exactly.

19   Q.  How many times did he punch you during that time?

20   A.  Several times.

21   Q.  How many times did he kick you?

22   A.  I don't know exactly how many times.

23   Q.  You said he was attempting to run away?

24   A.  Yes.

25   Q.  Which direction was he attempting to run away?

1   A.  As stated before, once Carleto Allen was brought out of the

2   vehicle, we were in many different directions because he was

3   trying to run and also grab the firearm.

4   Q.  Yesterday you testified that Officer Tass and

5   Sergeant Sanchez helped you bring Mr. Allen to the ground.  Do

6   you recall that?

7   A.  I don't remember him -- stating brought to the ground.  I

8   don't remember stating that.  I remember it was Officer Ravelo

9   and I that was with Carleto Allen.

10  Q.  Do you recall me asking you yesterday, "After you took the

11  lit cigarette out of Mr. Allen's hand, you immediately pulled

12  him out of the car, correct?"

13  A.  Yes.

14  Q.  And you agreed that you immediately pulled him out of the

15  car after you took the lit cigarette out of his mouth.  Do you

16  remember that testimony yesterday?

17  A.  Yes.

18  Q.  And now today it is 15 seconds or so where Mr. Allen is

19  punching and kicking you while you -- he is in the car.  Is

20  that correct?

21          MR. MANNINGHAM:  Objection.

22          THE COURT:  Sustained.

23  Q.  And yesterday I asked you:  Officer Tass, Officer Ravelo,

24  and Sergeant Sanchez assisted you in bringing Mr. Allen down to

25  the ground, correct?

J412all4                      Williams - Redirect

1    A.   I don't remember exactly that particular question.  I

2    remember -- I possibly could have misunderstood you.  All I

3    remember is Officer Ravelo and I were with Carleto Allen.

4    Officer Tass, Sergeant Sanchez, they were not on our side

5    while -- with Carleto Allen.

6    Q.   So if you testified yesterday -- strike that.

7              So your testimony yesterday that Officer Tass and --

8              THE COURT:  Sustained.

9    BY MR. KNUDSEN:

10   Q.   So are you trying to protect yourself when Mr. Allen is

11   attempting to punch you?

12   A.   I'm trying to grab the firearm.  That's my main concern.

13   Q.   Are you doing anything else while Mr. Allen is attempting

14   to punch you?

15   A.   I'm trying to grab the firearm and trying to bring Carleto

16   Allen under arrest.

17   Q.   Did Mr. Allen at this time have the gun?

18             THE COURT:  At what time?

19             MR. MANNINGHAM:  Objection.

20   BY MR. KNUDSEN:

21   Q.   When you had brought him out of the vehicle and he is

22   standing up outside of the car, did Mr. Allen have the gun with

23   him at that time?

24   A.   Yes, he did.

25   Q.   And where was it on him at that time?

1   A.  As I stated before, the firearm was on -- inside of his

2   jacket pocket, hanging out on the right-hand side.

3   Q.  So how long did it take to get Mr. Allen on the ground

4   after you brought him out of the vehicle?

5           MR. MANNINGHAM:  Objection.

6           THE COURT:  Grounds.

7           MR. MANNINGHAM:  Asked and answered multiple --

8           THE COURT:  Overruled.

9   A.  Repeat your question.

10  Q.  How long after you took Mr. Allen out of the vehicle did it

11  take to put him on the ground?

12  A.  Maybe 15 to 20 seconds.

13  Q.  And eventually you get Mr. Allen down to the ground,

14  correct?

15  A.  Eventually, yes.

16  Q.  How many times has he punched you before you got him down

17  to the ground?

18  A.  I don't remember exactly how many times, but several.

19  Q.  More than five?

20  A.  I don't remember.  My main focus was the firearm that

21  Carleto Allen had.

22  Q.  And you said he attempted to run away when he got outside

23  the car?

24  A.  That is correct.

25  Q.  And which direction did he attempt to run?

1              MR. MANNINGHAM:  Objection.

2              THE COURT:  It is getting repetitive.  These questions

3   have been asked before --

4              MR. KNUDSEN:  All right.

5              THE COURT:  -- and I have given you some leeway, but

6   you can't keep on going over the same questions.

7   BY MR. KNUDSEN:

8   Q.  What is Mr. Allen doing when he is down on the ground?

9   A.  Mr. Allen is on the ground, still trying to get up and run

10  away as well as grabbing the firearm.

11  Q.  Which hand is he attempting to grab the firearm with?

12  A.  Right hand.

13  Q.  And where are you when he is down on the ground?

14  A.  I don't remember exactly where.  I just remember trying to

15  keep my hand on the firearm of Carleto Allen.

16  Q.  Does Mr. Allen attempt to punch you while he is down on the

17  ground?

18  A.  Carleto Allen was trying to kick, elbow, whatever it was,

19  for him to not want to be arrested or not be there.  He wanted

20  to run away.

21  Q.  Did he kick or elbow you while he was down on the ground?

22  A.  As I just stated before, yes.

23  Q.  And how long after you got Mr. Allen on the ground were you

24  able to put him in handcuffs?

25  A.  I don't remember exactly.  You know, the whole situation

1    happened so quick.  Maybe all together, from beginning to end,

2    maybe a minute, maybe a little bit longer.

3    Q.  So --

4             THE COURT:  So the whole time from when you opened the

5    door to getting the handcuffs on Mr. Allen, about a minute?

6             THE WITNESS:  Approximately a minute or longer.  You

7    know, when a struggle goes on like that, you don't really

8    realize how long it is.  It feels like forever, but it

9    approximately took maybe a minute or longer.

10   BY MR. KNUDSEN:

11   Q.  At some point you were able to secure one of Mr. Allen's

12   arms so he could be put into handcuffs?

13   A.  Eventually he was able to be placed in the handcuffs.

14   Q.  Were you assisting in putting -- did you assist in putting

15   the handcuffs on Mr. Allen?

16   A.  Yes.

17   Q.  Which arm -- were you holding one of the arms?

18   A.  I don't remember exactly where exactly on the arm.  I just

19   remember maintaining control on the right-hand side where his

20   hand was on the firearm.

21   Q.  But do you recall securing one of Mr. Allen's arms so he

22   could be put into handcuffs?

23   A.  Yes.

24   Q.  And which arm did you secure?

25   A.  I don't remember.

1  Q.  And how did you secure his arm for it to be put in

2  handcuffs?

3  A.  I don't remember exactly how, but his hands were eventually

4  placed behind his back.

5  Q.  Did you use one of your arms to secure his arm?

6  A.  I don't remember exactly.

7  Q.  Whose handcuffs were used on Mr. Allen?

8  A.  I don't remember exactly.  I don't remember whose

9  handcuffs.

10 Q.  How many officers are on the ground -- strike that.

11        How many officers are assisting in handcuffing

12 Mr. Allen?

13 A.  It was just Ravelo and I.

14 Q.  So Officer Ravelo had Mr. Allen's other arm?

15 A.  Officer Ravelo and I was finally able to secure Carleto

16 Allen, place the handcuffs.  I don't remember exactly who had

17 what hand or who had what arm.  I just remember maintaining the

18 firearm side of Carleto Allen.

19 Q.  By the time Mr. Allen was arrested -- strike that.

20        By the time Mr. Allen was in handcuffs, how many times

21 had he punched you?

22 A.  I don't remember exactly how many times Carleto Allen

23 struck me.

24 Q.  How many times had he kicked you at that point?

25 A.  I don't remember exactly how many times.

1  Q.  And was he going for the gun the entire time?

2  A.  He was not -- he was already going, his hand was on the

3  firearm.

4  Q.  Was his hand going for the firearm this entire time after

5  you opened the door to the car until he was in handcuffs?

6  A.  Once I opened the vehicle, his hand went straight to the

7  firearm.

8  Q.  And after you opened the vehicle and his hand allegedly

9  went straight for the firearm until he was in handcuffs, was he

10  going for the firearm the entire time?

11  A.  The whole time.

12  Q.  When Mr. Allen is on the ground, is he attempting to get

13  up?

14  A.  Yes.  He is trying to run away.

15  Q.  How is he trying to get up when he is down on the ground?

16  A.  I don't know exactly.  I wasn't concentrating exactly how

17  he was trying to get up.  I was concentrating on the firearm

18  that could potentially hurt me or my coworker.

19  Q.  Why did you think he was trying to get up while he was down

20  on the ground?

21  A.  Why do I think Carleto Allen was trying to get up?

22  Q.  Yes.

23  A.  Oh, he went to run away.

24            THE COURT:  No, I think what the lawyer is asking you

25  is what, if anything, do you recall Mr. Allen doing as he was

1  trying to get up.

2  A.  I remember Carleto Allen still had his hand on the firearm

3  as well as getting up, trying to run away, and not be arrested

4  or . . .

5  BY MR. KNUDSEN:

6  Q.  Let me show you what's been previously marked as

7  Plaintiff's Exhibit 5.

8          This is the arrest report for Carleto Allen, correct?

9  A.  Yes.

10 Q.  Where in the detail section where does it say that

11 Mr. Allen was punching?

12 A.  It says "defendant did resist arrest by flaring his arms

13 and kicking P.O. in the legs, refusing to be handcuffed," so

14 kicking his arms and flaring his -- meaning he struck me.

15 Q.  Flaring his arms means he struck you?  Is that what you

16 just said?

17 A.  He was flaring his arms when he was -- flaring his arms and

18 also trying to run away.  He did hit me several times.

19 Q.  Okay, but it doesn't say that he was punching in the

20 details section, correct?

21 A.  Well, this is just details for the arrest report.  When I

22 talked to the ADA I get into a little bit more further --

23          MR. KNUDSEN:  Objection.

24 A.  -- into the story of what --

25          THE COURT:  The question is not what you said to the

1    ADA.  The question is what's on the arrest form, so if you

2    could confine your answer to that, please.

3    A.  On the arrest report it does not say he punched.

4    Q.  And where on the arrest report does it say he was reaching

5    for his gun?

6    A.  It does not say in details.

7    Q.  And so despite your description of that use of force with

8    Mr. Allen, this arrest report says that no force was used?

9            THE COURT:  Sustained.  You are here to ask questions,

10   not to make argument.  Argument comes later.  So we are here

11   for questions now.

12   Q.  Did Mr. Allen have his jacket on the entire time when he

13   was -- strike that.

14           Did Mr. Allen have his jacket on until he was put in

15   handcuffs?

16   A.  You have got to speak up.

17   Q.  Did Mr. Allen have his jacket on until he was put in

18   handcuffs?

19   A.  Yes, he had his jacket on.

20   Q.  And that was when he was in handcuffs, he had his jacket

21   on, correct?

22   A.  Yes.

23   Q.  When Mr. Allen was face down on the ground and -- strike

24   that.

25           When you were putting handcuffs on Mr. Allen, what was

1    his position?

2    A.  Mr. Allen was on the ground face down.

3    Q.  Face down.

4    A.  Yes.

5    Q.  And was he being held down?

6    A.  What do you mean was he being held down?

7    Q.  Were you applying force to keep him on the ground when

8    handcuffs were being applied?

9    A.  Yes.  I had him on the ground.

10            THE COURT:  Where were you in relationship to him?

11            THE WITNESS:  I was either on -- I don't remember

12   exactly where I was exactly, if I was on the side or on the

13   top.  I just remember on the right-hand side of the gun side.

14   BY MR. KNUDSEN:

15   Q.  And you had control of one of Mr. Allen's arms, correct?

16   A.  Yes.

17   Q.  And how did you have control of the arm?

18   A.  With one hand.

19   Q.  Where on the arm were you holding Mr. Allen?

20   A.  I don't remember exactly where.  I just remember exactly --

21   Q.  Was it on the wrist?

22   A.  I don't remember exactly.  I remember holding on to the

23   firearm.

24   Q.  You are holding on to the firearm at this time when you are

25   securing Mr. Allen to be put in handcuffs?

1    A.   Yes.  My main concern was my safety.  I did not want

2    Carleto Allen to use the firearm against me, so I was holding

3    on to the firearm.

4    Q.   And Mr. Allen is face down at this time?

5    A.   That is correct.

6    Q.   You have one of his arms secured?

7    A.   I believe so, yes.

8    Q.   And Officer Ravelo has the other arm secured?

9    A.   Yes.

10   Q.   And at that time you are still holding on to the gun in

11   Mr. Allen's jacket?

12   A.   Yes.

13            MR. KNUDSEN:  I have nothing further at this time.

14            THE COURT:  All right.  Any recross?

15            MR. MANNINGHAM:  Yes, your Honor, just very briefly.

16   RECROSS EXAMINATION

17   BY MR. MANNINGHAM:

18   Q.   Detective Williams, you were just asked about the details

19   you put in the arrest report, is that correct?

20   A.   Yes.

21   Q.   Now, did you have to tell -- did you have to put the entire

22   story in that detail section?

23   A.   I would need a book for that day, so I was not able to

24   write a whole detailed story.  I figured I would give the gist

25   of the story and be ABLE to talk to the ADA and draft it up.

1    Q.  So did you talk to the ADA after the arrest report?

2    A.  Yes.

3    Q.  Okay.  And when did you talk to the ADA?

4    A.  I'm not sure if it was later on that day or the next day.

5    Q.  And did you tell the ADA the whole story?

6    A.  Yes.

7    Q.  Did you tell the ADA that plaintiff punched you?

8    A.  Yes.

9    Q.  Did you tell the ADA that plaintiff kicked you?

10   A.  Yes.

11   Q.  Did you tell the ADA that plaintiff pushed and flailed his

12   arms?

13   A.  That is correct.

14   Q.  Did you count how many times you were punched?

15   A.  No.

16   Q.  Did you count how many times you were kicked?

17   A.  No.

18   Q.  Were you looking at your watch when you were trying to

19   arrest the plaintiff?

20   A.  No.

21   Q.  What were you focused on?

22   A.  My main focus was the firearm that Carleto Allen had.

23           MR. MANNINGHAM:  Nothing further.

24           THE COURT:  Anything else?

25           MR. KNUDSEN:  Nothing, your Honor.

J412all4                    Williams - Recross

1          THE COURT:  All right.  You can step down.

2          (Witness excused)

3          THE COURT:  Does plaintiff have any additional

4     evidence.

5          MR. KNUDSEN:  Plaintiff rests.

6          THE COURT:  Does the defendant have any additional

7     evidence?  Do the defendants have any additional evidence?

8          MS. RYAN:  Your Honor, defendants do have a motion to

9     make at this time.  I don't know what your Honor's preference

10    is as far as timing and taking a break for the jury.

11         THE COURT:  I want to inquire of the jury, did you

12    have lunch before you showed up today?  Have you eaten?  Okay.

13    So ladies and gentlemen, we are going to take about a 15-minute

14    recess.

15         THE DEPUTY CLERK:  One juror did not.

16         THE COURT:  Are you hungry?  You are hungry?

17         JUROR:  Old.

18         THE COURT:  Aren't we all.  If you haven't eaten, the

19    time now is quarter to 2, I'm going to ask you to make it a

20    quick lunch, if you will, because I do want to get you back

21    here so we can get what we need to do done, so the time now is

22    quarter to 2, so I am going to ask you to all come back at

23    2:30.

24         As always, don't discuss the case with anyone.  Keep

25    an open mind, and we will resume at 2:30 with the jury.

1            Thank you all very much.

2            (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Please be seated.

3           All right.  Ms. Ryan, do you want to make a motion?

4           MS. RYAN:  Yes.  Mr. Manningham is going to.

5           MR. MANNINGHAM:  Actually I will, your Honor.

6           THE COURT:  Go ahead.

7           MR. MANNINGHAM:  Your Honor, for the record, at this

8    time the defendants move for judgment as a matter of law under

9    Rule 50(a) of the Federal Rules of Civil Procedure based on the

10   evidence presented.

11          Plaintiff has not met his burden of establishing his

12   case.  Specifically, plaintiff has not presented evidence that

13   Sergeant Sanchez or Officer Tass were personally involved in

14   any use of force against him.  Plaintiff's testimony at trial

15   is that he is not sure who other than Detective Williams used

16   force.  He testified that other officers may have participated,

17   however he was not able to say which officers.  The testimony

18   we have from Sergeant Sanchez and Officer Tass is that they

19   were dealing with the driver during plaintiff's arrest, so

20   therefore there is just no evidence in the record and any

21   evidence that they directly participated would be sheer surmise

22   or conjecture, which is prohibited under Rule 50.

23          And further, there is not evidence to support

24   plaintiff's failure to intervene claim against Sergeant Sanchez

25   or Officer Tass.  The evidence that has been presented

1    demonstrates that both of these officers were dealing with the

2    driver during plaintiff's arrest, which was on the other side

3    of the vehicle, and they would not have had a reasonable

4    opportunity to intervene in any use of force.

5         And finally, based on the evidence presented, these

6    officers are entitled to qualified immunity because it was

7    reasonable for them to believe that their actions were

8    constitutional because they all believed that plaintiff was

9    dangerous and resisting arrest.

10        THE COURT:  All right.  Mr. Knudsen, anything you want

11   to say?

12        MR. KNUDSEN:  Obviously the Rule 50 should be denied

13   with respect to the -- Rule 50 with -- pertaining to Sanchez

14   and Tass.  Williams testified yesterday that they were there

15   and present and assisted him in putting Mr. Allen on the

16   ground.  Ravelo testified that he believed officers from the

17   other side of the car came over to assist in apprehending,

18   physically apprehending Mr. Allen.  Mr. Allen testified that at

19   least four to five officers were there assisting in

20   apprehending Mr. Allen.  All of that would indicate that a jury

21   could determine that all four of them participated in the

22   arrest.

23        With respect to the failure to intervene claim, it is

24   essentially the same, that these people -- the officers had an

25   opportunity to come over to the extent they weren't there

1    and -- that being Sanchez and Tass, and they would have been

2    able to intervene to stop the use of excessive force.

3         And, indeed, the officers are not entitled to

4    qualified immunity.  It is a question of fact what had

5    happened, and I don't think, if you believe Mr. Allen's version

6    of events, that the officers' actions -- there was any

7    reasonable basis for the officers to take that action that they

8    did.

9         THE COURT:  All right.  I will reserve decision.

10        How long are the parties' summations going to be?

11   Ms. Ryan, or I don't know who is doing the closing.  Is it

12   going to be you?

13        MS. RYAN:  Yes, your Honor.

14        THE COURT:  Do you know how long your summation is

15   going to be?

16        MS. RYAN:  I think right about 15 minutes.  15, maybe

17   20 to be safe.

18        THE COURT:  All right.

19        And how about you, Mr. Knudsen?

20        MR. KNUDSEN:  I would say over 30, maybe 40.

21        THE COURT:  Okay.  So we will resume at 2:30.  We will

22   hear from Ms. Ryan first, and then we will hear from

23   Mr. Knudsen.  And depending on how long you actually go, I will

24   either take a short break or I will go right into the charge.

25        MR. KNUDSEN:  Very good.

1          THE COURT:  Okay.

2          MS. RYAN:  Thank you, your Honor.

3          (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                             2:30 p.m.

3              THE COURT:  Are we prepared to proceed?

4              MS. RYAN:  Yes, your Honor.  I don't know if we have

5     officially rested for the record.

6              THE COURT:  OK.  We will do that before you start.  I

7     can't remember.  I think you're right because you wanted to

8     make your motions.

9              (Jury present)

10             THE COURT:  Ms. Ryan, do the defendants have any

11    additional evidence?

12             MS. RYAN:  No, we do not.

13             THE COURT:  Does the defense rest?

14             MS. RYAN:  Yes, your Honor.

15             THE COURT:  Are you prepared to proceed with your

16    closing argument?

17             MS. RYAN:  Yes, your Honor.

18             THE COURT:  Please proceed.

19             MS. RYAN:  On January 9, 2015, plaintiff was wanted

20    for armed robbery.  He was sitting in a car with a loaded gun.

21    This loaded gun.  And when he saw the police approaching, he

22    reached for it.  He fought the officers at every step.  And now

23    we are here because plaintiff wants you to give him money.

24    Don't do it.

25             When you go into the jury room, you are going to be

1    given a verdict sheet, and it has questions that you are going

2    to need to answer.  And the very first question is:  Has

3    Carleto Allen proven, by a preponderance of the evidence, his

4    excessive force claim against each of these officers?

5            Members of the jury, plaintiff hasn't proven any of

6    his claims.  The answer to each of these questions is no.

7            The force that Detective Williams and Detective Ravelo

8    used to arrest plaintiff was not excessive.  The judge will

9    explain that excessive force is determined based on the facts

10   and circumstances confronting each officer at that moment.  So

11   let's talk about those circumstances.

12           In January of 2015, plaintiff was wanted by Mount

13   Vernon in connection with an armed robbery.  And again, armed

14   means with a gun.  So Detective Williams and Officer Tass had

15   been looking for the plaintiff.  Officer Tass told you how he

16   went to plaintiff's house and he spoke to plaintiff's

17   grandfather.  There were wanted fliers up in the 47th precinct,

18   giving plaintiff's address and noting that he should be

19   considered armed and dangerous.

20           Then on January 9, Detective Williams saw plaintiff in

21   a parked car.  But Detective Williams didn't just approach

22   plaintiff himself.  He called for backup.  And these four

23   officers met and came up with a plan in order to approach.

24   They wanted to be safe.  Because they were concerned that

25   plaintiff had a gun.  And spoiler alert, he did.  They were

1    right to be concerned.

2         So the officers drove to the scene, and they used

3    their cars to box in the car that plaintiff was sitting in.

4    Sergeant Sanchez and Officer Tass, they went to the driver's

5    side.  And Officer Williams and Detective Ravelo went to the

6    passenger side.

7         And if we are talking about the force that was used,

8    this is where Sergeant Sanchez and Officer Tass leave our

9    story.  They told you what they did on-scene.  They went to the

10   driver's side, and while they were arresting the driver, they

11   heard someone yell the word "gun."  So they got the driver

12   secured as quickly as possible.  And then Sergeant Sanchez ran

13   around to see if anyone needed help, but by the time he got

14   there plaintiff was in handcuffs and being picked up off the

15   ground.

16        So on the verdict sheet, when you see the questions,

17   did Sergeant Sanchez use excessive force, did Officer Tass use

18   excessive force, the answers are no, because they didn't use

19   any force at all.

20        OK.  So that leaves us with Detective Williams and

21   Detective Ravelo.  They actually interacted with the plaintiff

22   that day.  The officers acknowledged that they used force.  The

23   question is, was that force intentional and excessive?  Not by

24   accident, not by negligence, which did not happen here.  But

25   plaintiff has to prove that the officers intentionally used

1   excessive force, which they did not.

2            Detective Williams got to the car first, and he opened

3   the door.  He said, Police, don't move.  And what is the first

4   thing that plaintiff did?  He moved.  He reached for a jacket

5   pocket.  So Detective Williams looks down, and what does he see

6   sticking out of that jacket pocket?  This gun.  So he grabs

7   plaintiff's hand, the one reaching for the gun, and he yells

8   "gun" to alert those other officers.

9            Now, Detective Ravelo is right there, and he also saw

10  plaintiff reaching for that jacket pocket.  And as soon as he

11  hears the word gun, Detective Ravelo moves in to try to grab

12  plaintiff as well.  And as he reaches into the car, Detective

13  Ravelo, he told you how his hand hit up against that jacket

14  pocket, and he felt a heavy metal object that he thought was a

15  gun, because it was.

16           Now, the other day counsel questioned Detective Ravelo

17  at length about this object that he felt, and how could he be

18  sure it was a gun?  Members of the jury, you felt that gun for

19  yourselves today.  You felt how heavy and solid it was.  If you

20  feel that, you're not mistaking that for a cell phone or a

21  wallet.  That is a gun.

22           So think about this moment for Detective Williams and

23  Detective Ravelo.  They are both squeezed into this car door

24  opening, trying to reach in and get control over the plaintiff,

25  who is fighting them, pulling away, pulling further into the

1   car where there could be more weapons.  And the whole time

2   there is this loaded gun right there between the officers and

3   the plaintiff.

4           Now, why plaintiff was reaching for that gun we don't

5   know.  And for your deliberations it doesn't matter.  It

6   doesn't matter what plaintiff's intentions were or what was in

7   plaintiff's head.  The judge will instruct you that the police

8   officers can use the amount of force necessary under the

9   circumstances to make an arrest.  They don't have to use the

10  least amount of force possible, although these officers did.

11  It's about whether, given the circumstances, the force was

12  necessary.  And the circumstances here were an individual, who

13  is wanted for armed robbery, who saw them coming to arrest him,

14  and the first thing he did was reach for a loaded weapon.

15          So the officers approach and plaintiff starts

16  reaching.  They have to get plaintiff out of the car.  But

17  plaintiff keeps fighting and keeps resisting.  They struggle

18  with him for 20 to 30 seconds, which here doesn't sound like a

19  very long time, but think about in that tense moment how long

20  that must feel.  Eventually they get plaintiff out of the car,

21  but plaintiff is still struggling so they all three fall to the

22  ground.

23          Plaintiff keeps fighting when they are on the ground.

24  He keeps his hands underneath him.  He is throwing elbows.  He

25  is throwing arms.  He is resisting.  He is trying to stand up.

He told you that he was trying to stand up.  And the whole time

there is still a loaded gun involved.  The officers explained

to you exactly what force they used and why.

Detective Ravelo explained that he used his body

weight to try to pin the plaintiff down so he can gain control

of plaintiff's arm.  They needed to get plaintiff in handcuffs.

And the only way to do that, when someone is resisting, is to

forcefully bring their arm behind their back.

Remember the demonstration that Detective Ravelo did,

when I offered up my unwitting co-counsel.  He showed you that

he puts pressure on the elbow to make the arm bend, and then he

grabs the forearm -- not the hand, not wrist, but the

forearm -- so he can control where the hand goes.

It took another 30 to 40 seconds of fighting with

plaintiff before they are able to cuff him.  But once plaintiff

was in handcuffs, it's over.  Plaintiff was put in a car.  The

gun was secured.  And everyone went back to the precinct.

Members of the jury, that force is not excessive given

the threat that plaintiff posed.  And it bears repeating.

Plaintiff saw police officers approaching and the first thing

he did was reach for a loaded gun.

Now, we have been going beat by beat of this

interaction, but this was anything but slow and methodical.  It

was tense.  It was fast moving.  The whole thing was over in

about a minute.  Detective Williams described it best when he

1   said he had tunnel vision.  Once he saw the gun, that is what

2   he was focused on.  So no, he couldn't tell you whether

3   plaintiff's jacket had a zipper or not.  He was trying to

4   secure a deadly weapon.

5         Counsel may get up here and distract you on these

6   little details or small differences between what the officers

7   might have said.  But members of the jury, who cares?  Look, if

8   everything the officers told you matched precisely down to

9   every last detail, then counsel would probably change tactics

10  and say something like, aha, now they're colluding, getting

11  their stories straight.  Don't let plaintiff distract you from

12  what really matters in this case.  Plaintiff saw the police and

13  reached for a gun.

14        So did these officers use excessive force?  The answer

15  on that verdict sheet is no.

16        But there is another way you can get to know, and that

17  is because the plaintiff has not met his burden.

18        First of all, he told you this fantastical story about

19  being put in a headlock until he passed out, and having a bone

20  sticking out of his hand.  Plaintiff told you he had a

21  fracture, a bone sticking out, he is getting ice packs at the

22  hospital, diagnosed with a concussion.  Even a month after the

23  incident he is on Percocet for his pain.  But the records only

24  showed two injuries:  A fracture in his left hand and a scrape

25  on the back of his right hand.

1      Take a look at those medical records for yourself when

2  you deliberate.  You will have them.  Nowhere in those records

3  does it say punched in the face, concussion, bone sticking out

4  of hand.  If plaintiff really had suffered all those injuries,

5  he probably would have gotten more treatment than just a cast

6  and some ibuprofen which, when you look at the records, that is

7  all he was prescribed on the day of this incident.

8      They are being selective about what they tell you and

9  show you.  Remember, plaintiff's lawyer didn't even show you

10  the medical records himself.  We had to do that.  So if they

11  are being selective, you should be suspicious.  Be suspicious

12  of the blatant lies that plaintiff told you from the stand.

13      For example, pain medication.  Remember, a month after

14  the incident plaintiff went to see a doctor who told him his

15  hand was healed.  Plaintiff told that doctor his pain had

16  resolved.  We pointed that out to plaintiff on the stand.  And

17  what was plaintiff's response to you?  Oh, he said he wasn't in

18  pain that day because he was on painkillers.  That's what it

19  was.  We showed him this document, but directly underneath it

20  there is a section for medication where it says, and I quote,

21  the patient takes no known medication.  So he told you he was

22  on pain meds, but he blatantly lied to you even though the

23  evidence was right in front of his face.

24      Another lie.  Plaintiff's hand was healed after a

25  month.  The X-rays showed that.  But then all of a sudden a

1    year later, plaintiff starts demanding more treatment and

2    physical therapy.  Why?  We looked at these.  The reason he

3    filed these is because plaintiff had decided he was filing this

4    lawsuit and he was creating a paper trail.

5            Look at the objective evidence.  Look at the medical

6    records.  Members of the jury, if someone had picked plaintiff

7    up by his rear-cuffed hands while he was unconscious, he

8    wouldn't have a fracture in his hand.  His shoulders would

9    probably be dislocated.

10           Look at the pictures.  Those are not photos of someone

11   who just suffered that wild beating that plaintiff described.

12   Even plaintiff knows that.  His lawyer asked him to point out

13   what injuries do you see on this picture, and his response was,

14   oh, maybe my jaw is a little swollen.  That's all he said.

15           Plaintiff's actual documented injuries are not

16   consistent with plaintiff's story.  But you know what

17   plaintiff's injuries are consistent with?  What the officers

18   told you happened.  Plaintiff fought, everyone fell to the

19   ground, where plaintiff's hands hit the pavement, causing a

20   fracture in the left hand and a scrape on the right hand.  And

21   that is consistent with the medical records.  And that is not

22   excessive force.

23           Moreover, we can't believe a word that plaintiff said

24   about that day because he told you himself he was impaired.  He

25   said he was impaired.  He thought he was bugging out, tripping.

1    Those were his words.  So even according to plaintiff, you

2    can't trust his version of what happened.

3         So plaintiff needs you to believe that all of these

4    officers are lying to you.  Ask yourselves:  Why would these

5    officers put their entire careers on the line, why would they

6    falsify evidence and lie about where they found this gun?

7    Because in order for plaintiff's story to be true, that's what

8    you have to believe.

9         Members of the jury, don't buy it.  Plaintiff hasn't

10   offered you any evidence as to why the officers would do that

11   because he can't.  Because if he tells you what actually

12   happened, he won't win this lawsuit, and he won't get any

13   money.  So instead we heard this crazy story, about plaintiff

14   being put into a headlock and being beaten into

15   unconsciousness.

16        We heard a story that involved Detective Ravelo

17   sitting in a car with plaintiff, just minutes after this

18   allegedly happened, and saying to the plaintiff, yes, I hurt my

19   hand punching you in the back of the head so hard so I had to

20   use my elbow to continue beating you.  Wow.  How convenient for

21   plaintiff's impending lawsuit that this officer just confessed

22   and detailed exactly what he did.

23        Members of the jury, come on.  As the judge said at

24   the very beginning of this week, you're here in part to use

25   your common sense to determine what happened that day.  Your

1    common sense tells you that just didn't happen.

2         Let me throw in something else here.  Plaintiff

3    testified that he did not resist, that he did not fight.  In

4    his story he is the hapless victim.  We had to impeach him and

5    point out that at a different trial he said he was resisting

6    and he was fighting.  So why didn't he say that here?  He was

7    under oath both times.  He didn't say it here, because if he

8    did, he wouldn't get any money.

9         So yes, we don't know the exact moment that plaintiff

10   was injured in the struggle.  But just because plaintiff was

11   injured does not mean the force was excessive.  If it did, we

12   wouldn't be here; this case would have already been decided.

13   We are not disputing that plaintiff was injured on January 9,

14   but it is plaintiff's burden to prove that it was the

15   intentional actions of these officers that caused that injury,

16   and he has failed to meet that burden.

17        Now, let me talk about the driver really quick because

18   plaintiff's counsel gave him a lot of airtime during this

19   trial.  Plaintiff claims he doesn't know the driver very well,

20   but we know that's not true.  First of all, plaintiff had a

21   nickname for him.  He called him Chargie.  You don't give

22   nicknames to people that don't know very well.  This guy asked

23   plaintiff to sell him marijuana and plaintiff agreed.  They

24   were sitting there smoking together in this small car.  The

25   driver clearly had plaintiff's cell phone number because he

1    called him that day.  And since we had to listen to so much

2    about the driver in this trial, it begs the question, where is

3    he?

4              MR. KNUDSEN:  Objection.

5              THE COURT:  Overruled.

6              MS. RYAN:  Why didn't plaintiff call him as a witness?

7    Probably because he wouldn't support plaintiff's lies.

8              MR. KNUDSEN:  Objection.

9              THE COURT:  Overruled.

10             MS. RYAN:  Think about this for a second.  Two men are

11   sitting in a car together smoking marijuana.  They both get

12   taken out of the car.  They both get arrested.  So why was

13   force used on the plaintiff and not the driver?  Because the

14   driver didn't reach for a loaded gun.

15             They spent hours talking about the basis of the

16   driver's arrest, but you are going to look at this verdict

17   sheet, and you know whose name is not on it?  The driver.

18   Plaintiff's counsel really wanted to convince you that, if the

19   gun was found on plaintiff, then there was no probable cause to

20   arrest the driver.  OK.  Then the driver can file his own

21   lawsuit.  That doesn't make plaintiff entitled to any more

22   money.  The driver has nothing to do with plaintiff's claim for

23   excessive force.  So why did they spend so much time talking

24   about him?  Members of the jury, it's because they're

25   desperate.  They are trying to prove something in order to win

1    this case.

2          I am sure we will hear more about the driver and his

3    arrest paperwork when counsel gets up in a few minutes.  They

4    may ask you not to believe plaintiff's medical records.  Maybe

5    the doctors just didn't write down all the plaintiff's

6    symptoms, and maybe that's why it doesn't say the word

7    concussion.  Maybe the doctor somehow missed the bone sticking

8    out of plaintiff's hand.  Or, because Detective Williams

9    accidentally clicked, was force used, no instead of yes, that

10   must mean there is some sort of conspiracy to cover things up.

11   But this isn't a trial about whether Detective Williams's

12   paperwork was perfect or not.  This is a trial about force.

13   And these are distractions from what actually matters.

14          Did plaintiff meet his burden and prove that these

15   officers used excessive force against him?  The answer to all

16   those questions is no.

17          The final and third way that you can get to no on this

18   verdict sheet is if you find the plaintiff and the defendants

19   are evenly split, and the judge is going to explain this to

20   you.  But plaintiff has the burden of proof.  So if you find

21   the evidence was equally divided 50/50, that means plaintiff

22   hasn't met his burden and you have to answer no.  But when you

23   consider the evidence, this case is not evenly split.  It's not

24   even close.

25          There is one last question on the verdict sheet that I

1    want to mention briefly.  It's something called failure to

2    intervene.  And the only thing I am going to say about that is,

3    you are not even going to get there.  You only have to answer

4    questions about failure to intervene if you find that the

5    officers used excessive force, which they didn't.  So I am not

6    going to waste your time talking about something that doesn't

7    matter.

8          Here is what does matter.  Detective Williams and

9    Detective Ravelo are the only people who touched plaintiff that

10   day.  They both saw or felt a gun in plaintiff's possession,

11   and everyone, including the plaintiff, agrees that plaintiff

12   fought with the officers when they tried to arrest him.  Those

13   are the things that are relevant to your deliberation.

14         On January 9, 2015, plaintiff reached for a loaded

15   gun, this loaded gun, when he saw the police approach him.  He

16   fought, he resisted, and now he wants you to give him money.

17   Don't do it.

18         Thank you.

19         THE COURT:  Mr. Knudsen.

20         MR. KNUDSEN:  Thank you, your Honor.

21         Why all the evasion?  Why all the misdirection?  Why

22   all the falsehoods in the testimony?  If you did nothing wrong,

23   why is it so hard to explain or tell the truth about it?  And I

24   think it was apparent this week that these four defendants

25   tried their best to evade, to misdirect, and just not tell the

1    truth during this trial.  If you did nothing wrong, then why is

2    there the need to do that?

3         If you did nothing wrong, why in the arrest report,

4    the first document drafted, does Officer Williams lie and say

5    no force was used during the arrest?

6         Why wouldn't Sergeant Sanchez admit that the driver

7    was under arrest?  The driver was put in handcuffs; he is

8    brought to the station, logged in in the command log as under

9    arrest, and an arrest report was written.

10        Why wouldn't Officer Ravelo admit he had a hand

11   bruise, despite admitting that he read the record the day

12   before that said he had a hand bruise?

13        And why wouldn't Officer Tass admit that he was there

14   and participated when Officer Williams said he was?

15        So if you did nothing wrong, why do all that?

16        Well, the answer is, it was necessary to do all that

17   to cover it up, because, in fact, you did something wrong.  And

18   that is, they dragged Mr. Allen out of that car, beat him up

19   and fractured his hand.  And for no good reason, because Mr.

20   Allen did not have a gun.

21        Good afternoon.  I want to thank you for your time and

22   patience this week.  As you will recall, my name is John

23   Knudsen, and this is Mr. Carleto Allen.

24        Mr. Allen has brought this claim alleging that the

25   defendants violated his Fourth Amendment rights by using

1    excessive force on him and by failing to stop another officer

2    from using excessive force on him.  The judge is going to go

3    over the specifics of these claims with you, and there will be

4    a verdict sheet that you will be given that will list all the

5    claims.  I am going to go over with you a little bit about what

6    happened this week and what the evidence shows.

7           As I said in my opening, a lot of this case is not

8    disputed.  But, as you learned, a lot of it was.  Mr. Allen was

9    in the car that morning, smoking marijuana with someone, and

10   Officer Williams opens that door, takes the lit marijuana

11   cigarette out of his mouth, and initiates physical force on Mr.

12   Allen.  Mr. Allen is thrown out of the vehicle.  Force is used

13   on him, a use of force that ends with Mr. Allen going to the

14   hospital in an ambulance with a fractured hand.  And

15   defendants, as I said, did not offer a reason this week how

16   that fractured hand happened.

17          How do you evaluate this case?  The defendants are not

18   going to come up and say, yeah, we punched Mr. Allen, we kicked

19   Mr. Allen, we elbowed Mr. Allen, and then we fractured his

20   hand.  That's not how it works.  You have to use your common

21   sense and infer from other actions and evaluate those claims

22   based upon other evidence that has come in.

23          Think about something when evaluating the use of

24   force.  As we said, Officer Williams in the arrest report says

25   that no force is used.  There is a lot of other things in the

1   arrest report that are not accurate as well.  We will go over

2   that a little bit.  But the big point of the defendants is that

3   Mr. Allen had the gun.  It was very impressive pulling out the

4   gun, letting you see the gun, letting you hold the gun.  The

5   question is, did Mr. Allen have the gun, not the gun itself.

6          Defendants argue that they needed to use force on Mr.

7   Allen because he posed a threat because he possessed a gun on

8   his person.  They don't offer any other reason for using force

9   on him.  If you find that they did not establish that Mr. Allen

10  had the gun -- they haven't offered another basis to use force

11  on him -- then there is really no basis to use force on him.

12  And I think the evidence establishes pretty clearly that Mr.

13  Allen did not have the gun that day in the car.  Who really

14  says he had the gun?  What is the defendants' evidence that Mr.

15  Allen had the gun?  It's basically Officer Williams's

16  testimony.

17         I am sure you will recall Officer Ravelo's testimony

18  about the gun.  He was with Williams when the passenger side

19  door of the Honda was opened.  He helped Mr. Williams get out

20  of the car.  He was down on the ground with Mr. Allen.  And he

21  was there when the handcuffs were applied.  He was there for

22  the whole interaction and with Officer Williams the whole time.

23  But what does he say about the gun?  Well, I didn't see the

24  gun.  And I know Mr. Allen did not have the gun outside the

25  car.  That's what Officer Ravelo's testimony was.  Ravelo's

1    whole testimony was that he bumped into something that may or

2    may not have been a gun and the jacket that may or may not have

3    been on Mr. Allen.

4            Tass and Sanchez says they don't see the gun, because

5    they claim they didn't participate in the arrest, something I

6    think has been debunked by Officer Williams's own testimony.

7            Sanchez is the supervising officer at the scene.  When

8    someone is supposedly yelling "gun, gun, gun," does he say he

9    goes over and looks for the gun?  Did he say I asked anyone

10   about the gun?  No.  He denies he spoke to anyone at the scene.

11           As we heard today, the gun was tested after the

12   arrest.  No fingerprints were found on the gun.  DNA swabs were

13   taken.  No DNA match for Mr. Allen.

14           Where was the gun supposedly on Mr. Allen?  In his

15   jacket.  In his jacket that no one can describe.  In his jacket

16   that is not listed on the arrest report in his clothing.  And

17   Mr. Allen says he is not wearing a jacket.

18           As you will recall from the testimony today of Officer

19   Williams, when asked about the arrest report, he says it's a

20   pull-down screen.  The judge asked him, Can you put jacket?

21   Yes.  Did he pick jacket?  No.

22           Then of course -- I mean, defendants charged someone

23   else with possession of the gun.  Long discussion with Sergeant

24   Sanchez about that.  He said, sure, it was fine to arrest both

25   people in the car because the gun was in the vehicle.  I asked

1    where it says you can do that.  And after a bit of evasion, we

2    eventually got that it was from the criminal laws of New York,

3    what is called the penal law.

4        Sergeant Sanchez admitted that he is trained in the

5    penal law and expected to know it as part of his job duties;

6    and, in fact, was issued a copy of the penal laws as part of

7    his job duties.  And I believe he said he carries it with him

8    when he works.  Eventually he agreed that the proper penal law

9    dealt with possession of gun in a car, 265.15 specifically.

10   Then I read him the applicable language, which specifically

11   said that the presence in an automobile of a firearm is

12   presumptive evidence of its possession by all persons in the

13   car, except when the weapon is found upon a person in the car.

14       So they have -- and Sergeant Sanchez admitted that he

15   read the section of the penal law before, and he knew it.  That

16   language obviously indicates that you cannot arrest the driver

17   of the gun for criminal possession of a weapon if it is on Mr.

18   Allen.  And yet that's what they did.

19       MS. RYAN:  Objection.

20       THE COURT:  Overruled.

21       MR. KNUDSEN:  And Sergeant Sanchez was the person, the

22   defendant who wrote in the command log criminal possession of a

23   weapon next to the driver's name.

24       So if you knew that section of the penal law, and you

25   knew you couldn't charge the driver with criminal possession of

1    a weapon, and you bring him into the station and charge him

2    with criminal possession of a weapon, what does that mean to

3    you?  That means that the gun is not on Mr. Allen, that the gun

4    is actually in the back seat like he said.

5         Why the evasion from Sergeant Sanchez?  Why does he

6    refuse to admit that the driver is under arrest?  The driver is

7    put in handcuffs, put in the back of the police vehicle, driven

8    to the precinct.  His name is put in the command log with the

9    word arrest next to it, and then CPW, which is criminal

10   possession of a weapon, and an arrest report is filled out that

11   charges the driver with criminal possession of a weapon.

12        So why does he say they are just investigating?  They

13   are not actually charging the driver with anything.  It seems

14   obvious to me, and I think anyone in this courthouse, that if

15   you're put in handcuffs, brought to the station, and they

16   indicate in the documents that you're under arrest, that you're

17   actually under arrest.

18        Sergeant Sanchez was also asked about speaking with

19   the other officers at the scene after Mr. Allen and the driver

20   were arrested.  He denied speaking with the officers.  He hears

21   "gun, gun, gun."  Doesn't go over to ask where the gun is.  It

22   seems absurd to me.

23             MS. RYAN:  Objection.

24             THE COURT:  Overruled.

25             MR. KNUDSEN:  Who initiated the force here?  Who is

1    the first one to start?  Officer Williams opens the door.  Did

2    he say, put out the marijuana cigarette?  No.  He grabs it out

3    of his hand.  Then just grabs Mr. Allen and pulls him out.  If

4    Mr. Allen did not have the gun on his person, think about this,

5    what is the basis to do that?  Why would you do that?  There

6    would be no reason to do that.  Why would you be able to throw

7    him to the ground and use force on him?  There wouldn't be.  So

8    in the write-up after the arrest Mr. Allen better have that gun

9    on him.

10          Why would Officer Ravelo not tell the truth about his

11   hand bruise?  I am sure you will recall, when I first asked

12   him, he did not remember what it was, maybe a wrist injury or

13   maybe a sprain.  He claimed he did not know.  I asked when he

14   had read the medical report for his hand injury previously.  He

15   said maybe before his deposition.  Would not say it was a hand

16   contusion or a bruise, despite my asking him specifically if it

17   was a hand contusion or a bruise.  Finally, I showed him the

18   medical record.  What does it say?  Hand contusion, which is a

19   bruise.  Then I asked, when did you review this last?

20   Yesterday is what he said.  So if you have nothing to hide, why

21   say that?  Well, he knew that was a problem.  He did not want

22   to say bruise or contusion.  He got the bruise from punching

23   Mr. Allen, as he said.  So hence, the elaborate tap dance up

24   there.

25          And there was some testimony about punching of Mr.

1    Allen.  Previously, Officer Ravelo had never said that Mr.

2    Allen had been punching.  And when he comes into this courtroom

3    he says it.  When I showed him his inconsistent prior testimony

4    on that point, that did not say anything about punching, he

5    pointed to the testimony when Mr. Allen was moving his arms and

6    elbows back and forth.  And he said, well, that's what I meant

7    by punching.  I am pretty sure that a police officer would

8    actually say punching in a document or in testimony if that's

9    what someone was doing.  That happened also when Officer

10   Williams was testifying, when there was no mention of punching,

11   and he said, well, flaring his arms is punching.  If he was

12   punching, why does no one say it?  Officer Williams doesn't put

13   it in the arrest report.  Officer Ravelo doesn't say it

14   happened in his prior testimony.  But now Mr. Allen is

15   punching.

16          Ravelo also did that demonstration with his attorney

17   where they showed you how to hold someone's arm.  Why did they

18   do that?  And what did that say?  I don't think it said much.

19   Did they show you what happened here?  Was his attorney

20   facedown on the floor with people holding his arms up behind

21   his back and applying handcuffs?  Then you can really see how

22   someone's arm is held.  I bet you in that situation it would be

23   a little more obvious as to how someone's hand could get

24   broken.  But that's not what you saw.

25          You heard Officer Tass's testimony yesterday.  What

1   did he say? Well, he tried not to say much. He had no

2   personal knowledge whether Mr. Allen had a gun or resisted

3   arrest. That's what he testified to at least. He said there

4   was some sort of struggle. But then when asked by the judge,

5   he said he really had no personal knowledge about the struggle.

6   He admitted that the arrest report against the driver contained

7   a lot of false information.

8        Tass, while he avoided saying anything of substance on

9   the stand, added this new bit of info, calling for a car with a

10  cage at the scene. I am not sure if he specifically said that

11  it was for Mr. Allen, but it seemed apparent. Of course he

12  testified he didn't see the struggle, had no personal

13  information that Mr. Allen had a gun, or that he resisted

14  arrest, and did not speak with anyone else at the scene. But

15  on his own, he decides he will call for a car with a cage in

16  it. Does he say that Mr. Allen was put in that car with a

17  cage? No. Just that he decided to call for it. It seemed

18  totally made up to me and fabricated to just emphasize that Mr.

19  Allen was some sort of dangerous criminal that needed to be put

20  into a cage.

21       What did Officer Tass specifically say about the

22  arrest of Mr. Allen? He had no recollection whether he had

23  been on the side of the car where Mr. Allen was arrested.

24  That's what I would call a non-denial denial. There was a

25  specific reason why he said that, which was that he knew there

1   was no good answer to the question.  Sergeant Sanchez had

2   already testified that Tass was on the side of the driver, and

3   he knew that Williams was going to say that Tass was with him

4   when he arrested Mr. Allen.  In fact, that's what Officer

5   Williams did say.  So Officer Tass had to have no recollection

6   so he couldn't outwardly contradict either of his defendants.

7          You know he is at the scene of the arrest.  Officer

8   Williams said that Tass was in the car with him.  Officer

9   Williams said that Tass approached the passenger side door with

10  him.  Officer Williams says that Tass, Ravelo and Sanchez

11  assisted in bringing him down to the ground.  All of that is

12  Officer Williams' testimony.  And Officer Ravelo testified that

13  he believed that other officers assisted besides him and

14  Officer Williams in this apprehension.

15         It was brought out during the trial, on examination by

16  defendants' counsel, that Mr. Allen said he sold the driver

17  marijuana.  Defendants asked him about it.  When you think

18  about it, I want you to think about something as well.  Where

19  did it go?  You saw the only voucher for the marijuana.  One

20  lit cigarette.  They said they searched Mr. Allen, they

21  searched the driver, and they searched the car.  No marijuana

22  vouchered outside of the one lit marijuana cigarette.

23  Something smells.  It may not be marijuana, I'll tell you.

24         Let's talk about the arrest report of Mr. Allen,

25  drafted by Officer Williams.  It doesn't really seem to be

1    consistent with what they allege happened.  The arrest report

2    has pull-down tabs.  Two of them about force.  Did you use

3    force, physical force, and did you use force?  Officer Williams

4    testified, yes, you pull it down and you pick yes or no, and he

5    picked no for both of them.

6         There is a dispute in Officer Williams' testimony

7    about whether Mr. Allen was punching or not while he was in the

8    car.  We will talk about that in a little bit.  But when I

9    showed him his arrest report and said, where does it say

10   punching?  Again, not in the arrest report.  I said, you claim

11   the gun is in Mr. Allen's jacket.  Where does it say jacket on

12   the arrest report?  It's not on the arrest report.  Where in

13   the arrest report -- the whole thing is we had to arrest him

14   because he was going for the gun.  Nothing in the arrest report

15   about that.  So the arrest report seems to almost contradict a

16   lot of what Officer Williams said on the stand about what

17   happened.

18        Let's talk about Mr. Allen a little.  He testified

19   yesterday.  A basic argument by the defendants is he is a bad

20   dude.  He had a gun.  He is a criminal.  It's more of an

21   atmosphere that they have created here.  I am not here to vouch

22   for Mr. Allen.  He is not an angel and he has not been a model

23   citizen by any stretch.

24        MS. RYAN:  Objection.

25        THE COURT:  Overruled.

1          MR. KNUDSEN:  But the case is not about that.  Mr.

2     Allen went on the stand and told you what happened to him, even

3     though he is not a angel, he didn't deserve to have his hand

4     broken.

5          As you heard defendants say, he had some

6     inconsistencies in his testimony, and there is no doubt.  Those

7     are valid points and you should consider that.  But think about

8     this.  He has always been consistent with what happened that

9     day.  Starting with the fact that he committed a crime.  He

10    admitted that.  He has never veered away from that, which is

11    the smoking of the marijuana, which is a crime, and it's on the

12    arrest report, and he voluntarily admits to that.

13         You heard about his hand fracture.  He has always been

14    consistent that he was facedown on the street with defendants

15    holding his arms up.  And then he had his hand pain after the

16    defendants had control of his arms and hands to put him in

17    handcuffs.  And of course there is no dispute about his injury,

18    his hand injury.

19         We showed you some pictures taken of Mr. Allen on the

20    day of the incident.  We will say that the pictures on the

21    video seem to obscure some of the detail, where he pointed out

22    that he had jaw swelling and bruising on his face and his

23    broken lip.  Admittedly, not the most dramatic injuries.  But

24    they are consistent with what he said.  And then he showed you

25    the pictures of him in a cast.  Again, consistent with what he

1   said.

2           Also not in dispute, Mr. Allen went to the hospital

3   shortly after the arrest.  Someone from NYPD called saying we

4   have someone complaining of a hand injury.  He was brought to

5   the hospital, where he was X-rayed, diagnosed with a hand

6   fracture, put in a cast and given Percocet.  Defendants argued

7   in summation that it's not in the record, but feel free to take

8   a look at the medical records because it clearly says on the

9   day in question that he did get oxycodone, which is morphine,

10  a/k/a Percocet.

11          MS. RYAN:  Objection.

12          THE COURT:  Sustained.

13          MS. RYAN:  Move to strike.

14          THE COURT:  That will be stricken from the record.

15          MR. KNUDSEN:  We went through some of the medical

16  records.  You saw that the doctors diagnosed him with a

17  fracture.  Defendants, when they brought out the records,

18  didn't point to any of that.  They just pointed to the fact

19  that they said some of those records were inconsistent with his

20  facial bruising and injuries.  Mr. Allen did say he got an ice

21  pack.  It's not something in the records, typically.

22          MS. RYAN:  Objection.

23          THE COURT:  Sustained.

24          MR. KNUDSEN:  They made a point of a couple of times

25  arguing that Mr. Allen had a bone sticking out of his hand.  He

1    explained what that meant.  He explained that the bone was

2    separated and raised.  It's called a displaced fracture.

3              MS. RYAN:  Objection.

4              THE COURT:  Sustained.

5              MR. KNUDSEN:  You can see the records.  It says

6    displaced fracture.

7              Mr. Allen then testified about going back to

8    Montefiore for a follow-up on his hand fracture.  What do those

9    records say?  Mr. Allen has a permanently disfigured hand.  Not

10   a huge, horrible disfigurement, by any stretch, but something

11   he has to deal with for the rest of his life.  He testified he

12   already feels arthritis in his hand.  It stiffens and it hurts

13   when he works out.

14             After Mr. Allen came back to the precinct, he said

15   officers came to speak to him about his injury.  These officers

16   brought Mr. Allen four photo arrays, each photo array contained

17   pictures of one of the four defendants.  Mr. Allen had not

18   spoken with these officers before.  So who told those officers

19   that these four defendants were involved in the use of force?

20   It's an open question, I think something you should think

21   about.

22             Let's talk about what happened today.  There is a huge

23   discrepancy between the testimony of Officer Williams and

24   Officer Ravelo.  Ravelo says that Mr. Allen did not have the

25   gun outside the car.  Officer Williams says it was on Mr. Allen

1    until he was handcuffed.  These are two officers standing next

2    to each other.  Why such different versions?  If Mr. Allen did

3    not have the gun outside the car, as Officer Ravelo testified,

4    why is his hand broken?

5          There was discussion about Mr. Allen resisting in the

6    car.  Officer Ravelo says that Mr. Allen sat in the car and

7    leaned over to the side a bit to try to resist.  Officer

8    Williams yesterday said that he went in and immediately removed

9    Mr. Allen from the car and put him to the ground.  Today

10   Officer Williams says that Mr. Allen was punching and kicking

11   in the car for 15 seconds, and trying to run, and also going

12   for the gun, all at the same time.  Why the change in the

13   testimony?

14         I asked a lot of questions today about the resisting

15   arrest.  Officer Williams said two things repeatedly.  I was

16   trying to secure the firearm and Mr. Allen was going for the

17   gun.  Regardless what question I asked, one of those two

18   statements came out of his mouth, it appeared.  It is obvious

19   he had planned what he was going to say and was not going to be

20   put off by whatever other question I asked him about it.  He

21   didn't remember exactly a lot about what happened, but he said

22   Mr. Allen had the gun, was kicking, was punching, was trying to

23   run, and also going for the gun, all at the same time.

24         I asked Officer Williams about the car search today.

25   He testified today that he had done the search and found

1    nothing in the car.  When I asked him about his testimony in

2    November of 2017, where he flatly denied at all being involved

3    in the search, no explanation is given why that is different.

4    I think you can surmise why it's different.  Because the gun

5    was found in the car and he doesn't want to be involved, so he

6    is avoiding that in his prior thing, and now someone has to say

7    they searched the car, and every time I asked everyone else,

8    everyone claimed ignorance of who actually searched the car.

9         Williams testified about the jacket.  It was a dark

10   jacket.  That's it.  Nothing else.  Couldn't say anything else

11   about it.  And again, not on the arrest report.  That's a key

12   thing, right?  The gun is in the jacket.  Can't describe it.

13   Can't say anything about it.  Not on the arrest report.  Really

14   no evidence about that at all, except for Officer Williams'

15   testimony.  When I asked Officer Ravelo about the jacket, he

16   goes, I'm not sure if it was on Mr. Allen or on his lap.

17   That's a lot different than what Officer Williams is saying.

18        There was discussion about the voided arrest today.

19   Basically, the argument is, well, it doesn't exist, we voided

20   it.  Why are we looking at it?  As I discussed before, that guy

21   was under arrest.  It seemed pretty obvious he was under

22   arrest.  And the reason why the voided arrest is irrelevant to

23   the defendants is because it says criminal possession of a

24   weapon.  They need to avoid any inference that anyone else

25   other than Mr. Allen had the gun.  So that voided arrest, where

1    they wrote he had the gun, really doesn't matter in their

2    opinion.

3            You heard the testimony today from Officer Williams

4    that he had given prior testimony about the driver in November

5    2017.  That he was asked, does he know anything about the

6    driver?  No.  Did he write down the driver's name?  No.  Did

7    the driver do anything illegal?  No.  Was the driver possessing

8    a weapon?  No.  You know at least some of that is totally false

9    because he admits that he wrote down the driver's name on the

10   arrest report and in the pedigree card.

11           I think taking all of that together you can see the

12   purpose of that was to deflect and not admit that they had

13   charged someone else with possession of a weapon.  I think that

14   was calculated testimony.  Officer Williams knew he was going

15   to be giving testimony about the arrest.  And then when I asked

16   him about questions, he would say, oh, I must have been

17   confused, I didn't understand the questions.  And I said, you

18   didn't understand did you write the driver's name down?  He

19   couldn't explain what questions he was confused about.

20           There is a lot of -- not a lot, but there was some

21   testimony from the defendants about Mr. Allen's acting and

22   resisting arrest.  There wasn't that much testimony about it,

23   and it wasn't that specific.  But the point was that Mr. Allen

24   was resisting so we had to use force.  Mr. Allen, under the

25   description of Officer Williams, is acting a bit crazy and

1    moving and doing everything possible.  He is kicking, and he is

2    punching, and he is trying to grab the gun, all at the same

3    time.  Do they say they actually did anything really against

4    him?  No.  They were trying to secure him, whatever that means,

5    and put him in cuffs.  There is no explanation given as to how

6    Mr. Allen suffered a hand fracture.  Nothing that the

7    defendants actually say that they did would cause that.  And I

8    think you should think about that when evaluating the case.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. KNUDSEN:  The arrest report of the driver -- this

2  was the first thing I showed you today.  The first thing I

3  showed you this week was the arrest report of the driver which,

4  as Sergeant Sanchez admitted was -- everything in there was

5  totally wrong and I think that kind of summarized this trial.

6      So what really happened, it's not that complicated,

7  they pulled him out, beat him up, fractured his hand for no

8  reason because he didn't have the gun, but there has been this

9  elaborate attempt to evade what happened.  You know they

10  charged someone else with the gun, evasion on that point.  They

11  had Mr. Allen face down on the ground, putting him in

12  handcuffs, and his hand was fractured deliberately by one or

13  more of the defendants.

14      Talk a little bit about damages.  What damages are

15  appropriate in this case?  That's all that relates that

16  Mr. Allen can get at this point is damages for his pain and

17  suffering.  Think about this, what damages are appropriate when

18  members of the government decide to take justice into their own

19  hands?  How much is a broken hand worth?  How much is it worth

20  when someone deliberately breaks someone's hand, especially

21  under the guise of the government?

22      MS. RYAN:  Objection.

23      THE COURT:  Overruled.

24      MR. KNUDSEN:  Think about this.  He testified he has a

25  permanent disfigurement of his hand.  That's in the medical

1    records themselves.  Consider that when considering what you

2    think it would be appropriate to award in damages.

3            I'm not going to recommend an amount or anything like

4    that.  We have seven jurors here.  You have to use your life

5    experience and your common sense to determine what you think is

6    appropriate for what Mr. Allen had to go through.  I'm not sure

7    any of us can conceive of what happened, what it's like to be

8    in that situation, thrown down forcefully on the street,

9    beaten, and then having your hand deliberately broken.  So you

10   have to use your life experience and your common sense to

11   determine what you think is appropriate.

12           And I also think you should think about what -- well,

13   we are going to talk about punitive damages.  Punitive damages

14   are awarded when someone -- to punish -- I would like to get

15   the exact -- punitive damages, we are asking for punitive

16   damages.  The judge is going to explain to you what punitive

17   damages are in the charge, so I'm not really going to get into

18   it explicitly.  The basic premise is, though, is punishment for

19   egregious conduct and to deter either the defendants or people

20   in a similar position from committing similar acts.  I think

21   this was egregious conduct here, deliberately breaking

22   someone's hand, deliberate and intentional acts.

23           You should also think about the fact that they have

24   continuously tried to avoid.  They drafted documents that are

25   essentially false to support their claim and to cover up what

1    happened, and they have, to this day, not admitted what

2    happened.  I don't think they have shown any remorse about what

3    happened, which would be important to consider, and I think

4    that a lot of the testimony here was false and evasive and an

5    attempt to obfuscate what happened and the truth.

6         So we are asking for punitive damages.  Again, I don't

7    suggest an award, but think about it and compare it to the

8    compensatory damages award and think about whether it should be

9    higher or lower or if it doesn't compare at all.

10        Based upon the evidence, I think it is pretty clear

11   what happened, and therefore we ask that you render a verdict

12   for Mr. Allen.

13        Thank you.

14        THE COURT:  All right.  Mr. Ruocco, would you please

15   distribute to the jury a copy of the jury instructions.

16        MS. RYAN:  Your Honor, is there a copy for counsel?

17   Thank you.

18        THE COURT:  Members of the jury, I will now instruct

19   you as to the law that governs this case.  You have been handed

20   a copy of the instructions I will read.  Please read along with

21   me.  You will be able to take your copy of the instructions

22   into the jury room.

23        You have heard all of the evidence in the case as well

24   as the final arguments of the lawyers.  You have paid careful

25   attention to the evidence, and I am confident that you will act

1   together with fairness and impartiality to reach a just

2   verdict.

3          There are three parts to these instructions.  First,

4   there are general instructions about your role and about how

5   you are to go about deciding the factual issues in this case.

6   I will then instruct you as to the law that applies to the

7   specific claims in this case.  Finally, there are more general

8   instructions about such matters as communications with the

9   court, about deliberations, and about returning a verdict.

10         It is important that you listen carefully.  I am

11  reading these instructions from a prepared text because the law

12  is made up of words that are very carefully chosen.  This is

13  not a time to *ad lib*.  So when I tell you what the law is, it

14  is critical that I use exactly the right words.

15         My duty is to instruct you on the law.  It is your

16  duty to accept these instructions of law and to apply them to

17  the facts as you determine them.  With respect to legal

18  matters, you must take the law as I give it to you.  If any

19  attorney has stated a legal principle different from any that I

20  state to you in my instructions, it is my instructions that you

21  must follow.

22         You are to consider these instructions together as a

23  whole; in other words, you are not to isolate or give undue

24  weight to any particular instruction.  You must not substitute

25  your own notions or opinions of what the law is or what you

1    think it ought to be.

2           As members of the jury, you are the sole and exclusive

3    judges of the facts.  You decide what happened.  You must

4    determine the facts based solely on the evidence received in

5    this trial.  Any opinion I might have regarding the facts is of

6    absolutely no consequence.

7           The personalities and the conduct of counsel in the

8    courtroom are not in any way at issue.  If you formed an

9    opinion of any kind as to any of the lawyers in the case,

10   favorable or unfavorable, whether you approved or disapproved

11   of their behavior as advocates, that should not enter into your

12   deliberations at all.

13          From time to time, the lawyers and I had conferences

14   at the bench and other conferences out of your hearing.  These

15   conferences involved procedural and evidentiary matters and

16   should not enter into your deliberations at all.

17          Lawyers have a duty to object when the other side

18   offers testimony to other evidence that the lawyer believes is

19   not admissible.  It is my job to rule on those objections.  Why

20   an objection was made is not your concern.  You should not draw

21   any inference simply from the fact that a lawyer objects to a

22   question.  If I sustain the objection, you may not consider the

23   testimony or exhibit at issue; if I overruled the objection,

24   you should consider the testimony or exhibit just as you would

25   any other evidence in the case.

1          You must evaluate the evidence calmly and objectively,

2     without prejudice or sympathy.  You must be completely fair and

3     impartial.  Your verdict must be based solely on the evidence

4     presented at this trial, or the lack of evidence.  Our system

5     of justice cannot work unless you reach your verdict through a

6     fair and impartial consideration of the evidence.

7          You may not consider, in deciding the facts of the

8     case, any personal feelings you may have about the race,

9     national origin, sex, or age of any party or witness.  You must

10    regard the parties as of equal standing in the community, and

11    of equal worth.  All parties are entitled to the same fair

12    trial at your hands.  They stand equal before the law and are

13    to be dealt with as equals in this court.

14         The preponderance of the evidence standard applies to

15    all disputed issues in this case.

16         To establish by a preponderance of the evidence means

17    that the evidence of the party having the burden of proof must

18    be more convincing and persuasive to you than the evidence

19    opposed to it.  A preponderance of the evidence means the

20    greater weight of the evidence.  The difference in

21    persuasiveness need not be great: it requires only that you

22    find that the scales tip, however slightly, in favor of the

23    party having the Bureau of Prisons -- that what that party

24    claims is more likely than not true.  If you find that the

25    credible evidence as to a particular issue is evenly divided,

1    then you must find in favor of the party not having the burden

2    of proof.

3              What is important here is the quality and

4    persuasiveness of the evidence relied on by a party, and not

5    the number of witnesses, the number or variety of exhibits that

6    that party introduced, or the length of time that party spent

7    on a particular subject.  In determining whether any fact has

8    been proven by a preponderance of the evidence, you may

9    consider the testimony of the witnesses and the exhibits

10   received in evidence, regardless of which side introduced this

11   evidence.  Simply because I have permitted certain evidence to

12   be introduced does not mean that I have decided that it is

13   important or significant.  That is for you to decide.

14             In determining the facts, you must rely upon your

15   recollection of the evidence.  The evidence in this case

16   includes the testimony of the witnesses and the exhibits

17   received in evidence.

18             As I instructed you at the outset of the trial, you

19   are not to consider questions asked by the lawyers as evidence.

20   It is the witnesses' answers that are evidence, not the

21   questions.  The questions are significant only insofar as they

22   put the answers in context.

23             From time to time, I asked witnesses questions.  You

24   should draw no inference from that.  My questions were only

25   intended for clarification or to expedite matters and were not

intended to suggest any opinion on my part as to whether any

witness was more or less credible than any other witness, or

any view as to what your verdict should be.

        Where I struck or excluded testimony, you may not

consider that testimony in rendering your verdict.

        To constitute evidence, exhibits must first be

received in evidence.  Exhibits marked for identification but

not admitted are not evidence, nor are materials that were used

only to refresh a witness's recollection.

        Arguments by the lawyers are not evidence, because the

lawyers are not witnesses.  What they have said to you in their

opening statements and in their closing arguments may help you

understand the evidence and assist you in reaching a verdict,

but these arguments are not evidence.  Moreover, if your

recollection of the evidence differs from the statements made

by the lawyers in their arguments to you, it is your

recollection that controls.

        Finally, any statements that I may have made during

the trial do not constitute evidence.  Similarly, any

statements or rulings I have made during the trial are not any

indication of my views as to what your decision should be.  The

decision here is for you alone.

        It is for you alone to decide what weight, if any,

should be given to the testimony and the exhibits received in

evidence in this case.

1          Generally, there are two types of evidence that you

2   may consider in reaching your verdict.

3          Direct evidence is testimony by a witness about

4   something he or she knows by virtue of his or her own senses --

5   something seen, felt, touched, or heard.  For example, if a

6   witness were to testify that when he or she left home this

7   morning, it was raining, that would be direct evidence about

8   the weather.  Direct evidence may also be in the form of an

9   exhibit.

10          Circumstantial evidence is evidence from which you may

11   infer the existence of certain facts.  For example, assume that

12   when you came into the courthouse this morning, the sun was

13   shining and it was a nice day.  Assume that the courtroom

14   blinds are drawn and you can't look outside.  As you are

15   sitting here, someone walks in with an umbrella, which is

16   dripping wet.  A few minutes later, another person enters with

17   a wet raincoat.  Now, you can't look outside the courtroom and

18   see whether it is raining.  So you have no direct evidence of

19   that fact.  But based on the facts that I have asked you to

20   assume, you could conclude that it had been raining.

21          That is all there is to circumstantial evidence.  On

22   the basis of reason, experience, and common sense, you infer

23   from one established fact the existence or nonexistence of some

24   other fact.

25          The matter of drawing inferences from facts in

 1    evidence is not a matter of guesswork or speculation.  A proper

 2    inference is a logical, factual conclusion that you might

 3    reasonably draw from other facts that have been proven.  It is

 4    often the case that material facts -- such as what a person was

 5    thinking or intending -- are not easily proven by direct

 6    evidence.  Proof of such matters is often established by

 7    circumstantial evidence.

 8            Circumstantial evidence is of no less value than

 9    direct evidence.

10            You should evaluate the credibility or believability

11    of the witnesses by using your common sense.  Common sense is

12    your greatest asset as a juror.  Ask yourself whether the

13    witness appeared honest, open, and candid.  Did the witness

14    appear evasive or as though he or she was trying to hide

15    something?  How responsive was the witness when questioned by

16    opposing counsel as compared to that witness's responsiveness

17    when questioned by his own lawyer?

18            If you find that any witness lied under oath, you

19    should view the testimony of that witness cautiously and weigh

20    it with great care.  It is for you to decide, however, how much

21    of that witness's testimony, if any, you wish to believe.  Few

22    people recall every detail of every event precisely the same

23    way.  A witness may be inaccurate, contradictory, or even

24    untruthful in some respects and yet entirely believable and

25    truthful in other respects.  It is for you to determine whether

1  such inconsistencies are significant or inconsequential and

2  whether to accept or reject all, or to accept some and reject

3  the balance of, that witness's testimony.

4          In sum, it is up to you to decide whether a witness's

5  testimony is truthful and accurate, in part, in whole, or not

6  at all, as well as what weight, if any, to give to that

7  witness's testimony.

8          In evaluating the testimony of any witness, you may

9  consider, among other things:

10          The witness's intelligence;

11          The ability and opportunity the witness had to see,

12  hear, or know the things that the witness testified about;

13          The witness's memory;

14          Any interest, bias, or prejudice the witness may have;

15          The manner of the witness while testifying; and

16          The reasonableness of the witness's testimony in light

17  of all of the evidence in the case, including testimony from

18  other witnesses and the exhibits that have been received in

19  evidence.

20          You have heard evidence that at some earlier time,

21  witnesses have said or done something that counsel argues is

22  inconsistent with their trial testimony.

23          Evidence of prior allegedly inconsistent statements

24  was introduced to help you decide whether to believe the trial

25  testimony of a witness.  If you find that a witness made an

earlier statement that conflicts with the witness's trial

testimony, you may consider that fact in deciding how much of

the witness's trial testimony, if any, to believe.

In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake; whether the inconsistency concerns an

important fact, or whether it had to do with an insignificant

detail; whether the witness had an explanation for the

inconsistency, and whether that explanation accords with your

common sense.

It is exclusively your decision, based upon all of the

evidence and your own good judgment, whether the prior

statement was inconsistent, and if so how much weight, if any,

to give to the inconsistent statement in determining whether to

believe all, part of, or none of that witness's testimony.

In deciding whether to believe a witness, you should

consider any evidence that the witness is biased in favor of,

or against, one side or the other.  Likewise, you should

consider evidence of any interest or motive that the witness

may have in cooperating with one side or the other.  You should

also take into account any evidence that a witness may benefit

in some way from the outcome of the case.

It is your duty to consider whether any witness has

permitted bias or interest to color his testimony.  If so, you

should view that witness's testimony with caution, weigh it

1  with great care, and subject it to close and searching

2  scrutiny.

3       Of course, the mere fact that a witness has an

4  interest in the outcome of this case does not mean that the

5  witness has not told the truth.  It is for you to decide from

6  your own observations and applying your common sense and life

7  experience whether the possible interest of any witness has

8  intentionally or otherwise colored or distorted that witness's

9  testimony.  You are not required to disbelieve a witness with

10 an interest in the outcome of this case; you may accept as much

11 of that witness's testimony as you deem reliable and reject as

12 much as you deem unworthy of acceptance.

13       I will now turn to the law that governs the specific

14 claims in this case.

15       As you know, the plaintiff in this case is Carleto

16 Allen.

17       The defendants are Detective Jeremiah Williams,

18 Detective Brandon Ravelo, Sergeant Miguel Sanchez, and Officer

19 Jozsef Tass of the New York City Police Department.

20       All of the parties are entitled to the same

21 consideration by you.  The fact that a defendant is or was a

22 police officer does not mean that he is entitled to any greater

23 or lesser consideration by you.  Again, all parties stand equal

24 before the law.

25       You will be asked to render a separate verdict as to

1   each defendant.  Accordingly, you must consider separately, as

2   to each defendant, whether Mr. Allen has proven each element of

3   his claim by a preponderance of the evidence.  Each defendant

4   is entitled to have his case determined from evidence as to his

5   own acts, statements, and conduct, and any other evidence in

6   the case which may be applicable to him.

7          Mr. Allen's claims are brought under a federal civil

8   rights statute, Title 42, United States Code, Section 1983.

9   Briefly stated, Section 1983 provides a remedy for individuals

10  who have been deprived of their constitutional rights by a

11  person acting under color of state law.

12         Mr. Allen has brought the following claims under

13  Section 1983:

14         1.  An excessive force claim against all four

15  defendants; and

16         2.  A failure to intervene claim against Sergeant

17  Miguel Sanchez and Officer Jozsef Tass.

18         The defendants each deny Mr. Allen's claims.

19         I will now instruct you as to the law that is

20  applicable to Mr. Allen's Section 1983 claims.

21         Section 1983 states that "every person who, under

22  color of any statute, ordinance, regulation, custom, or usage,

23  of any State . . ., subjects, or causes to be subjected, any

24  citizen of the United States . . . to the deprivation of any

25  rights, privileges, or immunities secured by the Constitution

1  and laws, shall be liable to the party injured . . .."

2         To establish a Section 1983 claim, the plaintiff must

3  prove, by a preponderance of the evidence, each of the

4  following three elements:

5         First, that the acts as alleged by plaintiff were

6  committed by a defendant acting under color of state law;

7         Second, that in committing these acts, the defendant

8  intentionally or recklessly deprived the plaintiff of a right

9  secured by the Constitution or laws of the United States; and

10        Third, that the defendant's acts were the proximate

11  cause of injuries sustained by the plaintiff.

12        I will now discuss each of these three elements in

13  detail.

14        The first element of a Section 1983 claim is that the

15  conduct complained of was committed by a defendant acting under

16  color of state law.  Here, there is no dispute that each

17  defendant was acting under color of state law.  Accordingly,

18  this element has been proven.

19        The second element of a Section 1983 claim is that the

20  defendant you are considering, in committing the conduct

21  complained of, intentionally or recklessly deprived the

22  plaintiff of a federal right.  In order for Mr. Allen to

23  establish this element, he must show that the conduct you found

24  each defendant engaged in under color of state law caused

25  Mr. Allen to suffer the loss of a federal right, and that,

1    while engaged in that conduct, the defendant acted with an

2    intent to deprive Mr. Allen of his rights or with a reckless

3    disregard for the law.

4           An act is intentional if it is done voluntarily and

5    deliberately and not because of a mistake, accident,

6    negligence, or other innocent reason.  Intent can be proven

7    directly or by reasonable inference from circumstantial

8    evidence.

9           An act is reckless if it is done in conscious

10   disregard of its known probable consequences.  In other words,

11   even if a defendant did not intentionally seek to deprive

12   plaintiff of his rights, if he nevertheless purposely

13   disregarded the high probability that his actions would deprive

14   plaintiff of his rights, then the state of mind element would

15   be satisfied.

16          In determining whether a person acted intentionally or

17   recklessly, you should remember that there is no way of looking

18   into a person's mind.  You must look to what was done, what the

19   people involved said was in their minds, and your evaluation of

20   all the testimony and other evidence concerning this issue.

21          Additionally, in order for a plaintiff to prevail on a

22   Section 1983 claim, there must be some evidence of personal

23   involvement by a defendant.  Personal involvement may be shown

24   through evidence of direct participation, that is, personal

25   participation by one who has knowledge of the facts that

1    rendered the conduct illegal, or indirect participation, such

2    as ordering or helping others commit the unlawful acts.

3         As I mentioned a moment ago, Mr. Allen asserts that he

4    was deprived of his constitutional rights in two ways.  You

5    will consider each claim separately and determine whether

6    Mr. Allen has proven the elements of each claim.  I will now

7    discuss both claims in detail.

8         Mr. Allen claims that each defendant used excessive

9    force against him on January 9, 2015.

10        The Fourth Amendment to the United States Constitution

11   protects persons from being subjected to excessive force.

12   While a law enforcement official may use force to make an

13   arrest, the officer may only employ that amount of force which

14   is reasonably necessary under the circumstances.  The use of

15   excessive force is impermissible even during an otherwise

16   lawful arrest.

17        To show that excessive force was used, Mr. Allen must

18   show that any force used was objectively unreasonable in light

19   of the facts and circumstances confronting each defendant at

20   the time, without regard to that defendant's underlying

21   intentions or motivation.  In other words, you must determine

22   whether the amount of force was that which a reasonable officer

23   would have employed under similar circumstances.

24        In making this determination, you should take into

25   account the totality of the circumstances.  You should not make

1    this determination, however, by considering how the facts

2    appear when assessed with 20/20 hindsight.  Police officers

3    often must make quick judgments in uncertain situations about

4    the amount of force that is necessary.

5            When officers are effectuating an arrest, not every

6    push or shove by a police officer constitutes excessive force,

7    even though the force used may later seem unnecessary in the

8    peace and quiet of a courtroom.  Moreover, the issue is not

9    whether the least amount of force was used but rather whether

10   the force that was used was reasonable.  You should also be

11   aware that a police officer can have reasonable, but mistaken,

12   beliefs as to the facts and circumstances justifying the use of

13   force and will not be liable so long as his actions are

14   objectively reasonable in light of all the facts and

15   circumstances at the time force was used, as the officer

16   reasonably believed them to be.

17           The extent of the injury suffered is one factor to be

18   considered when determining whether the use of force was

19   excessive, but it is not dispositive.  Just as reasonable force

20   is not unconstitutional even if it causes injury, neither does

21   unreasonable force become immunized from challenge because it

22   causes only minor injury.

23           If you find that Mr. Allen has proven by a

24   preponderance of the evidence that one or more of the

25   defendants used a greater amount of force than a reasonable

1    officer would have employed, then Mr. Allen will have

2    established the loss of a federal constitutional right.

3         Mr. Allen has also brought a Section 1983 failure to

4    intervene claim against Sergeant Miguel Sanchez and Officer

5    Jozsef Tass.  All police officers have an affirmative duty to

6    intervene to protect the constitutional rights of individuals

7    from infringement by other police officers in their presence.

8    This means that if a police officer witnesses another officer

9    using excessive force in effecting an arrest, the first officer

10   has an affirmative duty to stop the constitutional violation,

11   even if he is not directly involved in the use of excessive

12   force in effectuating the arrest.  The first officer's failure

13   to do so would make him liable for the preventable harm

14   proximately caused by the other officer's use of excessive

15   force.

16        In order for a plaintiff to prevail on a failure to

17   intervene claim, he must show that excessive force was used.

18   If excessive force was not proven, a plaintiff has not suffered

19   a preventable violation of his constitutional rights, and you

20   must find for defendants Sanchez and Tass on plaintiff's

21   failure to intervene claim.

22        Moreover, an officer can only be held liable for

23   preventable harm caused by the actions of other officers if

24   there was a realistic opportunity to prevent the harm from

25   occurring.  Accordingly, if you find that the defendant you are

1    considering did not have sufficient time to intervene on

2    Mr. Allen's behalf, or if he was incapable of intervening

3    because he was otherwise engaged, then you should not hold that

4    police officer liable for failing to intervene.

5         If Mr. Allen has proven that a defendant acting under

6    color of state law recklessly or intentionally deprived him of

7    a constitutional right, or that a defendant failed to intervene

8    to prevent the deprivation of Mr. Allen's constitutional

9    rights, the final element of a Section 1983 claim that

10   plaintiff must prove is that the defendant you are considering

11   proximately caused injuries that Mr. Allen has proven he

12   sustained.  Proximate cause means that there must be a

13   sufficient causal connection between the act of the defendant

14   you are considering and any injury or damages sustained by

15   plaintiff.  An act or omission is a proximate cause if it was a

16   substantial factor in bringing about or actually causing

17   injury, that is, if the injury or damage was a reasonably

18   foreseeable consequence of that defendant's act.

19        A proximate cause need not always be the nearest cause

20   either in time or space.  In addition, there may be more than

21   one proximate cause of an injury or damage.  Many factors or

22   the conduct of two or more people may operate at the same time,

23   either independently or together, to cause an injury.

24        A defendant is not liable if Mr. Allen's injuries were

25   caused by a new or independent source that intervenes between

the defendant's acts or omissions and Mr. Allen's injuries,

however.  A defendant is also not liable if Mr. Allen's

injuries were caused by a third person and the defendant's acts

or omissions were not a substantial factor in bringing about or

causing the injury.

I will now instruct on damages.  You should not infer

that Mr. Allen is entitled to recover damages merely because I

am instructing you on damages.  It is exclusively your function

to decide liability, and I am instructing you on damages only

so that you will have guidance should you decide that Mr. Allen

is entitled to a recovery.  If you return a verdict in favor of

Mr. Allen on liability according to the standards I have just

set forth, then you must consider the issue of damages.  If you

do not return a verdict for Mr. Allen on any of his claims,

then you need not consider damages.

If you find that Mr. Allen has proven one or more of

his claims by a preponderance of the evidence, then you must

determine an amount that is fair compensation for Mr. Allen's

injuries.  This type of damages is known as "compensatory

damages."  You may award compensatory damages only for injuries

that Mr. Allen proves were caused by a defendant's wrongful

conduct.  The damages that you award must be fair

compensation -- no more and no less -- for the loss, if any,

which resulted from a defendant's wrongful conduct.  The

purpose of the law is to make Mr. Allen whole -- to put him in

the same position that he would have been in had there been no

violation of his rights.  The purpose of such an award of

damages is not to punish a defendant.

You should not award compensatory damages for

speculative injuries, but only for those injuries that

Mr. Allen has actually suffered, or which he is reasonably

likely to suffer in the future.  You may award Mr. Allen such

amount you find is fair and just compensation for any physical

injury or pain and suffering caused by a defendant's

misconduct.

You may not award Mr. Allen damages for an injury that

existed prior to the incidents at issue, or for injuries, pain,

or suffering caused by factors other than the unlawful conduct

of a defendant.

In determining the appropriate amount of compensatory

damages, you should be guided by dispassionate common sense.

You must use sound discretion in fixing an award of damages,

drawing reasonable inferences from the facts in evidence.  You

may not award damages based on sympathy, speculation, or

guesswork.  On the other hand, the law does not require that

Mr. Allen prove the amount of his losses with mathematical

precision, but only with as much definiteness and accuracy as

the circumstances permit.  No evidence of the monetary value of

such intangible things as pain and suffering need be introduced

into evidence.

1        If you return a verdict in Mr. Allen's favor on one or

2    more of his claims but find that Mr. Allen has failed to prove

3    any amount of compensatory damages, you must award Mr. Allen

4    "nominal damages."  Nominal damages are awarded as a

5    recognition that a plaintiff's rights have been violated, even

6    if he suffered no actual injury.

7        You may not award both nominal and actual damages to

8    Mr. Allen; either he suffered actual damages, in which case you

9    must award him actual damages, or else he did not, in which

10   case you may award nominal damages.  Nominal damages may only

11   be awarded for a token sum, up to $1.00.

12       Mr. Allen also seeks an award of punitive damages.  If

13   you find that Mr. Allen has proven by a preponderance of the

14   evidence that a defendant is liable, then you must decide

15   whether to award Mr. Allen punitive damages.  Mr. Allen also

16   bears the burden of proof as to punitive damages, and he must

17   demonstrate by a preponderance of the evidence that punitive

18   damages are appropriate here.

19       The fact that I am giving you instructions on punitive

20   damages should not be considered an indication of any view on

21   my part as to what your verdict should be or as to whether

22   punitive damages should be awarded.  It is entirely up to you

23   to decide whether or not punitive damages should be awarded in

24   this case.

25       You may award punitive damages if you believe that a

1  defendant should be punished for conduct that was motivated by

2  an evil motive or intent, or that involved callous disregard or

3  reckless indifference to Mr. Allen's rights.

4        Mr. Allen is not entitled to punitive damages as a

5  matter of right.  You must make a judgment about a defendant's

6  conduct.  To make that judgment, it is important to keep in

7  mind the reasons for awarding punitive damages: to punish a

8  defendant for malicious conduct against a plaintiff or callous

9  disregard for or reckless indifference to a plaintiff's rights,

10  and to deter the defendant or others like the defendant from

11  engaging in similar conduct.  Thus, you should consider whether

12  the award of punitive damages will accomplish this dual purpose

13  of punishment and deterrence.

14        Ladies and gentlemen of the jury, that concludes my

15  instructions to you concerning the specific claims in this

16  case.  You will soon retire to the jury room and begin your

17  deliberations.  All of the documentary exhibits that were

18  admitted into evidence during the trial will be sent in to the

19  jury room.  If you want any of the testimony, you may request

20  that.  If you wish to examine the firearm that is in evidence,

21  that will be made available to you here in the courtroom.

22  Please remember that it is not always easy to locate what you

23  might want, so be as specific as you possibly can be in

24  requesting exhibits or portions of testimony.

25        If you want any further explanation of the law as I

1  have explained it to you, you may also request that.  As I

2  noted earlier, however, you will each be permitted to take your

3  copy of the instructions into the jury room.

4      Any communication to me should be made in writing,

5  signed by your foreperson, include the date and time, and be

6  given to one of the marshals.  Please make any notes as clear

7  and precise as possible.  Do not tell me or anyone else how the

8  jury stands on any issue until after a unanimous verdict is

9  reached.

10     It is your duty as jurors to consult with one another

11  and to deliberate with a view to reaching an agreement.  Each

12  of you must decide the case for himself or herself, but you

13  should do so only after a consideration of the case with your

14  fellow jurors, and you should not hesitate to change an opinion

15  when convinced that it is erroneous.  Discuss and weigh your

16  respective opinions dispassionately, without regard to

17  sympathy, without regard to prejudice or favor for either side,

18  and adopt that conclusion which in your good conscious appears

19  to be most in accordance with the truth.

20     Your verdict must be unanimous, but you are not bound

21  to surrender your honest convictions concerning the effect or

22  weight of the evidence for the mere purpose of returning a

23  verdict or solely because of the opinion of other jurors.  Each

24  of you must make your own decision about the proper outcome of

25  this case based on your consideration of the evidence and your

1    discussions with your fellow jurors.  No juror should surrender

2    his or her conscientious beliefs solely for the purpose of

3    returning an unanimous verdict.

4         If you are divided, do not report how the vote stands;

5    and if you have reached a verdict, do not report what it is

6    until you are asked in open court.

7         Your verdict will be organized according to a verdict

8    form.  This form will assist you in reaching a verdict and

9    lists the questions you must answer based on the instructions

10   that I have given.

11        Finally, I referred a moment ago to a foreperson.  It

12   is customary for Juror No. 1 to serve as the foreperson, and

13   that is what we will do here.  The foreperson doesn't have any

14   more power or authority than any other juror, and his vote or

15   opinion doesn't count for any more than any other juror's vote

16   or opinion.  The foreperson is merely your spokesperson to the

17   court.  He will send out any notes, and when the jury has

18   reached a verdict, he will notify the marshal that the jury has

19   reached a verdict, and you will come into open court and you

20   will deliver your verdict.

21        After you have reached a verdict, your foreperson will

22   fill in the form that has been given to you, sign and date it,

23   and advise the marshal outside your door that you are ready to

24   return to the courtroom.

25        Each of you must be in agreement with the verdict that

1    is announced in court.  Once your verdict is announced by your

2    foreperson in open court and officially recorded, it cannot

3    ordinarily be revoked.

4           Members of the jury, that concludes my instructions to

5    you.  I will ask you to remain seated for just a moment while I

6    confer with the attorneys to see if there are any additional

7    instructions that they would like me to give.

8           I will see counsel at sidebar.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  All right, are there any additional

3    instructions you wish me to give the jury?

4          MR. KNUDSEN:  One thing on the verdict sheet.  Two

5    things, actually.  One thing, will special interrogatories be

6    on the verdict sheet?  And I don't know if there should be any

7    anything in the instructions or not.

8          THE COURT:  I don't think so.

9          MR. KNUDSEN:  All right.

10          And the second point, I wanted to know the basis

11    for -- I objected when they said, essentially, that -- where is

12    the driver?

13          THE COURT:  Right.

14          MR. KNUDSEN:  And you overruled my objection.  I think

15    it may be appropriate, a missing witness charge.  I don't want

16    the jury to be -- to imply that it was Mr. Allen's

17    responsibility or he somehow had a duty to produce someone at

18    this trial that -- and that was the basis of my objection.

19          THE COURT:  Well, it is your burden to prove your

20    case.  You didn't call the driver as a witness, so why wasn't

21    that an appropriate argument?  He does have a burden to prove

22    his case actually, and the driver, as it turned out, figures

23    quite prominently in the case, largely because of your

24    examination about what happened with him and what he was

25    charged with, etc., etc.  So why wasn't it an appropriate

1    argument to point out that you didn't actually choose to call

2    the driver?

3         MR. KNUDSEN:  I think the implication being that it

4    was his -- if anyone had to call the driver, it was Mr. Allen.

5    I think that was my --

6         THE COURT:  No, I think the implication is actually

7    what was said, which was that he didn't call the driver, and it

8    is hard to disagree with that.

9         MR. KNUDSEN:  Okay.

10        THE COURT:  Now, you could have said, well, they

11   didn't call the driver either.  I mean, that would have been

12   fair.

13        MR. KNUDSEN:  Yeah, that's typically -- why I object

14   is because any time they say anything like that, the objection

15   comes out that, you know, neither side is under a duty to call

16   anyone.

17        THE COURT:  I mean, well, that's not exactly true,

18   actually.  In a criminal case, you have to be very careful that

19   defendants obviously don't have an obligation to do anything.

20   But in a civil case, where a plaintiff does have a burden of

21   proof, and where there is a witness who figures prominently, I

22   think it's fair game for either side to point out that they

23   weren't called.

24        Because you focused so much on the driver, I think it

25   did raise an obvious question, well, if he is so important why

j4a2all6          Charge

1    isn't he here?  But you could have made the same argument to

2    them and you got the last word, so you could have pointed that

3    out.

4              MR. KNUDSEN:  All right.  I appreciate the

5    explanation, then.  Okay.  Thank you, your Honor.

6              THE COURT:  Okay.

7              MS. RYAN:  Nothing from us, your Honor.

8              THE COURT:  So what I want to do is, I want to tell

9    them we will keep you here until 5:00.  If you want to stay

10   later, send out a note and we will stay later, but it is up to

11   you.  If you want to leave at 5:00, send out a note tell us you

12   want to leave at 5:00.  We will bring you out and send you

13   home.  Okay?

14             MS. RYAN:  Okay.

15             MR. KNUDSEN:  Sounds good.  Thank you, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

j4a2all6

1          (In open court)

2          THE COURT:  All right, ladies and gentlemen, in just a

3   moment you will be sent out to the jury room.  The time now is

4   about 20 past 4.  We will stay here as late as you want to stay

5   tonight.  If you want to leave at 5:00, send out a note saying,

6   We want to go home at 5:00.  If you want to stay later, that's

7   fine, too.  We are in your hands.

8          Mr. Ruocco, would you please swear in the marshal.

9          (Marshal sworn)

10         THE COURT:  All right, ladies and gentlemen, you may

11  now begin your deliberations.

12         THE DEPUTY CLERK:  All rise.

13         (Jury retires to deliberate; time noted 4:20 p.m.)

14         THE COURT:  Please be seated.

15         All right.  I want the parties to quickly pull

16  together the exhibits that were received in evidence so that we

17  can send them in to the jury room.

18         MR. KNUDSEN:  I believe I have most of the originals.

19         THE COURT:  And then of course we will send back a

20  copy of the verdict sheet.

21         (Pause)

22         THE COURT:  All right, can the lawyers compare the

23  exhibits to make sure there are no disputes about what should

24  go back?

25         MS. RYAN:  Yes, your Honor.

1            (Pause)

2            THE DEPUTY CLERK:  Your Honor, I am bringing them in.

3            THE COURT:  All right.  All right.  You are welcome to

4    remain in the courtroom while the jury deliberates.  You are

5    also welcome to go to some other convenient location as long as

6    we can reach you immediately.  It is entirely up to you.  All

7    right?

8            MS. RYAN:  Thank you.

9            (Recess pending verdict)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  The jury has reached a verdict.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J4a2all6

1          (Jury present; time noted: 5:15 p.m.)

2          THE COURT:  Mr. Foreperson, has the jury reached a

3    verdict?

4          THE FOREPERSON:  Yes.

5          THE COURT:  As to Question No. 1 concerning excessive

6    force under Section 1983 liability, first question, has Carleto

7    Allen proven, by a preponderance of the evidence, his Section

8    1983 excessive force claim against Detective Jeremiah Williams?

9    Yes or no.

10         THE FOREPERSON:  No.

11         THE COURT:  Question No. 2.  Has Carleto Allen proven,

12   by a preponderance of the evidence, his Section 1983 excessive

13   force claim against Detective Brandon Ravelo?  Yes or no?

14         THE FOREPERSON:  No.

15         THE COURT:  Question No. 3.  Has Carleto Allen proven,

16   by a preponderance of the evidence, his Section 1983 excessive

17   force claim against Sergeant Miguel Sanchez?  Yes or no.

18         THE FOREPERSON:  No.

19         THE COURT:  Has Carleto Allen proven, by a

20   preponderance of the evidence, his Section 1983 excessive force

21   claim against Officer Jozsef Tass?  Yes or no.

22         THE FOREPERSON:  No.

23         THE COURT:  Now, the instructions say that if you

24   answered no to all of questions 1 through 4, your deliberations

25   were at an end, but did you go on to answer 5 and 6?

1          THE FOREPERSON:  Yes.

2          THE COURT:  So with respect to Section 1983, failure

3    to intervene, Question No. 5, has Carleto Allen proven, by a

4    preponderance of the evidence, his Section 1983 failure to

5    intervene claim against Sergeant Miguel Sanchez?  Yes or no.

6          THE FOREPERSON:  No.

7          THE COURT:  No. 6, has Carleto Allen proven, by a

8    preponderance of the evidence, his Section 1983 failure to

9    intervene claim against Officer Jozsef Tass?  Yes or no.

10          THE FOREPERSON:  No.

11          THE COURT:  Mr. Ruocco, would you please poll the

12    jury.

13          THE DEPUTY CLERK:  Yes, your Honor.

14          Juror No. 1, John Chan, is that your verdict?

15          JUROR:  Yes.

16          THE DEPUTY CLERK:  Juror No. 2, Faith Bowen, is that

17    your verdict?

18          JUROR:  Yes.

19          THE DEPUTY CLERK:  Juror No. 4, Christopher Andrianos,

20    is that your verdict?

21          JUROR:  Yes.

22          THE DEPUTY CLERK:  Juror No. 5, Angela Ginty, is that

23    your verdict?

24          JUROR:  Yes.

25          THE DEPUTY CLERK:  Juror No. 6, Ivette Agosto, is that

J4a2all6

1   your verdict?

2              JUROR:  Yes.

3              THE DEPUTY CLERK:  Juror No. 7, Kelly Bit, is that

4   your verdict?

5              JUROR:  Yes.

6              THE DEPUTY CLERK:  Juror No. 8, Barbara Welsh, is that

7   your verdict?

8              JUROR:  Yes.

9              THE DEPUTY CLERK:  Jurors polled; verdict unanimous.

10             THE COURT:  All right, ladies and gentlemen, I want to

11  thank you very much for your service.  It was a short trial,

12  even a little shorter than I told you it might be, but

13  nonetheless an important case.  The care with which you went

14  about your duties and the close attention you paid to the

15  evidence was obvious to everyone here in the courtroom, and so

16  we thank you for your service.

17             I hope you found your jury service important and

18  enjoyable, and that the next time you get a jury notice, maybe

19  you will look at it a little differently than you did this

20  time.  That's my hope.

21             As I told you when we selected a jury, it is my belief

22  that jury service is one of the most important responsibilities

23  of an American citizen.  It is something that we need to value

24  very highly in this country.  And so I would like to thank each

25  of you.  I wish you Godspeed, and you are discharged.

1           Thank you all very much.

2           JURORS:  Thank you.

3           (Jury dismissed)

4           THE COURT:  Please be seated.

5           Are there any applications?  All right then.  We are

6    adjourned.

7           MS. RYAN:  Thank you.

8           MR. MANNINGHAM:  Thank you, your Honor.

9                                   - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

 JEREMIAH WILLIAMS

Direct By Mr. Knudsen  . . . . . . . . . . . 341

Cross By Mr. Manningham  . . . . . . . . . . 367

Redirect By Mr. Knudsen  . . . . . . . . . . 374

Recross By Mr. Manningham  . . . . . . . . . 398


                    PLAINTIFF EXHIBITS

Exhibit No.                               Received

 19   . . . . . . . . . . . . . . . . . . . 347

 20   . . . . . . . . . . . . . . . . . . . 349


                    DEFENDANT EXHIBITS

Exhibit No.                               Received

 A   . . . . . . . . . . . . . . . . . . . 371